UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ADRIENNE SOUTHGATE :
*Plaintiff,* :
:
vs. : C.A. No. 06-500 ML
:
VERMONT MUTUAL :
INSURANCE COMPANY, :
*Defendant*. :

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION TO COMPEL DEPOSITION TESTIMONY AND FOR ATTORNEYS' FEES**

Plaintiff, ADRIENNE SOUTHGATE ("Southgate"), submits the following Memorandum in support of her Motion to Compel Deposition Testimony from deponent Jeffrey Gorman ("Gorman") - an adjuster hired by defendant VERMONT MUTUAL INSURANCE COMPANY ("Vermont Mutual") to investigate certain property damage sustained by Southgate at her residence and to make recommendations as to available coverage under a homeowners policy that had been issued to Southgate by Vermont Mutual - and for attorneys' fees pursuant to Fed. R. Civ. P. 37(a)(2)(B) and 37(a)(4)(A). (A copy of Gorman's May 10, 2007 deposition transcript is attached hereto in its entirety as Exhibit A (the "Gorman Depo.")).

## II. Facts

This is an action for breach of contract and bad faith stemming from defendant Vermont Mutual's refusal to pay Southgate's valid claim under her homeowner's insurance policy covering premises she owns at 22 Rosedale Avenue in Barrington, Rhode Island (the "Premises"). (A copy of the Policy is attached as Exhibit 2 to the Gorman Depo., which, as noted, is attached as Exhibit A).

On or about August 31, 2006 Southgate discovered certain mold damage at the Premises when it was called to her attention by a laborer whom she had engaged to replace certain wall-to-wall carpeting in the Premises. See First Amended Verified Complaint (the “Complaint”), ¶ 5 at 2. Southgate promptly informed Vermont Mutual of the mold damage and made a claim for its remediation and for the loss of use of the Premises. Southgate also made the Premises available for inspection by Vermont Mutual and on or about September 6, 2006, Gorman, an employee of a local insurance adjusting firm retained by Vermont Mutual - Pelletier & Rourke, Inc. - inspected the Premises, questioned Southgate and took photographs of the Premises and the mold damage. See id., ¶ 6 at 2.

On or about September 7, 2006, Gorman sent a so-called “First Report” to Vermont Mutual wherein he concluded, among other things, that: “The water damage appears to relate to the seepage of surface **and/or** subsurface water which has been occurring over a period of time.” See Exhibit 3 to the Gorman Depo. at 2 (emphasis added). Gorman also provided Vermont Mutual with his opinion that there was no coverage available under the Policy, see Gorman Depo. at 52, and included a proposed declination letter which quoted: (1) a so-called mold endorsement to the Policy; and (2) certain other Policy language pertaining to water exclusions. See Gorman Depo. at 51-52, Exhibit 3 attached thereto at 5-10.

The so-called mold endorsement to the Policy which was quoted by Gorman provided, in pertinent part, that the policy does not cover various types of damage caused from water leakage “***unless”***:

> such seepage or leakage of water or the pressure or condensation of humidity, moisture or vapor and the resulting damage is unknown to all ‘insureds’ and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

See Exhibit 2 to the Gorman Depo. at 30, Limited Fungi, Wet or Dry Rot or Bacteria Coverage Endorsement (HO 04-32 05 02) at page 2, adding ¶ 2.e.(9) to Section I, Perils Insured Against (hereinafter, the "Mold Endorsement").

On the other hand, the water exclusion language quoted by Gorman in the declination letter he prepared for Vermont Mutual was not even a part of the policy that had been issued to Southgate. See Exhibit 3 to the Gorman Depo. at 6. In fact, the water exclusion cited by Gorman (and subsequently relied upon by Vermont Mutual, see Exhibit 4 to the Gorman Depo. at 1-2), had been expressly "deleted and replaced by the following":

> 3. Water damage, meaning:
> a. Flood surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind; or
> b. Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

See the Policy, attached as Exhibit 2 to the Gorman Depo., at 22 (VM_CEA 3/99 Page 2 of 3, Section 4).

On September 12, 2006, Vermont Mutual's insurance adjusters wrote Southgate to inform her that her claim had been denied. Interestingly, in the actual declination letter sent by Vermont Mutual, the insurer, while: (1) removing the Mold Endorsement language which had originally been included by Gorman, nonetheless (2) included and relied upon the water exclusion language that had been expressly "deleted and replaced". See Exhibit 4 to the Gorman Depo. at 1-2.

