UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

ADRIENNE SOUTHGATE,
Plaintiff,

VS. C.A. NO. 65-500 ML

VERMONT MUTUAL INSURANCE COMPANY,
Defendant.

VOLUME I

* * * * * * * * * * * * * * * * *

DEPOSITION OF JEFFREY A. GORMAN, of Pelletier & Rourke, Inc., a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Julia A. Puleo, RPR, a Notary Public in and for the State of Rhode Island, at the Law Offices of Anthony F. Cottone, 55 Dorrance Street, Suite 400, Providence, Rhode Island, on May 10, 2007, at 2:00 P.M.

PRESENT:

FOR THE PLAINTIFF...... LAW OFFICE OF ANTHONY F. COTTONE
BY: ANTHONY F. COTTONE, ESQUIRE

FOR THE DEFENDANT...... HINES & CORRIGAN, INC.
BY: JOHN G. HINES, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

INDEX


WITNESS PAGE
JEFFREY A. GORMAN
EXAMINATION BY MR. COTTONE................ 3


EXHIBITS
(PLAINTIFF'S - FOR I.D.)


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | First Amended Notice of Deposition (3pgs).............................. | 5 |
| 2 | Homeowners Policy - Declarations, Vermont Mutual Insurance Co., 11-28-05 through 11-28-06 (40pgs).... | 5 |
| 3 | Records of Pelletier & Rourke, Inc. of Insured, Adrienne Southgate (19pgs)............................ | 19 |
| 4 | Letter from Pelletier & Rourke, Inc., to Ms. Southgate, 9-12-06 (3pgs)..... | 44 |
| 5 | Letter from Attorney Cottone to Attorney Hines, 10-5-06, with copies of Estimates (10pgs)................ | 53 |

Instructions to Witness at pages 60 and 64.




(DEPOSITION COMMENCED AT 2:10 P.M.)
JEFFREY A. GORMAN
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE WITNESS: Jeffrey A. Gorman, G-O-R-M-A-N.
EXAMINATION BY MR. COTTONE
Q. I represent the plaintiff in this action, Adrienne Southgate, as I am sure you are aware. During the next hour or so I'll be asking you questions, and if you don't understand the question, please tell me that you don't understand it, otherwise we will assume you do understand it; is that acceptable?
A. Yes.
Q. In addition, if you want a break, want to meet with your attorney, let me know and we can do that, okay?
A. Okay.
Q. Finally, use words rather than gestures, because the stenographer cannot appropriately notate gestures, all right?
A. Understood.



Q. Have you had your deposition taken before?
A. Yes.
Q. About how many times, roughly?
A. Three.
Q. Where do you currently reside?
A. 666 Roger Williams Avenue, Rumford, Rhode Island 02916.
Q. Are you married?
A. I am.
Q. And your wife's name?
A. Carolyn L. Gorman.
Q. Could you give me your educational background after high school?
A. I have a Bachelor of Science Degree from Rhode Island College in business management and insurance-related experience in adjusting.
Q. Do you have any professional certifications or licenses?
A. I have the Rhode Island Adjusters License, no other profession.
Q. When did you get the Rhode Island Adjusters License, what year?
A. I believe it was 1987.
Q. You've been licensed continually since that time?
A. I have.



Q. Have you taken any particular specific course or training concerning mold?
A. Various seminars put on by mold companies or insurance companies I've done business with.
(PLAINTIFF'S EXHIBIT 1 MARKED FOR I.D.)
MR. COTTONE: We've marked the deposition notice as Plaintiff's Exhibit 1. What I'd like to do is mark the copy of the insurance policy that is involved in this case as Plaintiff's Exhibit 2.
(PLAINTIFF'S EXHIBIT 2 MARKED FOR I.D.)
Q. I'll show you that, and if you would just go to the mold, "Limited Fungi," however you say that, "Wet or Dry Rot, or Bacteria Coverage," endorsement?
A. Okay. I have it.
Q. Now, we're going to be talking about mold quotes throughout this deposition at various times, and so we're on the same page, there is a sort of broad definition which is actually a definition of fungi, which is a definition under subsection A, definition section of the endorsement; do you see that?
A. I do.
Q. So when I say "mold," I'm talking about fungi, as well as any type of fungus, mold or mildew, and

any mycotoxins, spores, scents or by-products produced or released by fungi, all right?
A. Understood.
Q. Okay. Thank you. Getting back to the specific course of training regarding mold, when was the most recent of those that you took?
A. Probably a year ago or so. Various cleaning contractors that provide mold-damage restoration put on seminars.
Q. Do you remember who did the last one a year ago?
A. I believe it was -- I'm not sure who sponsored it at this point. It might have been Certified Disaster Restoration. There are various companies that have these seminars.
Q. Are they full-day seminars?
A. You can go half a day or a full day, or some of them, they are, a couple hours is a full day. Over the course of the last ten years I've probably been to three or four of them.
Q. Are they similar in subject matter?
A. They are.
Q. Do they deal with detection or causation or remediation?
A. More of its remediation.
Q. Have any of the insurance companies that you work



for at your firm sponsored any courses or training on mold?
A. Our firm has not.
Q. Any of the insurance companies that you work for?
A. Yeah, I believe so. Hingham Mutual. We work for various insurance companies.
Q. Do you think Hingham had a seminar on mold?
A. I believe they did, yeah, at their location. That might have been three or four years ago.
Q. Same thing, about remediation?
A. Yeah, or policy coverage in relation to mold. A lot of the companies over the recent years have adopted that form you pointed out.
Q. Generally speaking, in this climate in Rhode Island, what causes mold to occur as a general proposition; are you qualified to answer that?
A. I can speak for what I've seen, whether it be humidity in an attic level from improper ventilation, moisture in a basement from water seeping in from either below the ground or surface water, leakage from plumbing or heating system components. Any time you have moisture for a length of time, mold is associated with that oftentimes.
Q. Mold is always associated, in your experience,



with moisture of some sort?
A. I don't know if I'd say always --
MR. HINES: I want to object, because that's not what I think he said, but go ahead.
MR. COTTONE: I don't think it is what he said, either, actually, but I'm sort of recharacterizing it, maybe unfairly.
THE WITNESS: Can you state the question again?
Q. Yeah. Is there any type of mold that's caused any anything other than moisture, that you are aware of?
A. I know there is mold growth on vegetables and fruits, so yeah, I'd say there is other types.
Q. How about mold on property and in dwellings that you'd normally deal with in homeowners' coverage?
A. I think the majority that I've seen relates to some type of moisture, I believe.
Q. In your own personal experience, have you ever seen mold in a dwelling that was caused by something other than moisture of some sort?
A. I don't believe so.
Q. Okay. So the sources of the moisture that you personally have identified that you are familiar with would be humidity, right?