Whether or not a declination letter which relies exclusively upon "deleted and replaced" language can ever be legally effective under any circumstances is not relevant, at least for present purposes, and it can be assumed, again for present purposes only, that Vermont Mutual had quoted the water exclusion (quoted above) which actually was a part of the Southgate policy.

On October 2, 2006, Southgate wrote Vermont Mutual's adjusting firm to call its attention to the Mold Endorsement which, as noted, expressly covered damage caused by "seepage or leakage of water or the presence or condensation of humidity, moisture or vapor" when the "resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure." See Exhibit 2 to the Gorman Depo. at 30, Limited Fungi, Wet or Dry Rot or Bacteria Coverage Endorsement (HO 04-32 05 02) at page 2, adding ¶ 2.e.(9) to Section I, Perils Insured Against. Southgate also requested that Vermont Mutual provide her with the specific facts which led it to conclude that the mold damage in question was not covered under the Policy.

On October 11, 2006, Southgate - after having provided Vermont Mutual with three estimates to remediate the problem (estimates which Vermont Mutual did not bother to share with Gorman, see Gorman Depo. at 53) – went ahead and contracted for the remediation of the problem.

On October 16, 2006, Vermont Mutual's attorney claimed that since "the origin of the water in [Southgate's] realty was through the entering of surface water or water below the surface of the ground," see Exhibit 6 to the Complaint at 3, the mold damage was excluded under the water exclusion that had been cited earlier. Id. at 2. Vermont Mutual also cited (for the first time) so-called anti-concurrent language in the Policy which, it claimed, "trumps paragraph 2e(9) of the [Mold] endorsement. See id. at 3.

On October 23, 2006, Southgate wrote back to inform Vermont Mutual that:

(a) the exclusion it relied upon had in fact been deleted from the Policy by a so-called "Homeowners Coverage Enhancement Amendment" (see the Policy, attached as Exhibit 2 to the Gorman Depo., at 22 (VM_CEA 3/99 Page 2 of 3, Section 4).

(b) the plain language of the Mold Endorsement provided that "seepage or leakage of water" which causes mold damage is in fact covered provided it is unknown to the insureds and hidden, which was exactly the case here; and

(c) the inference in counsel's October 16 letter that the visible pooling of water in the front and rear yards during heavy rain was in any way related to the mold damage was simply unfounded.

See Exhibit 7 to the Complaint at 3-4.

**Gorman's Deposition**

Gorman, who was at all relevant times acting as Vermont Mutual's agent and who was represented by Vermont Mutual's attorney at his deposition on May 10, 2007, see Gorman Depo. at 12, reiterated that the property damage he observed at Southgate's residence had been caused: "by either surface and/or subsurface water." Gorman Deposition (attached as Exhibit 1) at 29-30, 33. He also made clear that he was not "sure" whether the relevant damage had been caused by surface or subsurface water. Id. at 35.

The following colloquy at Gorman's deposition is the primary basis of the instant motion:

54
Q. You've indicated, if you'd look at the policy on
page, the fungi endorsement, if you look at page 2
of 3?
A. Okay.
Q. And there is an addition to Coverage A - Dwelling
and Coverage B - Other Structures; do you see
where I am?
A. In the middle, yes.
Q. There is a small paragraph 9, which is the
language that I'm going to be asking you about,
which begins with, "Constant or repeated seepage
or leakage"; do you see that? Counsel can
interject if I'm mischaracterizing this language,

but essentially this described condition is not covered by the policy. In other words, the words before the "unless" --

MR. HINES: I'm going to object, and --

MR. COTTONE: We'll go through the policy and I'll read it to him.

MR. HINES: First of all, I think you're asking for a coverage opinion from him as to what

55

the policy says, and Mr. Gorman is a licensed insurance adjuster, and I'll let him talk about damage and stuff, but I won't let him talk about interpretation of policy language.

MR. COTTONE: If you're going to direct him not to answer, that's fine, but we'll have to go to court on that, because he just gave me his testimony that he gave an opinion about the coverage, which I have in writing here. So, therefore, I'm entitled to ask him -- your objection is duly noted. I'm asking for a legal opinion he is not qualified to make, but he made it clear that he informed Vermont Mutual of his opinion, he put it in writing, and they based their denial on his opinion, according to his testimony, so I'm entitled to ask him questions I think appropriate to --

MR. HINES: And his denial letter sets forth the areas of the policy to which he is making reference.

MR. COTTONE: They set forth areas of the policy that don't even exist.

MR. HINES: Not so. When you look at what you've said --

MR. COTTONE: That's also his testimony.