A. Okay.
Q. Moisture in a basement from water seeping in?
A. Yup.
Q. That could be from underneath the ground, right?
A. Possibly so.
Q. You also identified surface water?
A. Yes.
Q. Or water from a heating system, correct?
A. Yes.
Q. Is there any other --
MR. HINES: Plumbing system, I think he said.
A. I think I said plumbing or heating system, various components that contain water. It could be a boiler, hot water tank, which I would characterize more as heating versus plumbing, which would be domestic piping, hot water/cold water pipes. There is various components in a building that carry water.
Q. Are there any, in terms of your own experience in dealing with this problem, have you ever identified any other sources of moisture that actually cause mold, other than what you've already just said?
A. Not that I can think of off the top of my

Page 10

head. Seepage from roof leaks. The more I thought about it, I could probably think of some more. Spillage, if somebody dropped a bucket of water and left it unattended. There are various moisture-related I would associate with mold.
Q. Are you a member of any professional societies or associations?
A. I am not.
Q. What is your current employment?
A. Pelletier & Rourke, Inc., adjusters.
Q. And what is your position with Pelletier & Rourke?
A. I am a vice president adjuster.
Q. And who is the president?
A. Anthony J. Rourke, R-O-U-R-K-E.
Q. Are there shareholders of the company, or is it --
A. I believe he is the sole shareholder.
Q. Is it a Rhode Island corporation?
A. Yes, it is.
Q. And how long have you been with the company?
A. Most recently for five years. I left for a two-year period, and I worked there approximately eight or nine prior to that.
Q. Let's go back to the eight or nine years when you first started working there.
A. I came out of college in '86, and I worked

Page 11

for a year as a sales agent for Metropolitan Life, and took a job as a trainee for Aetna Insurance, as a property claim representative, and I was a property claim representative for about five years, and I became a supervisor of a claim unit. Then I went to work for Anthony Rourke, Pelletier & Rourke, stayed the length as an adjuster, I left there for a two-year period to take a job as a claim manager at the Safety Insurance Company in Boston for two years, and then I returned and I've been there since.
Q. What did you do at the Safety Insurance Company?
A. Claims manager.
Q. You said that.
A. That's okay.
Q. And that involves overseeing other adjusters?
A. A combination of handling claims, larger claims myself, and overseeing a unit of inside adjusters and outside adjusters.
Q. What is the business, generally speaking, of Pelletier & Rourke; could you describe what the company does?
A. We are first-party property claim adjusters.
Q. What do you mean by first-party?
A. We typically handle claims from various

Page 12

insurance companies relating to property damage in homes or buildings. We only represent insurance companies, and we represent the various companies, the majority of which do not have staff in Rhode Island to look at their claims.
Q. So there is no question in this case but that you were acting in all respects as an agent of Vermont Mutual Insurance Company; is that correct?
A. That --
MR. HINES: I'm only going to object to the form of the question, but you can answer.
A. We were acting as an adjuster for Vermont Mutual Insurance Company.
Q. And that would be, also, you're acting as an agent for them, correct?
MR. HINES: Objection.
A. I don't know what the clear definition of agent is versus adjuster, but I know what an adjuster is, and that's what we were hired to do.
Q. You were doing it on behalf of Vermont Mutual?
A. That's correct.
Q. And you were paid by Vermont Mutual?
A. My company was.
Q. Do you know how much you were paid for the particular claim we're here about, the Southgate

Page 13

matter?
A. Approximately $250.
Q. That's the whole, to the firm --
A. That's correct, yeah. They have a fee schedule that they set with us for various claims, and I believe this type of claim, that's what we would have been paid.
Q. Do you get paid the same amount irrespective of how many visits you make to a property?
A. That depends on the --
MR. HINES: Dealing with this type of situation or --
MR. COTTONE: I'll rephrase the question, because I think it was overly general.
Q. With respect to Vermont Mutual's schedules that you alluded to, are you paid the flat $250 regardless of how many different trips you may make to a property?
A. That's correct.
Q. So, if you have to go back ten times to look at, you know, some aspect of an incident or damage, you get paid the same amount?
A. It may not be correct, in that, depending on the circumstances, we may request for them to allow us to go time and expense, and then they may

Page 14

allow us to bill them by the hour, and that type of stuff. They have a fee schedule they set with us, and on a particular case, something like this where it was only one particular visit, we'd stay within the fee schedule, but if it became an issue where multiple visits were required, they may allow us to go on a different tact.

Q. I'd like to refer to Exhibit 1, which is just a copy of the deposition notice in the case, and specifically Exhibit A to the depo notice, which contains a list of documents that I asked if you could bring, or maybe they've all been produced already by your attorney, but if you'd just take a look at Exhibit A, number 1 is any documents referring to any inspection you made at 22 Rosedale Avenue, including photographs and a report, if any; do you have any documents that are responsive to number 1?

A. John has the file.

MR. COTTONE: Do you have an extra copy of that?

MR. HINES: We meant to make a copy and we didn't. Do you have a copy machine? Could we just run it off? It will take -- I can state for the record, that I -- here is a copy. I went

Page 15

through your Exhibit A to your deposition notice, and I made sure that we supplied what documentation we have that I believe was requested by you, and I'll hand you a complete copy of it. I apologize for not making a copy, but if you could, it would be appreciated. Maybe we could have two, maybe one for you and one for purposes of annexing the deposition. I can get it when the deposition comes to me, I can get the copies from that.

MR. COTTONE: We'll take a break.

(OFF THE RECORD FROM 2:26 P.M. UNTIL 2:30 P.M.)

Q. You inspected the premises on September 6, 2006?

A. Yes.

Q. Did you have any conversations with the insured, Adrienne Southgate, prior to the inspection?

A. I believe I called her to arrange the appointment and then met her at the house.

Q. What was your understanding -- well, let me ask you what the conversation was, if you recall, who said what in substance of the conversation you had with her?

THE WITNESS: In the telephone conversation?

MR. COTTONE: Right.

Page 16

A. I believe I just made direct contact, as I always do, to explain that I have received a claim on behalf of the insurance company, and I requested a meeting with her, and we set up a time to meet.

Q. What did you understand the nature of the claim to be?

A. My understanding was there was some type of damage at the house.

Q. Was it described specifically, is there a claim form she filled out?

A. We receive a Loss Notice from the insurance company, which would be in the file. That is there. Sometimes they put instructions on it. Typically they'll give us a copy of the policy dec. page and a description. A lot of times the description on it is the insured will call their insurance agent, the agent will take down the description of loss, and then the insurance company or the agent will print what's called a Loss Notice, which has the basic information, the effective dates of the policy, name and address, and that's faxed to us with the phone number of the insured, and we'll call them and arrange an appointment.