56

MR. HINES: Wait a minute. Let me finish. When you look at the basis for the denial letter, what you're arguing is form over substance. No matter what, even in the changed language, it calls for --

MR. COTTONE: John, what are we arguing about? You can't instruct him not to answer.

MR. HINES: Wait a minute. All I'm saying is that, Tony, I think your argument, even

though there may have been a change in the policy, it's still, under the changed language, it says that surface water and water seeping up from underneath are both excluded.

MR. COTTONE: He put -- I don't see any need for a whole discussion, because I think I'm entitled to an answer to the question, but in his September 7 letter to the insured, he included the fungi exclusion I'm asking him about, and they took it out. That even further gives me grounds to ask him a question about that exclusion that he put in.

MR. HINES: Okay. That -- he said that that was a form that was submitted by the insurance company.

MR. COTTONE: Right. And --

57

MR. HINES: I'll let you go further. I'll let you go further. Explain to me --

MR. COTTONE: I don't have to explain anything. You have no grounds, under "Kelvey," you can't direct him not to answer. You can object all you want.

MR. HINES: I'm going to let you go a little further. I'm going to object -- go ahead. Lead back into your question.

MR. COTTONE: John, you don't have the right to "let" me do anything. We're in a deposition. Are you kidding me?

MR. HINES: Go back to your question. I'm objecting. I'm not instructing him not to answer.

MR. COTTONE: Well, I'm glad, because that's not the way we do things. I understand you have an objection.

Q. I started out to say that I, I don't want to mischaracterize the policy, and John can correct me if I'm wrong, to save time, without going back and reading it, that basically the first, before the first couple of -- before the word "unless," is not covered by the policy?

MR. HINES: I want you to read the

58

language into the record, and then ask your

question.
Q. According to the policy --
MR. COTTONE: And I think we should go back and read the actual language, to make it clear. I'm referring to the fungi exclusion which was cited in Mr. Gorman's letter to the Vermont Mutual, it provides that, "We insure against risk of direct loss to property described in coverages A and B" --
MR. HINES: Where are you talking about?
MR. COTTONE: I'm reading where they amended it. I'm reading from "Coverage A - Dwelling and Coverage B - Other Structures. Paragraph 2.e.(3) is deleted and replaced by the following"; do you see that?
MR. HINES: Wait a minute. What page are you on?
MR. COTTONE: On page 2 of the fungi endorsement.
MR. HINES: Hold on. Page 2. Okay.
MR. COTTONE: See where in the middle of page it says, "Paragraph 2.e.(9) is added"?
MR. HINES: Yes, I do.
MR. COTTONE: I'm going back contextually

59

to read paragraph 2.e.(9), so we can read it together and make sense out of the subsection 9, that's going to be the subject of my question.
MR. HINES: Let's go to the policy, where the policy --
MR. COTTONE: That's what I was reading.
MR. HINES: What page?
MR. COTTONE: Page 6 of 15.
MR. HINES: Okay.
MR. COTTONE: "We insure against risk of direct loss to property described in Coverages A and B."
MR. HINES: Let me interject one thing. You're under "Section I - Perils Insured Against"?
MR. COTTONE: Right.
MR. HINES: And then you're reading the language appearing therein. Okay. Go ahead.
MR. COTTONE: "Coverage A - Dwelling and Coverage B - Other structures. We insure against risk of direct loss to property described in

Coverages A and B only if that loss is a physical loss to property. We do not, however, insure for loss:" Then 2 is, "Caused by," then if you go to e(9) --
MR. HINES: So we had 8 before, and now

60

we're going to put in 9.
MR. COTTONE: "Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years, unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure."
MR. HINES: Okay.
Q. Now my question to Mr. Gorman is, if we assume that the damage that you observed, and that you -- it was existing that you didn't observe, but the rotting floor damage that you did observe was caused by hidden water beneath the floors of the residence, okay, that was unknown to Ms. Southgate, wouldn't, in fact, it be covered by the policy, damage, that is, under the plain language of Section 9 that you quoted to Vermont Mutual?
MR. HINES: Objection, and I'm going to instruct him not to answer and I'll tell you why.
(SO NOTED)

61

MR. HINES: I want this on the record. Go to page 1 of 3 of that fungi endorsement.
MR. COTTONE: 1 of 3, okay.
MR. HINES: Under 12, go to b. It reads, "The coverage described in 12.a," and you were reading from 12.a and going over into what's added on --
MR. COTTONE: Wait a minute. I was reading from 9 2.e.(9).
THE WITNESS: Yeah, but before, when we were talking about the definitions of fungi, this is the coverage that applies for fungi, wet or dry rot or bacteria. It's just part of the coverage.