Page 17

Q. Do you have a recollection, independent of the documents, the Loss Notice, whatever, as to the nature of the property damage that was occasioned by --

A. At that point I'm usually, I'll read it and then just call them to set it up. I usually wait until I get out there to understand exactly what is going on.

Q. The conversation with Ms. Southgate prior to your showing up, did she discuss the nature of the damage with you?

A. I don't recall.

Q. So as far as you recall, it would be your practice to have kind of an open mind to go and observe --

A. That's what I usually typically do, unless they start explaining to me they need help with some type of service before I get out there, but I believe in this case I set up the appointment and met her there.

Q. Do you remember what time, it was a Wednesday, right, September 6?

A. I don't recall. I didn't bring my appointment book that would be listed as the time.

Q. Do you remember what time?

A. I believe it was in the morning. I believe

it was sometime in the morning.
Q. Did Ms. Southgate meet you at the premises?
A. At the residence, and we walked into the residence together.
(OUTSIDE INTERRUPTION)
MR. COTTONE: Thank you so much. I'm going to finish this line of questioning, and then we'll mark these exhibits so we don't get off track.
THE WITNESS: Okay.
Q. You met her at the residence?
A. Yes.
Q. And you walked into the residence together?
A. Yes.
Q. Did you walk into the front door or back door?
A. I'm not sure. I do recall being in the area of the rear door, so I'm almost -- I'm not sure.
Q. Did you observe any -- what was the weather like at the time?
A. I believe it was a sunny day.
Q. Was there any standing water that you noticed on the premises prior to your entry?
A. No.
Q. Did you notice anything pertinent to the damage or pertinent to the situation that you now can



recollect you saw before you entered the premises, on the property?
A. I don't recall anything sticking out.
Q. Outside?
A. Outside, and I do always take a risk photograph. I'll take a photograph of the house before I enter it. I give an overview of what the house looks like, then I enter it, obtain the situation, and then take photographs inside, so my file will have a photograph of the outsides and the lawn and the interior of the house. I do recall rot damage in the area of that rear-entrance door. That's one thing that sticks out to me about the meeting that we had.
Q. And that was on the outside of the door?
A. Inside. They had removed the carpets. She had a contractor already involved in the situation. I believe the house was vacant. She was getting it ready to sell, I believe, yeah.
MR. COTTONE: Before we continue about your inspection, I'd like to mark the entire package.
(PLAINTIFF'S EXHIBIT 3 MARKED FOR I.D.)
MR. COTTONE: John, correct me if I'm wrong, but you've represented that this is the



responsive documents that have been sought in the Exhibit A to the notice of deposition, correct?
MR. HINES: Correct.
MR. COTTONE: Okay. Now --
MR. HINES: When you say Exhibit 3, do you think we ought to indicate the Pelletier & Rourke, Inc., file pertaining to the claim of Ms. Southgate so, you know --
MR. COTTONE: That's what it is?
MR. HINES: Yeah.
MR. COTTONE: He'll identify it.
Q. I'm putting before you what was marked as Plaintiff's 3; is that, in fact, your file or the Pelletier & Rourke file with respect to the claim?
A. Yeah. This is a copy of the records in the file in response to your request for the documents.
Q. And is all this from your --
A. File, right. We have a file we maintain at the office. That's it.
Q. Feel free to look at this, as I am. If you look at the first document that's stapled together, is this the -- what is this document; do you have a description of it, the first report?
A. I would call this the First Report to Vermont



Mutual, so this was completed after my inspection.
Q. And you repeated it, correct, you prepared it, correct?
A. Right.
Q. And the 250 is the amount you were paid for the compensation, correct?
A. My boss, that's how he does the billing. He'll take a copy of the report, and he writes the note and the secretary types the bill, so that is the bill amount.
Q. Going to page 2 of the first report, at the bottom of the page, you're referring to a removed carpet pad, do you see that, on the third from the bottom paragraph?
A. Yup.
Q. Do you recall where in the house that removed carpet pad, where that area was?
A. I did not see the carpet pad, but I could only assume it was in the areas that were rotted. In the area of the entrance door, I would assume that would be saturated. I believe she said it was saturated in other areas, so I put areas rather than just the one I saw.
Q. Okay. So that was the area immediately as you entered the rear entrance?

A. Correct.
Q. And that was where you saw there was rotting --
A. Of plywood underlayment that was exposed after the carpet and pad was removed.
Q. Now you also indicated that there was surface mold growth on the painted walls and trim within the dwelling?
A. Right.
Q. What do you mean by "surface mold growth"?
A. There were specks that she was attributing to mold growth. I believe she had, whether she had a cleaning person or a painter, but I recall her saying she was already involved with cleaning the thing up, but there were areas that had some specks on it that she was advising me that this was mold growth. When I said surface, I meant it was visible on top of the painted surface. Some of it was sheetrock or panel that had been painted before.
Q. Where in the residence did you notice the surface mold growth?
A. I believe there was a hallway, there was --
MR. COTTONE: Feel free to look at the pictures, if you want to, to refresh your recollection.



MR. HINES: Do you need the originals, Jeff?
THE WITNESS: Let me see --
A. There is some mold growth in picture 8, and you may not be able to see it with the copy, but there are specks on that, and I believe that was one of the rear bedrooms, and then, I did say hallway. There is, photograph number 9 says visible mold growth on painted surface-hallway, so I can't recall if it was in every room, but there were various rooms which would appear to be some mold growth.
Q. Okay. But in terms of your notation of where you actually saw the mold growth, it was limited to the rear bedroom and the hallway, the two pictures?
A. I didn't take pictures of every single wall in every single door.
Q. You didn't take pictures of every place you observed the surface mold growth?
A. I don't believe I did. I was giving them representative copies of what I saw.
MR. HINES: Take a look at the originals.
A. In other words, there may be rooms where I refer to some descriptions of things that had it,



but maybe I didn't put that in every single photograph, and she had indicated that some cleaning had already been completed, and I think some painting was underway as well.
Q. Okay. Just so I understand, though, in terms of the surface mold growth, you have pictures of it in the rear bedroom and in the hallway, and you believe that it may have been surface mold growth in other areas; do you specifically recall any other areas where there was surface mold growth, or do you just have an impression it was in other areas?
A. I'd assume it was in other areas as well.
Q. Was it confined to the rear of the residence, or was it elsewhere?
A. I believe she said it was throughout.
Q. You didn't observe that, you don't recall whether you observed it?
A. No, I don't, and I do believe there was some work going on there, so that might have affected what would have been there to see at the time I went.
Q. There is a last sentence on the page 2 of the first report, it says, "The water damage appears to relate to the seepage of surface and/or