MR. HINES: Under 12.b it says, "The coverage described in 12.a only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period," etc., so I'm not going to allow him to answer, because the policy answers it itself. The Peril Insured Against do not cover surface water or water beneath the ground.

MR. COTTONE: You have now interjected your opinion in a completely inappropriate way in the middle of a deposition, and prevented your client from answering a question. It's not



appropriate. You can't coach a Witness during the entire deposition.

MR. HINES: Tony, the policy describes the answer --

MR. COTTONE: I'm not arguing with you. That's why we have lawsuits. I mean, I asked him a question. If you're going to continue to have him not -- I mean, we'll go to court on it.

MR. HINES: What is your question to him?

MR. COTTONE: Would you read it back?

(PENDING QUESTION READ BACK)

MR. HINES: I'm going to allow him to answer it, but I will object to it, number one, on the policy speaks for itself, and on the form of the question.

A. I presented the report with all of this information, and my draft declination, including the language of what I thought was the main policy and the endorsement on mold and rot. It was reviewed by Joel Dyke at the company, and what he came back to me with was because the origin appears to relate to surface water or water below the surface of the ground, the main body policy would negate coverage, and that's why he took out any language involving the mold endorsement,



because he didn't think it pertained, because the loss was not covered under the main policy for surface or subsurface water.

Q. Okay. You decided to include the --

A. I included the language in my draft.

Q. In your draft?
A. They told me to take it out, because they did not, in their opinion, believe it applied, because they took a position on the coverage, which was in the final draft.
Q. In your opinion, okay, when you look at that language that I quoted to you -- and you can put it in front of you there.
A. Yup. Let me flip to it. Got it. Okay.
Q. It says various things are not covered, "...unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors..." Now if this seeping or leaking water that was present at Ms. Southgate's residence was hidden beneath the floors, and it was unknown to her, wouldn't it be covered -- you can have no opinion, or you can have an opinion, you can say yes or no, I'm just asking for your

64

opinion since you cited this provision -- wouldn't it, by the plain language of what I just quoted to you, be covered by this policy?
A. I would say just with --
MR. HINES: Objection. I'm not going to allow him to answer, and I'll tell you why. I'll put it on the record.
(SO NOTED)
MR. HINES: The denial letter has been issued by the insurance company. He has issued it with the instructions of the insurance company. He is not the insurance company. The contract is with the insurance company. If you want to ask that to a representative of the insurance company, because they're the ones that are behind the denial, fine.
MR. COTTONE: John, we'll go to court. That's fine. We'll stop.
THE REPORTER: Mr. Hines, would you like a copy of this transcript?
MR. HINES: Yes, I would.
(DEPOSITION ADJOURNED AT 3:34 P.M.)

See Gorman Depo. at 54-64.

## III. Argument

### 1. The Applicable Federal Rules Make Clear that Defense Counsel's Suggestive Objections and Instruction Not to Answer Were Improper

Fed.R.Civ.P. 30(d)(1) provides that:

> Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4).

Id. The Advisory Committee Notes to the 1993 Amendments to the Rule provide, with respect to subdivision d, that:

> The first sentence of new paragraph (1) provides that any objections during a deposition must be made concisely and in a non-argumentative ***and non-suggestive*** manner. ***Depositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond***. While objections may, under the revised rule, be made during a deposition, they ordinarily should be limited to those that under Rule 32(d)(3) might be waived if not made at that time, i.e., objections on grounds that might be immediately obviated, removed, or cured, such as the form of the question or the responsiveness of an answer. Under Rule 32(b), other objections can, even without the so-called 'usual stipulation' preserving objections, be raised for the first time at trial and therefore should be kept to a minimum during a deposition.
>
> ***Directions to a deponent not to answer a question can be even more disruptive than objections.*** The second sentence of new paragraph (1) prohibits such directions except in the three circumstances indicated: to claim a privilege or protection against disclosure (e.g. as work product), to enforce a court directive limiting the scope or length of permissible discovery, or to suspend a deposition to enable presentation of a motion under paragraph (4).

Id. Rule 30(d)(4) provides that:

> At any time during a deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c).

Id.

Finally, Rule 26(c) provides in pertinent part that "for good cause shown" the court may make an order "which justice so requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . ." Id.