subsurface water which has been occurring over a period of time," correct?
A. Correct.
Q. What water damage?
A. If you look at picture number -- it's clearly evident in picture number 2, rot damage at that doorway and water damage. The water damage starts it, and the rot follows, so there is areas of saturation of that plywood in the area of the doorway, indicating that water was seeping in. There is plywood covering the cement slab. I couldn't see from the vantage point I was at if there was any cracking in that foundation and water was coming up through it as well, so I said seepage of surface and/or subsurface water. There is obvious water penetration in that area.
Q. Is there any other damage that you observed, in terms of this claim, that you opined on, other than the subsurface mold damage and the pictured area that's got the damage to the plywood?
MR. HINES: Wait a minute. Could -- I object to the form of the question. Could I have it read back?
(PENDING QUESTION READ BACK)
MR. HINES: I object to the form. If you

understand it, answer it. If you need clarification, tell Mr. Cottone.
A. I don't know if I really -- did I see --
Q. You named two areas where there was two types of damage, basically?
A. Okay, what --
Q. Subsurface mold?
A. I'd consider it the same damage. I don't know --
Q. Fine. The subsurface or at least evidence of --
A. I guess why I said and/or was because I wasn't sure if it also included subsurface water. I don't know what we're keying on here.
Q. I'll get back to that. What I'm saying now is, you said the water damage, and I'm trying to get to what damage you're talking about.
A. I'm talking about, her claim was the water damage to the carpeting padding, underlayment and mold growth. That's, I believe, what her claim was for.
Q. Where is her claim?
A. She never presented a claim. She never presented any estimates or anything like that. They did have a questionnaire that they asked me to have her fill out, which is attached to the



file as well.
Q. Would you repeat what you understood the claim to be, when you --
A. The -- before we got into that, I pulled out the copy of the property loss notice, which lists the description as most of flooring in house is moldy and rotted, so that's, I believe, what her claim was. That's the description she gave to her agent.
Q. Where are you looking?
A. I'm sorry. It's in the package. There is a note from Troy, Pires and Allen, which is her insurance agent, and I think when we were talking before, I referred to a notice that the insurance agent usually provides, they forwarded that to the company as a claim, and the company forwards it on to us as a claim-handling request, so in that three-page document is a description as to what her claim is.
Q. Okay. I got it. We're both looking at the same document now, which is within Plaintiff's Exhibit 3, and it's the, it's got a fax cover or a cover sheet from Troy, Pires and Allen, LLC, dated September 1, '06, and the second page is described as a property loss notice. Apparently, it was



prepared by Jeannie at Troy, Pires and Allen?
A. Okay.
Q. As reported by Adrienne Southgate, according to the form; is that what we're looking at?
A. That's right.
Q. Did you have this before you showed up at the residence?
A. I did, and that's what triggered me to call her.
Q. So the damage is described as most of flooring in house is moldy and rotted?
A. Yes.
Q. And getting back to your first report, when you described the water damage at the bottom of page 2, were you confining -- is that water damage that you're describing, the area that's pictured on picture number 2?
A. Yeah.
Q. How about the rest of the flooring in the residence, did you see any rotting or mold?
A. There were other areas that had saturation. The tile -- there was carpeting in, if you look at picture number 6, they had removed some carpeting and it looked like there was a final tile floor there below it. They must have put the carpeting



over it over the years, and that tile floor was peeling up. It looked like it had some moisture in it before causing the tiles to peel up. The problem was, all of the carpeting had already been torn out, so I was -- I didn't view probably some spots that were saturated. She said that all of the -- some of, the majority of the carpeting was soaked.
Q. What about the flooring; did you observe the flooring throughout the entire residence?
A. I did. Some of the areas, though, because it was a cement floor, as you see in that photo I referred to as 6 and 7, there was vinyl tile under it, so not all of it was that plywood that you could see the rot in. So I'm not sure if there was plywood under that area, or that was glued right to the cement, so I only observed rotting in that door area that I saw. I took pictures the best I could in various rooms. There are some areas, there was another one, if you look at 10, it looks like there was some prior water staining on some plywood in those areas as well, so I tried to capture as much as I could of wet areas.
Q. But the water damage that you're referring to, with respect to the seepage of surface and/or

subsurface water, is that pictured on picture number 2?
A. And I would attribute the rest of it to it as well, as either surface or subsurface water penetration.
Q. Did you see any mold underneath the flooring, or in any other location, other than the surface mold on the walls and trim?
A. I don't believe I did.
Q. Did you uncover any of the flooring at all --
A. I did not.
Q. ...to look under the flooring?
A. I didn't do any demolition at all.
Q. How did you conclude -- you said, "The water damage appears to relate to the seepage of surface and/or subsurface water"; what is the basis of that conclusion or -- it's not a conclusion, actually; you're saying it appears to, correct?
A. Yup.
Q. What is the basis of that statement?
A. Well, since the rot damage in that doorway was right at that door level, it's obvious to me that water was penetrating in that area, causing that damage. There is no plumbing in that area. There was no reports of any other type of a leak



in that area. I had a discussion with Ms. Southgate as to the type of situation that her -- occurs out there, and she indicated to me that there is pooling water in periods of heavy rain. I do recall her mentioning that. I do --
Q. Did she --
MR. HINES: Let him finish.
A. I do recall asking her and speaking about the property herself, and I believe she said to me that in periods of heavy rain water pools. Now this is a house without a basement. It's masonry slab, so the framing is at floor-grade level, so if water pools in that area and you have rot damage in the area of a doorway, water is collecting at the ground and coming in. The only thing I was not sure of is what type of activity is coming underneath, because I couldn't see it.
Q. Did you see -- you said you didn't see any pooling of water yourself, correct?
A. I did not.
Q. Did she talk to you about the location of water on her property, the pooling water?
A. I believe we were probably standing in the rear yard after we left that -- I believe it was in the rear yard we were talking.