**a. The Grounds Set Forth by Defense Counsel**

The following grounds were, at various times, set forth by defense counsel in an attempt to justify his suggestive objections and eventual direction to Gorman not to answer a question which Gorman had already answered for Vermont Mutual when he quoted relevant policy language to it and provided it with a draft declination letter:

(1) Gorman, as a licensed insurance adjuster was not allowed by defense counsel to talk "about interpretation of policy language." See Gorman Depo. at 54-55;

(2) according to defense counsel, "the policy answers it [the question] itself", since, again according to defense counsel's (erroneous) reading of the policy, "The Peril Insured Against do not cover surface water or water beneath the ground." Id. at 61; and/or

(3) although Gorman was hired by Vermont Mutual and rendered an opinion as to policy coverage and a draft declination letter to the insurance company, according to defense counsel, questions about the actual denial letter or the policy cannot be asked because Gorman "is not the insurance company." Id. at 64.

Although defense counsel did not actually use the words, it appears that he will argue that his suggestive objections - when he repeatedly made reference to specific Policy provisions for the benefit of the deponent - and his direction not to answer ostensibly were grounded upon his conclusion that Gorman was not qualified to render what defense counsel apparently concludes was a legal opinion, i.e., the applicability of the policy to the alleged damage. In fact, even if that were the case, his direction not to answer was clearly improper under Rule 30(d)(a) as it was

not necessary to: (1) "preserve a privilege", (2) "enforce a limitation directed by the court", or (3) present a motion under Rule 30(d)(4).

Indeed, defense counsel exhibited precisely the type of conduct which is prohibited by the Rules. In construing Sup.Ct.Civ.P. 30(d)(1), which contains precisely the same language as its federal counterpart, the Rhode Island Supreme Court noted that:

> When an attorney instructs a party or a witness not to answer on grounds other than privilege, the inquiring attorney is then forced to seek a court order. This process leads to substantial expense and significant loss of time. Our Rule 30(c), like the Federal Rule, was specifically designed to obviate such obstruction and the delay and expense.
>
> 'The harm caused by being required to take additional depositions of a witness who fails to answer a question based on an improperly asserted objection far exceeds the mere inconvenience of a witness having to answer a question which may not be admissible at the trial of the action. This seems to be the very purpose of the provisions of Rule 30(c).' W.R. Grace & Co. v. Pullman, Inc., 74 F.R.D. 80, 84 (W.D.Okla.1977).
>
> As one Massachusetts practitioner recently expressed it:
>
> 'A practical problem arises at the motion level, before the Superior Court judge. The moving party contends that the opposing counsel improperly instructed the witness not to answer. The opposing counsel claims that the questions were improper, and should not have to be answered. The judge's first instinct is to review the questions, and make his or her own decision on whether they were proper questions. At this point, the judge has already missed the boat!
>
> 'Unless the party opposing the motion to compel is claiming that the question called for 'privileged' information, the judge should not look at the question. When the judge undertakes to examine the propriety of the question, he or she immediately renders nugatory the rule's mandate, "[t]he evidence objected to shall be taken subject to the objections."' Ned C. Lofton, Deposition Witnesses Must Answer Questions, 21 M.L.W.2043, 2059 (Mar. 8, 1993) (quoting Mass.R.Civ.P. 30(c)).

See Kelvey v. Coughlin, 625 A.2d 775, 776-777 (R.I. 1993).

**2. Sanctions Are Appropriate**

Fed.R.Civ.P. 37(a)(2)(B) provides in pertinent part that if a deponent fails to answer a

question propounded, "the discovering party may move for an order compelling an answer," id., and Rule 37(a)(4)(A) makes clear that:

> If the motion is granted . . .the court ***shall***, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorneys' fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances makes an award of expenses unjust.

Id. (emphasis added).

As noted, here defense counsel has exhibited a textbook case of offensive deposition conduct under the applicable rules, which was not substantially justified and no other circumstances make an award of expenses unjust.

**III. Conclusion**

For all the above reasons, Southgate's Motion to Compel Deposition Testimony and for Sanctions should be granted.

Plaintiff,
ADRIENNE SOUTHGATE,
By her attorney,

/s/Anthony F. Cottone
Anthony F. Cottone, #3922
55 Dorrance Street
Suite 400
Providence, RI 02903
Tel: (401) 578-5696
Fax: (401) 861-2922
cottonelaw@cox.net

**Certification**

I hereby certify that a true and accurate copy of the above Memorandum was filed electronically and sent by electronic mail to John G. Hines, Esq., HINES AND CORRIGAN, INC., One James P. Murphy Highway, West Warwick, RI 02893 at HINES-CORRIGAN@CONVERSENT.NET on this 21st day of May, 2007.

/s/Anthony F. Cottone