Q. Did she approximate or locate the pooling water anywhere near the rear door?
A. I don't believe so. She just made a general statement that water pools in the yard.
Q. Somewhere in the yard?
A. That's correct.
Q. If I told you that her testimony will be that the pooling of water is nowhere near the rear door, would that surprise you?
A. No.
Q. Would that change your conclusion that the rotting or the damage that you observed, at least in picture 2, was caused by surface water coming into the --
A. I would not --
MR. HINES: Wait a minute. I object to the form of the question. That sentence that you're referring to, Tony --
MR. COTTONE: Page 2 of the first report.
MR. HINES: ...reads "surface and/or subsurface water."
MR. COTTONE: Right.
MR. HINES: You just mentioned the word "surface."
MR. COTTONE: Well, he testified that he



believed that, although he did say that, of course, it says what it says, that it came in through the door.
A. I said it came through the door, and I also said that I was unsure if it was coming up from underneath that area, because I couldn't see it. So I would say that either/or, and that's why I had to say it, and/or. I think I wanted to be clear that it's my opinion that it was all entering that door. Now maybe the water is pooling in the yard, but water is hitting that patio in that area and entering that doorway at the surface level. There was no staining around the ceiling or the walls, leading me to believe the roof was leaking. There was no evidence of any missing shingles, and that rot damage in that exposed area is clearly at grade level, so it has -- in my opinion it has --
Q. You didn't look underneath it, though?
A. So it had to be at least surface water, in my opinion. I just wasn't clear if it was also coming up underneath. You have areas that were wet that were in non-doorway areas, which led me to believe the possibility that when you have a serious saturation problem, there may be cracks in

the masonry slab or other areas that are allowing water to come up through it.
Q. Now, you said that the location of the pooling water in the yard -- strike that. Would the location of the pooling water in the yard have any bearing --
A. It would.
Q. ...on your conclusion?
A. It would, because it would lead me to believe that there was a surface and subsurface water situation where groundwater is high, water is not penetrating. Although it may be pooling in areas, you probably have a high groundwater table all around that dwelling and underneath it, leading to more problems, to water coming up from underneath. So there may be water pooling in a certain area and not visibly in that area, but if it's pooling in that yard in close proximity to the dwelling, it would lead me to believe that they have a high water table in that area and probably subject to various water conditions over time.
Q. Isn't it possible, with the high water table, there could have been a crack in the foundation, and the damage that you observed could have been caused by subsurface water coming up from the



bottom of the floor?
A. This particular area, I would be less likely to agree with that, but in other areas I would. I'd say it definitely could be a possibility.
Q. Is it a possibility in that area?
A. It is definitely a possibility.
Q. It's a possibility that you can't rule out?
A. It's definitely a possibility I can't rule out. That's why I said "and/or."
Q. Okay. So, do you today know which of the two caused the damage --
A. I'm not sure.
Q. ...surface or subsurface?
A. My opinion is it's most likely surface-related, but it's possibly surface or subsurface-related.
Q. And again, the basis of your opinion that it's surface?
A. Is my visual inspection and experience in looking at these type of things.
Q. Without any testing underneath, and without any visible pooling, but yet you come to the conclusion based on your visual --
A. That it was either/or.
Q. That it was either/or?



A. Yup, that's correct.
Q. But I'm trying to quantify one or the other, or the likelihood of --
A. I can't. That's why I said either/or.
Q. So it could, 50 percent is surface water from the top, 50 percent is subsurface water?
A. Although I believe it's surface water, I can't rule out subsurface water as well. That's why I said and/or.
Q. Is there any relevance to you, as to whether it was surface or subsurface water, in terms of coverage or --
A. Either/or is not covered.
Q. Okay. Is there any other damage that you saw that we didn't discuss; we discussed the flooring and the mold --
A. I don't --
Q. ...on the surface?
A. I don't think she was presenting any other damage other than that issue.
Q. Now, how long did you spend at the premises?
A. I would say maybe 45 minutes. I know she -- she filled out a questionnaire in my presence, took some time to do that, and we walked around.
Q. Where is that questionnaire?



A. That is attached to that first report.
Q. The Fungi, Mold, Wet or --
A. That's correct.
Q. ...Dry Rot Questionnaire?
A. Yeah. The company provides a blank form to us, and asks that we have the insured complete that form.
MR. COTTONE: Just for the record, we're looking within Plaintiff's Exhibit 3, page 10, there is a, Fungi Mold, Wet or Dry Rot Questionnaire, with Vermont Mutual Insurance Company on the top, and it's in total two pages, and it appears to be dated 9/6/06 and signed by Adrienne Southgate, and is that her handwriting on the document?
A. It is.
Q. Did you take any measurements of any kind with any device to measure moisture, or to do anything with the groundwater levels while you were there?
A. I did not.
Q. Is there any notation of any kind that you took while doing your inspection that is not reflected in Plaintiff's Exhibit 3; everything that you did is reflected in this?
A. I believe it is.

Q. Did you have any conversation with Ms. Southgate upon your, well, during the inspection, that you recall?
A. I think we had a discussion over time frames. She discussed when she bought the house, when she -- I asked her when she was working on it, because the carpets were removed, I was trying to get a time line as far as what was going on. There was nobody living in the house, was she living there, was she selling it. We just had a basic discussion about the house.
Q. Did you ask her if there was any problems with seeping water in the door?
A. I don't believe I asked her, because I was standing there looking at it.
Q. Well, you've testified that you were looking at either subsurface or surface water?
A. Right, right, yup.
Q. Did you ask her whether or not there was any experience with surface water since she lived at the house?
A. Yeah. I don't -- I think I did, and I don't believe she said she had any previous problems with it.
Q. Did that cause you to question your conclusion



regarding the surface water as causation?
A. It caused me to question her answer, because of the rot damage on that floor, because it would seem to me that there was moisture coming in there if it was that rotted.
Q. But we already concluded that that could have been caused by subsurface water, correct?
A. Right.
Q. So rather than going to that conclusion, you conclude that the insured is not accurate; am I right?
A. I'd conclude in that I would question if it had been penetrating there, if it had been rotted, it would be evident it was coming in over time.
THE WITNESS: Does that make sense?
MR. COTTONE: It doesn't, so let me ask you again.
Q. If the insured is telling you that there's been no problem with surface water pooling or entering or getting into the door where the damage occurred, and you agree that it's likely or possible that it could have been subsurface water that caused the damage, wouldn't the logical conclusion be that it was subsurface water?
A. I don't think so, because of the amount of



rot in that doorway area. I'd believe there had to be evidence of moisture coming in.
Q. Wouldn't that be dependent on the amount of water coming from the subsurface?
A. The question would be the carpet was removed, and I couldn't see that carpet that was covering it to see if that was, in fact, water staining over time as well. That kind of hindered my inspection of that area in total.
Q. I agree if the carpet was dry, certainly you'd conclude it was subsurface water, but without regard to the carpet, a great amount of water coming from the subsurface could clearly have created the condition that you observed and --
A. And I still would go back to, and I would still say it the same way, that it was surface and/or subsurface water, because I was not sure.
Q. What basis did you have for discounting the veracity of the insured, when she told you there was --
A. I didn't discount it. I just raised the possibility of the two scenarios, surface and/or subsurface water.
Q. Well, in raising the possibility of surface water, aren't you discounting the veracity of the insured



when she said --
A. I am not. I am not.
Q. Well, she said there was no surface water problem.
A. There was evident rot in that area. There had to be surface-water penetration in at least combination with that other issue, if there was, in fact, some subsurface-water penetration.
Q. Why couldn't it just have been subsurface water; I don't understand?
MR. HINES: Objection. We've been over this.
Q. What is the --
MR. HINES: Wait a minute. Wait a minute. I think that there's been a more-than adequate answer, number one, and number two, as far as coverage is concerned, it doesn't make any difference.
MR. COTTONE: That's a separate issue, isn't it?
MR. HINES: I presume you're asking the facts, because we're going to the coverage issue.
MR. COTTONE: That's a conclusion, but with all due respect, we can take this up later, but --
A. I can only give my opinion as to what I saw,

Page 42

and that's what I did.
Q. I know. I'm trying to get at the basis of your conclusion that it was surface water.
MR. HINES: I object to that, because his conclusion is stated in the letter, that it was surface or subsurface water, and the specific areas cited in the denial letter predicate as a basis for denial of both of those.
MR. COTTONE: Duly noted.
Q. Do you have any basis for -- we've agreed that you have concluded that there was a possibility that it was surface water as well as subsurface water that contributed to the condition. What I'm just trying to ask you is, is there any specific condition of the damage, or any other objective fact, that supports your claim that the surface water was a contributing factor, or may have been a contributing factor, since the insured told you there was no problem with surface water pooling in that area?
A. No. Only my observations.
Q. And again, what about your observation, per se, that justified the conclusion that surface water may have had something to do with this; anything in particular, the amount of wetness, the nature

Page 43

of the rot, what exactly?
A. The nature of the rot in the area of the doorway.
Q. What about the nature of it, oh, because it was located near the doorway?
A. Right next to the door.
Q. The proximate nature of it to the door?
A. Absolutely.
Q. All right. And there are other areas, though, that were rotted that were not near the door, right?
A. That's correct, or had water stains that led me to believe there was a moisture problem.
Q. All right. Now you wrote to Ms. Southgate on September 7 denying her claim, correct?
A. Yes.
Q. You got the copy of the --
A. On behalf of the insurance company.
Q. Right. I'm sorry.
A. I don't know if that --
MR. HINES: I just want to clarify something, and I'll do this on the record. What you see on September 7 is a proposed letter, and I'll let Mr. Gorman explain it, maybe you ought to explain it, because you'll see in there that there

Page 44

is a September 7 and there is a September 12 letter.
MR. COTTONE: I see. This is sent to the insurance company for review for --
THE WITNESS: Correct.
MR. HINES: That is to the insurance company for review. The one that actually went to Mrs. Southgate is the September 12 letter.
MR. COTTONE: Let's mark the September 12 letter separately as Exhibit 4.
(PLAINTIFF'S EXHIBIT 4 MARKED FOR I.D.)
Q. I'll show you that, and before we get into the letter you sent to the insurance company in your file, which is Plaintiff's Exhibit 3, I'd like to show you Plaintiff's Exhibit 4; is that your signature on page 3, or a copy of it?
A. Yeah, yup.
Q. Is that the letter you sent to Ms. Southgate denying coverage on behalf of Vermont Mutual?
A. Yes.
Q. Did you discuss this, the substance of this letter, with anybody prior to sending it to Ms. Southgate?
A. I did.
Q. Who did you discuss it with?

Page 45

A. Joel Dyke, D-Y-K-E.
Q. Is he an employee of Vermont Mutual Insurance Company?
A. He is a claim examiner.
Q. Could you recall your conversation with him?
A. I'm not sure if it was a phone conversation or through E-mail, but the first report was submitted to him with a draft letter of declination. They have some, their procedure is when there is a potential denial with the first report, they want a draft letter, and they have some boilerplate forms that they give you, and you draft a letter. They look at it, and they tweak it, and they come back to you with the final draft, and then they instruct you to send it to the insured, and that's what happened here. A first report went, giving the preliminary information to the company, they review it, and then come back to you with an opinion if they want to make a declination, and they tailor the letter to the specific claim.
Q. There are not any E-mails back and forth between you and Mr. Dyke?
A. Typically --
Q. Were they taken out or --

A. The report itself gets E-mailed to them, so he receives this and goes through it. That's the E-mail I'm referring to. He picks this up. Separately, the letter draft is E-mailed to him as a Word document, and he takes it at his desk, and he'll send back or E-mail back the final product, and then it's converted to our letterhead and sent out.

He may take that letter, write on it, and then it goes back -- it goes out in final form if he made any corrections to it. They want the opportunity to correct the letter and send it out the way they want, so it's sent out on our letterhead, but it's reviewed by them and --

Q. Approved?

A. Or approved, yeah.

Q. And you don't recall any conversation that you had with him, in connection with the transmitting of either the first report or the draft letter?

A. I don't recall if he just put notes on it that it was okay, but it was altered from what went originally to what was produced.

Q. Looking at the September 7 letter, that is part of Plaintiff's Exhibit 3, and comparing it with Plaintiff's Exhibit 4, could you describe what the



significant difference is between the two?

A. The original denial draft had a little more language in it, and it had the mold or limited fungi endorsement language on it as well. But when the company reviewed it, Mr. Dyke indicated that the loss itself as surface or subsurface water would not be covered at all, so he wanted to confine it to this specific language. That was the company decision that that's how they wanted the letter to look.

Q. So he took out the language that referred to the -- or let's call it the fungi endorsement?

A. Right.

Q. In fact, he put in, or at least he continued to use language from the policy regarding the water exclusions --

A. Right.

Q. ...that were actually not even -- that had been deleted from the policy, right? They were not even -- what's quoted in your letter on September 12, 2006, at the bottom, "Section I - Exclusions," was deleted from the applicable policy Ms. Southgate held; is that correct?

A. I don't know if I understand what you --

Q. The language that you quoted, "Section I -



Exclusions"?

A. Surface, or water below the surface of the ground, right.

Q. That language had, in fact, been removed from the policy that Ms. Southgate actually had; are you aware of that?

MR. HINES: Objection.

MR. COTTONE: If you're not aware, that's fine.

A. I don't know if I was aware of that.

Q. All right. Take a look at the policy we've marked as Plaintiff's Exhibit 2. Look at page, if you look at the first Homeowner Policy -- after the dec sheet there is enhancement endorsement, an amendment, rather; are you with me on that?

THE WITNESS: Which page number?

MR. COTTONE: Actually, it's 1 of 3, but if you go into one, two -- it's the fourth page of the whole thing, way in the beginning. Let me see that. This might have gotten stapled in different order from the one I'm looking at.

(ATTORNEY REVIEWS DOCUMENT)

MR. COTTONE: I must have --

THE WITNESS: That's all right. You want to show me yours?



MR. COTTONE: I don't want to have the wrong one marked as an exhibit. Here it is. Homeowner's Coverage Enhancement Endorsement. I'm sorry. It is, in fact, part of the policy, just in a different order. If you look at the second page, page 2 of 3, if you look at the bottom where it says, "Section I - Exclusions."

A. Okay.

Q. It says, "Water damage is deleted and replaced by the following"?

A. Okay.

Q. Now, the replacement language is different from what you quoted in the denial letter that was sent to Ms. Southgate, correct?

MR. HINES: Objection.

A. Surface water or water below the surface of the ground, including water which seeps or leaks to a building -- okay. It is different.

Q. So the language that you quoted was superseded, right?

A. Well, the verbiage might not be correct, but --

Q. That's the only question I'm asking you; the language is not the same?

A. It's not the same.

Page 50

Q. So you didn't quote from the policy when you denied the coverage?
A. The company instructed me to send the letter this way.
Q. I understand that. Whoever instructed what, you didn't quote from the policy, you quoted from the --
A. A section of this policy.
Q. A section of an amended policy that would have been struck, correct?
MR. HINES: Hold on a second.
MR. COTTONE: Okay.
A. I just said it looks like exerts pressure. There is a couple of words added that were not in the other --
Q. Did you ever send an amended, a corrected letter to Ms. Southgate denying coverage?
A. I did not.
Q. In looking at your letter that you sent to Vermont Mutual, you incorporated the outmoded language when you sent it to them. My question to you is, did you have a complete copy of Ms. Southgate's policy in your possession at the time you sent, or before you sent the September 12 letter to --
A. I did. I had a copy of the declarations

Page 51

page. I didn't have a complete copy of all of the endorsements as you have here, but I had a declarations page.
Q. You just had a declarations page?
A. Yes.
Q. And based on the declarations page, you made a decision to deny coverage, correct?
A. I did not. I sent the company a report indicating all the circumstances I had, and the company made the decision to deny the claim.
Q. But you, based on the --
A. I gave them a draft letter of --
Q. Looking at page 3 of your first report?
A. Yup.
Q. The origin, looking at Liability section, looking at, down to the fourth paragraph, "However, since the origin does not relate to a covered cause of loss, coverage would not be provided under the pertinent endorsement"?
A. With respect to the HO 0432 endorsement, yup.
Q. "A draft Letter of Declination is attached for your review"?
A. Correct.
Q. So, although you did not make the final decision, you recommended a denial of coverage, correct?

Page 52

A. I gave them a draft Letter of Declination based on what I saw of the applicable coverage, for them to review and apply it to the coverage that they had. I gave them an opinion based on what I saw.
Q. That's what I asked you.
A. Yeah, okay.
Q. So you opined that coverage should be denied, but you gave it to the insurance company to actually --
A. Formulate the --
Q. ...formulate the letter?
A. Right.
Q. They were following your advice, essentially?
A. They, you know, they were.
Q. Okay. Now, were you aware that there were estimates submitted for repair of the damage, of certain other damage to the property that were part of the claim that had been made, that there were --
A. I don't know what you're referring to.
MR. COTTONE: I'll just mark this as Plaintiff's 5.
MR. HINES: What are you marking?
MR. COTTONE: The estimates for repair

Page 53

work that I sent to you.
(PLAINTIFF'S EXHIBIT 5 MARKED FOR I.D.)
Q. Take a look at that, and let me know if you've seen it before; not necessarily the cover letter, but the repairs estimates I'm more interested in.
A. I do not recall seeing any of these.
Q. Okay. You never were given a copy of this to review?
A. I don't believe I was.
Q. And taking a look at the documents, does it bear at all in the scope of the damage that you were reviewing in your claim analysis?
A. I'm not sure. I'm looking at the first one talking about removing ceilings. I don't see anything about removing floors, so I'm not really clear, in just a quick look at this. I don't see anything in there for removing saturated plywood or rot damage plywood, but I see talk about wall insulation and ceiling insulation, so I'm not sure if this is partial. There is typical mold-type equipment being utilized to --
Q. That was part of the -- if you look specifically at the Bash Cleaning & Mold Remediation Services is what was actually undertaken.
A. Okay, yeah. Okay.

Q. But you've never seen it before?
A. I have not.
MR. COTTONE: That's all I needed to know.
Q. You've indicated, if you'd look at the policy on page, the fungi endorsement, if you look at page 2 of 3?
A. Okay.
Q. And there is an addition to Coverage A - Dwelling and Coverage B - Other Structures; do you see where I am?
A. In the middle, yes.
Q. There is a small paragraph 9, which is the language that I'm going to be asking you about, which begins with, "Constant or repeated seepage or leakage"; do you see that? Counsel can interject if I'm mischaracterizing this language, but essentially this described condition is not covered by the policy. In other words, the words before the "unless" --
MR. HINES: I'm going to object, and --
MR. COTTONE: We'll go through the policy and I'll read it to him.
MR. HINES: First of all, I think you're asking for a coverage opinion from him as to what



the policy says, and Mr. Gorman is a licensed insurance adjuster, and I'll let him talk about damage and stuff, but I won't let him talk about interpretation of policy language.
MR. COTTONE: If you're going to direct him not to answer, that's fine, but we'll have to go to court on that, because he just gave me his testimony that he gave an opinion about the coverage, which I have in writing here. So, therefore, I'm entitled to ask him -- your objection is duly noted. I'm asking for a legal opinion he is not qualified to make, but he made it clear that he informed Vermont Mutual of his opinion, he put it in writing, and they based their denial on his opinion, according to his testimony, so I'm entitled to ask him questions I think appropriate to --
MR. HINES: And his denial letter sets forth the areas of the policy to which he is making reference.
MR. COTTONE: They set forth areas of the policy that don't even exist.
MR. HINES: Not so. When you look at what you've said --
MR. COTTONE: That's also his testimony.



MR. HINES: Wait a minute. Let me finish. When you look at the basis for the denial letter, what you're arguing is form over substance. No matter what, even in the changed language, it calls for --
MR. COTTONE: John, what are we arguing about? You can't instruct him not to answer.
MR. HINES: Wait a minute. All I'm saying is that, Tony, I think your argument, even though there may have been a change in the policy, it's still, under the changed language, it says that surface water and water seeping up from underneath are both excluded.
MR. COTTONE: He put -- I don't see any need for a whole discussion, because I think I'm entitled to an answer to the question, but in his September 7 letter to the insured, he included the fungi exclusion I'm asking him about, and they took it out. That even further gives me grounds to ask him a question about that exclusion that he put in.
MR. HINES: Okay. That -- he said that that was a form that was submitted by the insurance company.
MR. COTTONE: Right. And --



MR. HINES: I'll let you go further. I'll let you go further. Explain to me --
MR. COTTONE: I don't have to explain anything. You have no grounds, under "Kelvey," you can't direct him not to answer. You can object all you want.
MR. HINES: I'm going to let you go a little further. I'm going to object -- go ahead. Lead back into your question.
MR. COTTONE: John, you don't have the right to "let" me do anything. We're in a deposition. Are you kidding me?
MR. HINES: Go back to your question. I'm objecting. I'm not instructing him not to answer.
MR. COTTONE: Well, I'm glad, because that's not the way we do things. I understand you have an objection.
Q. I started out to say that I, I don't want to mischaracterize the policy, and John can correct me if I'm wrong, to save time, without going back and reading it, that basically the first, before the first couple of -- before the word "unless," is not covered by the policy?
MR. HINES: I want you to read the

language into the record, and then ask your question.

Q. According to the policy --

MR. COTTONE: And I think we should go back and read the actual language, to make it clear. I'm referring to the fungi exclusion which was cited in Mr. Gorman's letter to the Vermont Mutual, it provides that, "We insure against risk of direct loss to property described in coverages A and B" --

MR. HINES: Where are you talking about?

MR. COTTONE: I'm reading where they amended it. I'm reading from "Coverage A - Dwelling and Coverage B - Other Structures. Paragraph 2.e.(3) is deleted and replaced by the following"; do you see that?

MR. HINES: Wait a minute. What page are you on?

MR. COTTONE: On page 2 of the fungi endorsement.

MR. HINES: Hold on. Page 2. Okay.

MR. COTTONE: See where in the middle of page it says, "Paragraph 2.e.(9) is added"?

MR. HINES: Yes, I do.

MR. COTTONE: I'm going back contextually



to read paragraph 2.e.(9), so we can read it together and make sense out of the subsection 9, that's going to be the subject of my question.

MR. HINES: Let's go to the policy, where the policy --

MR. COTTONE: That's what I was reading.

MR. HINES: What page?

MR. COTTONE: Page 6 of 15.

MR. HINES: Okay.

MR. COTTONE: "We insure against risk of direct loss to property described in Coverages A and B."

MR. HINES: Let me interject one thing. You're under "Section I - Perils Insured Against"?

MR. COTTONE: Right.

MR. HINES: And then you're reading the language appearing therein. Okay. Go ahead.

MR. COTTONE: "Coverage A - Dwelling and Coverage B - Other structures. We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not, however, insure for loss:" Then 2 is, "Caused by," then if you go to e(9) --

MR. HINES: So we had 8 before, and now



we're going to put in 9.

MR. COTTONE: "Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years, unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure."

MR. HINES: Okay.

Q. Now my question to Mr. Gorman is, if we assume that the damage that you observed, and that you -- it was existing that you didn't observe, but the rotting floor damage that you did observe was caused by hidden water beneath the floors of the residence, okay, that was unknown to Ms. Southgate, wouldn't, in fact, it be covered by the policy, damage, that is, under the plain language of Section 9 that you quoted to Vermont Mutual?

MR. HINES: Objection, and I'm going to instruct him not to answer and I'll tell you why.

(SO NOTED)



MR. HINES: I want this on the record. Go to page 1 of 3 of that fungi endorsement.

MR. COTTONE: 1 of 3, okay.

MR. HINES: Under 12, go to b. It reads, "The coverage described in 12.a," and you were reading from 12.a and going over into what's added on --

MR. COTTONE: Wait a minute. I was reading from 9 2.e.(9).

THE WITNESS: Yeah, but before, when we were talking about the definitions of fungi, this is the coverage that applies for fungi, wet or dry rot or bacteria. It's just part of the coverage.

MR. HINES: Under 12.b it says, "The coverage described in 12.a only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period," etc., so I'm not going to allow him to answer, because the policy answers it itself. The Peril Insured Against do not cover surface water or water beneath the ground.

MR. COTTONE: You have now interjected your opinion in a completely inappropriate way in the middle of a deposition, and prevented your client from answering a question. It's not

appropriate. You can't coach a Witness during the entire deposition.

MR. HINES: Tony, the policy describes the answer --

MR. COTTONE: I'm not arguing with you. That's why we have lawsuits. I mean, I asked him a question. If you're going to continue to have him not -- I mean, we'll go to court on it.

MR. HINES: What is your question to him?

MR. COTTONE: Would you read it back?

(PENDING QUESTION READ BACK)

MR. HINES: I'm going to allow him to answer it, but I will object to it, number one, on the policy speaks for itself, and on the form of the question.

A. I presented the report with all of this information, and my draft declination, including the language of what I thought was the main policy and the endorsement on mold and rot. It was reviewed by Joel Dyke at the company, and what he came back to me with was because the origin appears to relate to surface water or water below the surface of the ground, the main body policy would negate coverage, and that's why he took out any language involving the mold endorsement,



because he didn't think it pertained, because the loss was not covered under the main policy for surface or subsurface water.

Q. Okay. You decided to include the --

A. I included the language in my draft.

Q. In your draft?

A. They told me to take it out, because they did not, in their opinion, believe it applied, because they took a position on the coverage, which was in the final draft.

Q. In your opinion, okay, when you look at that language that I quoted to you -- and you can put it in front of you there.

A. Yup. Let me flip to it. Got it. Okay.

Q. It says various things are not covered, "...unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors..." Now if this seeping or leaking water that was present at Ms. Southgate's residence was hidden beneath the floors, and it was unknown to her, wouldn't it be covered -- you can have no opinion, or you can have an opinion, you can say yes or no, I'm just asking for your



opinion since you cited this provision -- wouldn't it, by the plain language of what I just quoted to you, be covered by this policy?

A. I would say just with --

MR. HINES: Objection. I'm not going to allow him to answer, and I'll tell you why. I'll put it on the record.

(SO NOTED)

MR. HINES: The denial letter has been issued by the insurance company. He has issued it with the instructions of the insurance company. He is not the insurance company. The contract is with the insurance company. If you want to ask that to a representative of the insurance company, because they're the ones that are behind the denial, fine.

MR. COTTONE: John, we'll go to court. That's fine. We'll stop.

THE REPORTER: Mr. Hines, would you like a copy of this transcript?

MR. HINES: Yes, I would.

(DEPOSITION ADJOURNED AT 3:34 P.M.)

C-E-R-T-I-F-I-C-A-T-E

I, JULIA A. PULEO, RPR, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of JEFFREY A. GORMAN, a Witness in the above-entitled cause, was taken before me on behalf of the Plaintiff, at the Law Offices of Anthony F. Cottone, 55 Dorrance Street, Suite 400, Providence, Rhode Island, on May 10, 2007, at 2:00 P.M., that previous to examination of said Witness, who was of lawful age, said Witness was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that said Witness thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said Witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Anthony F. Cottone, Attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of May, 2007.

JULIA A. PULEO, RPR/NOTARY PUBLIC
My Commission expires on January 26, 2010.