EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

VS. : C.A. NO. 06-500ML

DEPOSITION OF [illegible], a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of HINES & CORRIGAN, INC., One James P. Murphy Highway, West Warwick, Rhode Island, on Wednesday, August 22, 2007 at 9 a.m.

APPEARANCES:

FOR THE PLAINTIFF:
BY: Anthony F. Cottone, Esq.

FOR THE DEFENDANT:
HINES & CORRIGAN, INC
BY: Robert T. Corrigan, Esq.





I N D E X


| WITNESS | PAGE |
|---|---|
| ADRIENNE SOUTHGATE | |
| DIRECT EXAMINATION BY MR. CORRIGAN | 3 |


E X H I B I T S


| NO. | DESCRIPTION: DEFENDANT'S | PAGE |
|---|---|---|
| A | COPY OF TWO PHOTOGRAPHS | [illegible] |
| B | COPY OF TWO PHOTOGRAPHS | [illegible] |
| C | COPY OF TWO PHOTOGRAPHS | 30 |
| D | COPY OF TWO PHOTOGRAPHS | 34 |
| E | COPY OF TWO PHOTOGRAPHS | 35 |
| F | PROPERTY LOSS NOTICE | 39 |
| G | FUNGI, MOLD, WET OR DRY ROT QUESTIONNAIRE | 45 |
| H | DRAWING | [illegible] |






(COMMENCED AT 9:00 A.M.)

ADRIENNE SOUTHGATE

Having been first duly sworn, testified as follows:

STENOGRAPHER: Please state your name and address for the record.

THE WITNESS: [illegible]

DIRECT EXAMINATION BY MR. CORRIGAN

Q Good morning.
A Good morning.
Q My name is Bob Corrigan, and I represent Vermont Mutual in this case, and I'm going to take your deposition this morning as you know. Have you ever had your deposition taken before?
A No.
Q I understand that you are an attorney?
A Yes, I am.
Q So I'll just briefly go over the ground rules so we're on the same page. Everything that I ask you and all of your responses, as well as any objections by Mr. Cottone will be taken down by the stenographer. And when we're done, she'll produce a





booklet for us.
In the course of the deposition, I may use an insurance term or a legal term. If you're not exactly sure what I mean by the use of any type of such term, please let me know, and I'll do my best to rephrase the question.
A Thank you.
Q As I said before, we're on the record. If you want to take a break, just let me know; okay?
A Fair enough.
Q Are you prepared to go?
A I am.
Q All right. Before coming here today, did you review any records to prepare yourself to testify?
A The only document I reviewed was the fungi report that I signed on September 6th when I submitted the claim to Vermont Mutual.
Q And we will review that as well today. You were sworn in and you give an address of . That's where you presently live?
A That's correct.
Q Now, as I understand it, at the time that the loss occurred in this matter, you were living



FILE COPY

elsewhere; is that true?
A Yes, that's correct.
Q Where were you living in August of 2006?
A I had an apartment at ; in Providence.
Q And for approximately what inclusive period of time did you live at ;
A I moved in some of my belongings in May of 2005, to the best of my recollection, and I left Lennon Street permanently. All of my belongings were removed from Lennon Street in July of this year.
Q And you've been at
. .
A I've actually been at .
continuously from 1994 through -- functionally through May of 2005 when I returned in July of 2007.
Q And are you presently employed?
A Yes, I am.
Q Who is your employer?
A The City of Providence.
Q What is your position?
A I work in the law department, and my title is Deputy City Solicitor.
Q And for how long have you been employed in





that capacity?
A As deputy, since March of 2004. With the City, since March of 2003.
Q Are you employed in any other capacity presently?
A I am not.
Q Other than 22 Rosedale in Barrington, do you own any other properties presently?
A I have a timeshare in Newport, Rhode Island.
Q So you became the owner of 22 Rosedale originally in May of 2000? I'm sorry. In May of 1994?
THE WITNESS: Of 22 Rosedale did you say?
MR. CORRIGAN: Yes.
A I became the owner in November of 1993.
Q And how did you come to be the owner? Was it by inheritance or by purchase?
A I purchased the home.
Q And you first moved into the house at what point?
A January of 1994.
Q Do you know the approximate age of the home?
A I believe it was built in, roughly, 1950.





Q When you moved in in January of 1994, did you do any remodeling in the home?
A I had done substantial remodeling between the time the home was purchased in November and the time I moved in in January.
Q Specifically, what did you do in that period of time?
A I contracted with an entity called Rise to do an energy audit on the home, and they made a number of recommendations for additional insulation, window replacement, something to do with the furnace that I don't really understand and some other things, programmable thermostats and the like. And that was the work that was done on the home under their direction and control.
Q I understand. From 1993 through 2006, did you do any roof work?
A Yes. I put a new roof on the house in 19 -- I believe it was 1995, but it could have actually been the summer of 1994.
Q Did you do any interior painting during that period of time from 1993 through 2006?
A I must have done, but I don't have any present recollection. I might have painted the





ceiling, but I'm not really sure.
Q Once again, from 1993 through 2006, did you replace any floors in the home?
A No, I did not.
Q From 1993 through 2006, did you replace any of the plumbing serving either the heating system or the water distribution system in the house?
A I believe the only change to the plumbing system was that I replaced a hot water heater and added an expansion tank. Both the hot water heater and the expansion tank being located in a furnace room area next to my boiler.
Q Do you know approximately when that was done?
A I really would be guessing. I think the water heater was around '98 or '99, and the expansion tank was a couple of years later.
Q Had the hot water tank failed?
A No.
Q Did you ever have a situation where the hot water tank had ruptured?
A No.
Q Now, the house, as I understand it, is a ranch?

A Yeah. I think so.
Q There's no second story?
A There is no second story.
Q And it's built on a masonry slab?
A Correct.
Q So there's no basement either?
A That's correct.
Q And how many bedrooms are there?
A Three.
Q And how many bathrooms?
A Two.
THE WITNESS: Excuse me.
MR. CORRIGAN: Sure.
THE WITNESS: I have to fix my chair.
Q And so there's two bathrooms?
A Correct.
Q Three bedrooms?
A Yes.
Q There's a kitchen?
A Yes.
Q And how many other rooms are there?
A There is a large, what I think of as a family room. There's a living room. There's a short hall that connects the bedrooms and the bathroom with





the living room area.
Q Now, you lived there from January of 1994 through May of 2005?
A That's correct.
Q While you were living there during that period of time, did you ever have any fires in the house?
A I did not.
Q Did you have any floods in the house?
A I did not.
Q Did you have any plumbing leaks?
A I did not.
Q Did you have any roof leaks?
A I did not.
Q Did you reside there with anyone else during that period of time?
A Both of my sons lived there intermittently. They were away at boarding school and college, but no other individuals resided there.
Q Now, you first moved from that house in May of 2005 to Lennon Street?
A I moved some of my things to Lennon Street, that's correct.
Q When did you, yourself, begin to reside at





Lennon Street for the first time?
A I would say intermittently from May of 2005 on.
Q Did you have a specific reason for moving from your house on Rosedale Avenue to Lennon Street in Providence?
A Yes, I did.
Q What was the reason?
A The City of Providence at the time I had a residency requirement and, essentially, I want to say March and April of 2005, there were some stories in the journal bulletin and an indication that the residency requirement at that point not been regionally enforced was going to be regionally enforced. A number of reasonably highly-placed city employees were identified as living outside the city boundaries but not within the grandfathered period. If you were employed by the city prior I believe to the passage of the home rule charter, you were not required to live in the city. And if you were a member of the teaching staff or the Providence Police Department or the Providence Fire Department, you were not required to live in the city but all other city employees by city charter were required to live





in the City of Providence. I was told that I was one of the targeted employees. So, I, without making myself sound too Machiavellian, I required an accommodation address in the City of Providence and moved enough of my things and began spending some time there so that if there was indeed a residency action brought, I could establish that I had residence in the City of Providence.
Q Now, prior to moving some of your belongings to Lennon Street and beginning to spend time there did you ever notice any problems with water infiltration in the home at 22 Rosedale Avenue?
A I did not notice any problems with water infiltration.
Q Did you ever notice wet carpeting?
A I did not notice wet carpeting.
Q Did you ever notice any areas where the floor was softer in certain areas than it was in others?
A No, not specifically softer but the -- I didn't change any of the carpeting in the areas that I lived in, my own bedroom suite and the family room principally, and there were areas under the floor where it was clear that either the padding wasn't

adequate or perhaps the floor hadn't been finished adequately before the carpeting was laid down. So there was some unevenness in the floor but not -- I'm reading your question as softness meaning yielding something.

Q Yes.

A And there wasn't anything like that.

Q Okay. Were all the three bedrooms carpeted?

A Yes, but the carpeting in the bedrooms occupied by my sons was carpeting that was installed relatively soon after I moved into the house because those areas had linoleum floors, and I wanted to install carpeting. The carpeting every place else in the house was carpeting existing at the time I bought the house and I did not change that.

Q So the carpeting in the large room, --

A Yes.

Q -- the dining room --

A Yes.

Q -- was existing --

A Was existing carpeting.

Q -- before 1993?

A Before 1993. We don't know when.

Q And would that be the same in the hallways?





A The same in the hallway. The same in the living room. The same in my bedroom area.

Q Now, at some point, did you make the decision that you were going to sell the house at 22 Rosedale?

A Well, I really did. I had gotten to the point where, you know, the housing market had a pretty substantial run up, and I thought it was really time to stop doing this one-footed each camp routine. I am a licensed real estate broker, and so I made a decision to go ahead and sort of fix the house up for sale and put it on the market, which I intended to do around the beginning of September of 2006.

Q As part of that process, you made the decision to replace some floors or some floor coverings?

A I definitely had to -- the carpeting, as you can imagine, since it had already existed from the time before I moved in was now almost -- well, it had to be at least 15 years old and there was a lot of wear. So I decided that I at least had to replace the carpeting in the main living areas and in my bedroom.





Q And you hired a firm to do that?

A I did.

Q And they began their work in late August of 2006?

A I believe that they actually came on August 31st, 2006.

Q When they came to the house on that date, would you have had any furniture in the home?

A No. Everything had been completely emptied at that point.

Q So there was no personal property in the house?

A Nothing whatsoever in the house. There were a few things left in the shed that I hadn't moved yet.

Q And they were engaged to remove carpet and put down new carpet?

A Correct.

Q And do you know, specifically, where they were supposed to remove the carpet, what rooms?

A They were to remove the carpet in every room with the exception of a small -- the smallest of the bedrooms. That room had been my oldest son's bedroom. He was already a senior in prep school at





the time I bought the house. But, anyway, he was gone by then and he never really -- I mean, he came back for vacations and things, but the room had been very lightly used, and it had new carpeting in it so I didn't see any point of replacing it. All the rest of the carpeting in the house was going to be replaced.

Q And the same firm that was going to remove the carpeting was going to install the new carpeting?

A Exactly.

Q And prior to that carpet company coming in to do its work, did you notice any problems with water or moisture infiltration on the floors at 22 Rosedale?

A I did not.

Q Did you notice any problems with the development of mold or mildew in the house at 22 Rosedale?

A You're saying in the period when I had contracted for the --

Q August of 2006?

A No, I did not until the day that they called me and asked me to come down so they can show it to me.

Q So prior to the carpet company coming into the house on August 31st, 2006, you did not notice any evidence of mold or mildew on the walls?

A As I indicated to Mr. Gorman, the only time I had seen any evidence of mold at all was during a summer several years earlier when my son in the other bedroom had been away and it was a hot, humid summer. He was not there, so I closed his room off so the air conditioning wouldn't have to air condition that space. And when he returned in September, behind his dresser and stuff, there was some evidence that some mold had formed, and I just didn't realize that if you didn't have the air moving that that could happen since there's mold in the ambient air all the time. I learned my lesson since then and we keep the fans going.

Q Now, when did you first become aware that there was some property damage to your home, specifically the floors?

A Well, what I learned on August 31st from the carpet installers was that the sub, and I'm quoting them, "the subfloor has rotted", and I wasn't able to come down immediately. I remember being very frightened because I didn't know what that meant, but





it sounded pretty dire. And when I finally actually was able to see what was going on at the house, it turned out that it was a fairly limited area in the proximity of a back door to the patio, that clearly the wood was rotting there, but they already removed the carpeting from the rest of that area in the family room, and the rest of the wood wasn't rotted. So they kind of -- they kind of caused some concern over nothing. Not over nothing. That's the wrong word. But I mean, they lead me to believe it was much more extensive than it was.

MR. CORRIGAN: Let me back up just a little bit.

THE WITNESS: I'm sorry.

MR. CORRIGAN: No problem.

Q You first noticed a potential problem came by way of a telephone call from the carpet installation company?

A That's correct. Yes.

Q And they reported to you that the subfloor was rotting?

A Yes. And they said that the padding on some of the carpeting was wet. And I don't recall, as I sit here, if they identified to me specifically in





what area or areas of the house that condition existed.

Q And you were unable to get to the house immediately?

A That's correct.

Q Do you recall when you first went to 22 Rosedale after receiving that phone call from the carpet company?

A I may have met with them the next day. I certainly had a chance to get there sometime. I think I got there before Mr. Gorman showed up.

Q When you first went to the property, was someone from the carpet company there?

A They may have been, but I just don't recall.

Q When you first went to the property, what was the status of the removal of the carpets that you wanted taken out?

A All of the carpet had been removed and they accidentally removed the carpeting in that other bedroom as well.

Q So they did not save the carpet in your eldest son's room?

A They did not.

Q Had all the carpet padding been removed?





A Everything had been removed.

Q Do you know if it was still on site?

A It was not.

Q What was on the floors when you went through the house and made your first observations?

A In the family room, there was bare wood. Nothing had happened. There were lots of rolls of carpeting and padding and stuff that were waiting to be installed. Nothing happened in the kitchen. In the living room, the carpet was gone and, clearly, there had been linoleum at some point underneath that carpeting and that had been partially removed. Likewise, in the hallway. And in at least one of the bedrooms, the linoleum had been partially removed. And my bedroom, the linoleum in the portion of the room up to the point where an addition had been added sometime prior to my buying the house, some of the linoleum had been removed. But from that point where the addition began to the back wall of the house, there was mostly bare concrete.

Q Did you on your first visit after having the situation reported to you by the carpet company, did you observe any standing water anywhere inside the home?

A I did not.

Q Did you observe any mold growing anywhere inside the home on that first visit?

A Well, I saw what I thought was mold. There was some molding, a door frame in my bedroom, and it looked to me like there was some black spots. I omitted in telling you the contents of the telephone call. That in addition to telling you that the subfloor had rotted out he said "And mold is crawling up your walls." Lovely imagine. So I was looking to find the mold that was crawling up the walls. And I do remember being quite startled that in the area where the subfloor clearly had rotted, there didn't appear to me, as I lay person, to be any mold. The only place I saw any evidence of mold was on this door frame in my bedroom which is -- the house is sort of laid out in an L format. The door is on this L. The bedroom is on this other L. So they're physically separated by a cement patio and by the width of the kitchen and the hallway.

Q Did you notice any evidence of wood rot on your first visit to the property after the carpets had been removed?

A No, other than in the area where the





"subflooring" was rotting out. I did see that. That was clearly wood rot.

Q So the only areas of wood rot were in the subfloor?

A Well, you asked what I noticed. That's what I noticed.

Q Just so we're clear. The subfloor is a plywood covering between the concrete slab and the carpet pad?

A Yes. And, apparently, the reason that there was a subfloor in that area was, that had been a garage and so it had been at grade originally when it was turned into a family room. They wanted to or someone must have raised the level so you weren't sitting smack on the concrete. The rest of the house had more of a foundation than the garage area, if that makes any sense.

Q What do you mean by a foundation?

A Well, what I mean is that now to get from my kitchen into my family room, you have to take a step down. I have been in other houses in my neighborhood that still maintain the old configuration, which is what my family room is their garage, and that step is substantially higher than the step I have between my





kitchen and family room. So the subfloor raised the level of flooring so that there's only a two or three inch step down instead of a seven or eight inch step down. And that was when they said your subfloor had rotted. I thought they meant the entire house was about to fall down. It turned out there's only a subfloor in one room.

Q Let me see if I can understand this as the same way you see it.

A Okay.

Q The entire structure is built on a slab, correct?

A Yes.

Q There is no basement?

A There is no basement.

Q All right. The portion of the house that was originally a house and not garage has a slab that's above grade?

A Yes.

Q The portion of the house that was originally a garage has a slab that was on grade?

A Exactly.

Q And in order to raise the level of that area when it became house, they put a subfloor on top of





that portion of the slab that was once garage?

A Yes. I don't know what motivated them to do it, but they certainly did do it.

Q That subfloor, do you know if it was strictly a layer of plywood or if it also had joists below it?

A What are joists?

Q Joists would be boards running underneath.

A Okay. I actually saw what I think of as 2 x 4s, but maybe there's some other dimension when they started to take up the subfloor later on. I'm assuming that those, if you say they're joists, that they ran throughout the area underneath the plywood in the family room.

Q And that subfloor that we have just described with the joists and the plywood is limited to the area of the home that was once a garage?

A Correct.

Q And what room or rooms is that now?

A Well, I call it the family room. In fact, my dining room table is in that room and there's sort of a sitting, reading, television watching area. It's a big room.

Q And there's a door in that room?

A There are two doors. One leading to the deck, and one leading to a patio.

MR. CORRIGAN: I want to show you some pictures and ask you to identify them, and maybe I'll have a better understanding of the layout.

THE WITNESS: Sure.

(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)

Q We'll mark this as Defendant's A and describe it as a photocopy of two photographs. The top photograph shows the exterior of the house. Is that 22 Rosedale?

A Yes, it is.

Q Is that the way it looked in August of 2006?

A Yes, it does. Or September of 2006.

Q The bottom photo shows the bottom half of a door and what looks like a wooden floor; is that correct?

A Yes.

Q Is the bottom photo depicting the area of the subfloor that we discussed --

A Yes.

Q -- where there was once a garage and now a home?





A I beg your pardon. I didn't mean to interrupt your question. Yes, it does depict the area of the subfloor adjacent to the door to the patio from the area that I've been describing as the family room.

Q Okay. So the bottom picture in Defendant's Exhibit A shows a door which leads to a patio?

A Yes.

Q And that patio is at the back of the house?

A Correct.

Q And does this picture also show the area where you saw some wood rot?

A Yes.

Q Is the wood rot depicted in the picture?

A Yes. It looks like a darker area immediately adjacent to the sill of the door.

Q Was there any wood rot discovered by you anywhere else in the home?

A Not in the interior of the home. Eventually, as I was painting the outside of the house, I -- well, I was told by my painter that there was some areas up by the eaves that where there was some rot and he needed to replace small pieces of wood.





MR. CORRIGAN: Let me show you what I'll mark as Defendant's Exhibit B.

(DEFENDANT'S EXHIBIT B MARKED FOR IDENTIFICATION)

Q And once again we have a photocopy of two photographs. The top photograph shows a door. Is that the same door that's depicted in photograph Number 2 on Defendant's Exhibit A?

A Yes, it is.

Q Does that once again show the area where you observed wood rot?

A Yes, it does.

Q And this picture which shows a room is the area that was once a garage that is now part of the living area?

A Yes.

Q There's a second picture at the bottom of Defendant's Exhibit B. Do you know what that depicts?

A Yes, I do. This is the area that leads into my boiler room. It's also where the water heater and the expansion tank are located. And physically -- this is physically about, by scale, about six inches to the right of where you see here. You've got this





space. This is a utility closet where my washer and dryer were. There's an entryway into the kitchen adjacent to that. There's the entrance way to the kitchen. On the far side is the utilities room. Although, you can't see it here, because we removed the doors so that the carpets could be laid. This is a double closet for coats and things like that. There's a removable wall in the back of that so you could get access to the furnace.

MR. COTTONE: Is there a question pending?

THE WITNESS: I'm sorry.

Q If you were standing in the home looking towards the backyard --

A Yes.

Q -- and you were in the room that was once the garage, you'd be looking at the door that's shown in photo Number 3; is that correct?

A If I stood at the back door?

Q If you were standing in the house looking towards the backyard?

A I would actually be looking across the door. The door faces into that patio area which is between the Ls.

Q Oh, all right. So this door that I'm looking at in Defendant's Exhibit B, which is marked as photo 3, is actually towards the side of the house and not towards the back of the house?
A That's correct.
Q And in the photograph Number 4 on Exhibit B, these louvered doors are they for the utilities or for clothing storage?
A No. Immediately behind these doors is the boiler and the water heater and so forth. There's another set of doors that encloses the front part of the closet that have been removed so that the carpet people could lay carpet in that closet area.
Q Okay. Is that you standing with your head chopped off in photograph Number 4?
A It is.
Q Are you standing on wooden subfloor?
A I am.
Q Are you standing in the area of the home that was once a garage?
A Yes.
Q The boiler, is that located in a portion of the home that was once a garage?
A Yes.





Q Is there a wooden subfloor under the boiler?
A No.
Q Did you observe any wood rot in the subfloor in the area shown in photograph Number 4 on Exhibit B?
A I did not.
MR. CORRIGAN: This will be marked as Defendant's Exhibit C. Once again it has two photographs that are marked on the sheet as Number 5 and 6.
(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)
Q I'll show you what's marked as photograph 5 on Exhibit C. It appears to show a hallway leading to a door. Do you recognize where that is?
A Well, it says, view of living room and kitchen hallway. I can't really tell what part this floor is. I believe these other exhibits have identified what I call the family room as the living room. And if that nomenclature continues to be accurate, then, yes, this would be the little hallway that leads from what I call the family room and to my kitchen.
Q Is the flooring shown in the floor ground of





photograph Number 5 wooden subfloor?
A Yes.
Q That's also part of the home that was once a garage?
A Well, I will say, yes. But, clearly, the boiler area existed prior to the time this became a room. So I'm not really sure whether this little hallway was part of the garage or whether it was some sort of little vestibule potentially with a step or two leading into the house proper.
Q Was there, before the removal of the carpets, a height differential between the hallway shown on the floor ground of photograph Number 5 and the area shown in the top portion of Exhibit Number 5?
A Yes, there was. As I previously testified, there's approximately a three inch differential between the kitchen level and the family room level.
Q And the rolls of what appear to be carpeting or carpet padding that is shown in photograph Number 5, to your knowledge, was that the old carpet or the new carpet?
A It's the new carpet waiting to be installed.
Q On photograph Number 6 on Exhibit C there's





another doorway shown. Do you know which doorway that is?
A That's my front door.
Q And just inside the front door, there appears to be a square area. Do you know what that is?
A Yes. That is tile of some kind that existed at the time I bought the house that had been laid so that you came on tile before you walked on the carpet.
Q Is that like a stone tile?
A I was gonna say ceramic. I actually don't know what the material is.
Q And as you walk through that front door across that original square area of tile, you entered the room and there appears to be geometric square patterns. Do you know what that is?
A Yes, that's the linoleum that underlay the carpet. That was removed by the carpet installers.
Q And is this the way that this front room looked when you first observed it after you got the telephone call from the carpet company?
A I think that accurately depicts the way it looked.

Q Did you notice any damage in this front room when you first made your observations after getting the call from the carpet company?
A Damage of what sort?
Q Property damage.
A No. The tiles -- these tiles were just the way they should have been. And it was obvious that the carpet men were in the process of removing the underlying linoleum. I suppose if I wanted to live with the linoleum, I could say that this represented damage, because clearly you wouldn't have wanted to live with some on and some off: but the living room was in good shape.
Q What you're calling the living room is the front room as you come in the front door?
A Correct.
Q There was no evidence of standing water?
A No, none whatsoever.
Q No evidence of mold?
A No.
Q No evidence of wet rot or dry rot?
A None there.
Q There had been no wooden subfloor in that room?





A Correct.
MR. CORRIGAN: Defendant's D.
(DEFENDANT'S EXHIBIT D MARKED FOR IDENTIFICATION)
Q Defendant's D, once again, has two copies of pictures marked as picture 7 and 8. Do you recognize what's shown in picture 7?
A I believe that is one of the two bedrooms that belonged to my sons, but I cannot tell based on the detail of this picture which bedroom is represented.
Q Was there any wood subflooring in any of the bedrooms?
A No.
Q Did you find any evidence of standing water in any of the bedrooms?
A I did not.
Q Did you find any evidence of wet rot or dry rot in any of the bedrooms?
A I did not.
Q Did you find any evidence of mold in any of the bedrooms?
A I don't believe I found any evidence except this painted trim, and I cannot tell you as I look





whether this was the painted trim by the door of my bedroom or some place else. All of the trim looks very similar.
Q You're pointing to photograph Number 8 in Exhibit D?
A That's correct. Yes.
Q On the trim, there is what looks to be some spotting, correct?
A Yes.
Q Is that what you believe to be the mold?
A Yes.
Q Is the spotting shown on the trim in picture 8 an accurate representation of the types of evidence of mold that you discovered?
A Yes.
MR. CORRIGAN: Defendant's E.
(DEFENDANT'S EXHIBIT E MARKED FOR IDENTIFICATION)
Q Defendant's E, once again, is a photocopy of two pictures described as photograph 9 and 10. Do you recognize what photograph Number 9 depicts?
A It's described as visible mold growth on painted surface-hallway, but I don't recognize what wall that might have been. I do recognize this, and





I have a vague memory that Mr. Gorman took pictures in the area of my bedroom. I believe that this description of hallway maybe referencing this little area here, which I don't think of as a hallway. But this is the area that I indicated that there was -- that I could see visible mold growth on the paint of the trim. This description Number 10 is the patio door from the other L that leads from my bedroom onto the patio.
Q Okay. So you had a door that would lead from your bedroom out to a patio?
A I did.
Q Is it the same patio that leads to the door where you found the wood rot?
A Yes.
Q Just a different way of getting to that door?
A Correct.
Q And in photograph Number 10 we see a door. Is that the door that leads to the patio from your bedroom?
A That's correct.
Q In the area shown in photograph Number 10, did you find any evidence of standing water?

A I did not.
Q Did you find any evidence of mold growth?
A As I indicated I did see some on the trim, and Mr. Gorman pointed out other areas I believe on the walls where he said that's mold but I would not have known to identify it as such.
Q Did you see any evidence of dry rot or wet rot in the area shown in photograph Number 10?
A I did not.
Q You told me earlier that when the carpet company called to let you know that there was some problems, they told you that the carpet padding was wet; is that correct?
A Mm-hmm. That some areas of carpet padding.
Q Did they ever show you where those areas were?
A No, not to my recollection.
Q Do you recall asking where the water was?
A You know, I think I was just kind of overwhelmed.
Q Other than what we have already discussed when you first reported to 22 Rosedale after you got that phone call from the carpet company, did you find any other evidence of property damage at the home?





A No.
Q So you saw some damage -- strike that. You discovered yourself evidence of some rot on the wooden subfloor near the door that leads to the patio?
A Yes, I did.
Q And you found some evidence of what you thought was mold in the area near your bedroom?
A Near the door -- the door to the patio on the other side, yeah.
Q Did you discover mold in any other locations?
A Not when I first came to the house.
Q After you first observed this condition, you called your insurance agent to report the same?
A I did.
Q And that was Troy, Pires & Allen?
A Yes.
Q If you look at what's described as a Property Loss Notice. I'm going to ask you some questions about that.
A Okay.
MR. CORRIGAN: I'll mark this as Defendant's F.





(DEFENDANT'S EXHIBIT F MARKED FOR IDENTIFICATION)

Q Have you ever seen this Property Loss Notice?
A Not to the best of my knowledge.
Q This notice indicates that Adrienne Southgate reported a loss on September 1, 2006?
A Yes.
Q Would that be correct?
A That's what the form says.
Q And is it your memory that you would have called the insurance agency the next day to report the loss?
A I think -- and thank you for sharing this form with me because it does help refresh my recollection. I think what I did was, I wasn't able to get down to the house immediately and I came home and pulled my insurance file from files where I keep my house stuff, because you'll see that my description of the loss is basically what the gentleman had told me, and I had not yet been able to go down and see. Sort of an exaggeration to say the most. A gross exaggeration fortunately, but, yes.
Q You're speaking about an entry on this





Property Loss Notice under the heading of description of loss and damage?
A Yes.
Q And it appears to be typed written in there. Most of the flooring in the house is moldy and rotted?
A Yes.
Q Do you believe that that's what you first reported to the insurance agency?
A I'm sure that I passed along to them what the installers had said to me which was, your subflooring is all rotted out and you've got mold crawling up your walls. So it's quite a vivid description of what had happened, and I'm sure I passed along essentially that same language.
Q Does that help you to recollect if you filed your report of this loss to the insurance company before you actually visited the property yourself or if you reported it after you visited the property?
A I reported it -- I spoke to someone at Troy & Pires before I saw the property.
Q Now, you did meet Mr. Gorman at the property?
A I did.

Q And that was about five or six days after you discovered or were advised of the situation by the carpet company?

A I believe it was on September the 6th, the date the photographs were taken.

Q Between the time that you first learned of the situation through the carpet company and the time that you had Mr. Gorman at the property to look at it, did you have any other contractors or building professionals there to take a look at the home?

A I don't believe I had any contractors or building professionals before the 6th of September. I certainly did have a number after the 6th of September.

Q Do you know anyone who would have witnessed the condition at the home between August 31st and September 6th when Mr. Gorman first arrived?

A I cannot be certain. It is possible that I may have asked one of my neighbors to come in and look at things, but I just don't have a present recollection.

Q Okay. Do you know if the carpet company did any additional work between August 31st and September 6th?





A No. The carpet company did not come back until I told them that the remediation had been completed, and I think that wasn't until November.

Q So the home should have been in substantially the same condition on September 6th as it was when the carpet company completed the rip out on August 31st, 2006?

A Yes, with a caveat that we were then in hot, sultry summer weather, and I wasn't living in the house. It was closed up. There weren't air conditioners operating and so forth. So it is certainly possible that by the 6th of September if there was mold growth, that it had been enhanced from the time that had elapsed; but I'm speculating, of course, which I'm not supposed to do.

Q You were, however, able to observe the condition of the house before meeting with Mr. Gorman?

A I was.

Q When you made your observations, were you able to make any determination as to what caused the damage that you discovered to the house?

A No. That was clearly a matter of some moment to me.





Q When Mr. Gorman arrived, do you recall if anyone else was there other than yourself?

A No, it was just the two of us.

Q This was on September 6th of 2006?

A Correct.

Q And were you in the home or outside the home when he arrived?

A I don't recall.

Q And when he arrived, he asked you to fill out a fungi, mold, wet or dry rot questionnaire?

A I think we took a look at the house first, but then he gave me the questionnaire.

Q Okay. What do you recall was the first thing you reported to Mr. Gorman when he arrived at the house?

A Probably what the carpet installers had told me.

Q Did you show him the areas of your home that you felt had sustained some property damage?

A Yes.

Q You showed him the area of the home where the door and the former garage met the patio?

A I did.

Q You showed him the area of that short





hallway with the door from your bedroom connected to the back or the side patio?

A Yes, I did.

Q And did you show him any other areas in the home that you felt there was property damage?

A No, but we looked through the house very carefully, because I wanted to be sure that everything that needed to be looked at had been looked at.

Q Do you recall what you told Mr. Gorman about the history of the home?

A No, not with any degree of specificity. I believe I told him that I was planning on putting it on the market.

Q Did you advise him of what you told me today about the area where the subflooring was once garage?

THE WITNESS: Did I explain to him that it was once garage?

MR. CORRIGAN: Yes.

A I may well have done.

Q Did he ask you if you had experienced any plumbing leaks in the home?

A I'm quite sure that he did.

Q Do you recall what you said?

A I told him that I had not.
Q Did he ask you if you had experienced any roof leaks in the home?
A Yes.
Q Do you recall what you said?
A I told him I had none.
Q Did you show Mr. Gorman all areas of the home that he asked to see?
A I probably showed him areas whether or not he asked to see them. We looked, you know, in the bathrooms and all that kind of stuff.
Q Did you advise Mr. Gorman that you had ever experienced any type of failure of your hot water tank or your furnace?
A I had never experienced any failure of either one, so I'm sure I did not advise Mr. Gorman that I had done so.
Q Did you advise Mr. Gorman that you would sometimes have water pooling outside the home after heavy rains?
A I did. I pointed out that in the front yard of my home, which is located at the bottom of a slope, that in heavy rains, water would pool. It's an area of 15 feet or so from the foundation of the





home, because he asked about standing water, and that's the only place that there was standing water. But as I say, that was rather a rare event. But he asked specifically and I believe that that was my answer.
Q We've spoken about a patio. Did you have more than one patio?
A No. One patio and one deck.
Q As you're looking at the front of the house, what side of the house is the patio?
A It's on the rear of the house.
Q It's on the rear of the house?
A Mm-hmm.
Q Did you ever advise Mr. Gorman that you had water pooling after heavy rains anywhere near the rear of the house?
A I don't recall advising him of that. No.
Q The patio that we have spoken about, was that a part of the house where you purchased it in 1996?
A It was.
Q And was that a stone patio or cement?
A It's cement.
Q Was it connected to the house, do you know?





A Well, the cement runs to the foundation if that's what you're asking.
Q So the cement patio touches the cement slab that the house is constructed upon?
A Yes. There might be some substance that masks the joint of where the two come together but, if so, I don't know what it is or what it's called.
Q An area that may allow expansion of the two?
A Right.
Q Okay. Do you know if there is a discrepancy in height between the outdoor patio and the concrete slab that the house is built upon?
A Well, I would have to answer that yes, because if I go to the patio from my bedroom, I have to step down. So I would say that the patio is probably on grade which would mean it would be at more or less the level of the garage. I do know that the discrepancy between the patio door from the family room to the patio is much slighter than the one from my bedroom to the patio.
Q So if we look at the door shown on Defendant's Exhibit A which is marked as photo Number 2?
A Correct.





Q That photograph is taken from inside the house?
A Correct.
Q And the door would lead out to this patio that we're speaking about?
A Correct.
Q And if we step out of the house through this doorway, we'll step onto the patio?
A Yes.
Q And is it your testimony that the patio was just about even with the cement grade of the original garage?
A Correct. So that with the subfloor, this area is slightly elevated over the patio.
Q Okay. Would you use the patio often in the time that you owned the house or lived in the house rather?
A Seasonally, yes.
Q Would you normally access the patio from one door rather than the other?
A I generally accessed it from my bedroom. The door that lead from the family room to the patio was typically locked.
Q I'm going to have you look at what I'll mark

as Defendant's Exhibit G. It's a two-page exhibit, and it's entitled, Fungi, Mold, Wet or Dry Rot Questionnaire.

A I see it.

(DEFENDANT'S EXHIBIT G MARKED FOR IDENTIFICATION)

Q Okay. Do you recall handwriting the information contained on the exhibit?

A It's my handwriting.

Q And you signed it at the bottom?

A I did.

Q And you dated it?

A Yes.

Q And this would have been done on the day that Mr. Gorman visited your home?

A Correct.

Q And you believe that you showed him around before you visited the home? I'm sorry. Before you filled --

A Before I filled out the form, yes.

Q Approximately, how long did you and Mr. Gorman walk around the house to make your observations?

A I don't recall. I think that the entire





visit probably took about an hour, including the completion of this form.

Q And you would have completed it and handed it to Mr. Gorman before he left?

A In fact, Mr. Gorman was giving me some suggestions about how to phrase things.

Q What did he suggest?

A That, I don't recall. I said, well, how should I say whatever it was. Maybe it was this writing professional repairs called. And he said just let them know what you've done.

MR. CORRIGAN: Why don't you take a look at it briefly, and let me know if there's any information that's in there that you now believe to be incorrect.

THE WITNESS: That I now believe to be incorrect.

(Witness perusing exhibit.)

THE WITNESS: No, I don't think there's anything incorrect.

Q Okay. Did you take any measures between August 31st and September 6th of 2006 to prevent further damage to the home?

A I wouldn't have known what measures to take.





Q Okay. Do you recall telling Mr. Gorman anything else regarding the perceived scope of the property damage?

A Well, nothing comes to mind. It's possible that your questions will lead me to recall more, but I don't recall anything at the moment.

Q Do you recall telling Mr. Gorman anything regarding what you believe might have been the cause of the property damage?

A No. I wouldn't have had any reason to know what the cause might have been.

Q Did you ever have an opportunity to view any of the old carpeting or the old carpet padding?

A I did see some very small pieces of old carpet padding that were left on the lawn but, clearly, not all been gone. But they looked like foam rubber, and there wasn't anything remarkable about them.

Q You were advised that some of the carpet padding was wet?

A That's what I was told.

Q And you did observe some areas where there was wood rot on the subfloor?

A The one area that we have identified in





Exhibit A, yes.

Q Did you, also, observe any areas in the wooden subfloor that were discolored from water?

A Well, that's a conclusion. There's certainly areas in the subfloor that were discolored, but whether that discoloration arose from an animal urinating or some other source including water, I couldn't express an opinion.

Q Prior to the carpets being removed, did you ever notice any areas of the carpet that was discolored?

A Yes.

Q Where were those areas located?

A There was only one, and it was where our Christmas tree was put up year after year, and there was a rust stain as a result of not very careful Christmas tree maintenance.

Q No other --

A I'm sorry. *(laughter)*

Q That's okay. Physically that's unrelated to the area where you discovered the property damage?

A That's correct.

Q The area where the Christmas tree was, was that located in the spot that was part of the wooden

subfloor or was it on the original home slab?
A On the original home slab.
Q And was there any evidence of any property damage in that area once the carpets had been removed?
A No.
Q Other than plumbing leaks, roof leaks, did you ever have any episodes at the home where you had substantial amounts of moisture or water infiltrating the home?
A No.
Q You didn't have a fish tank that fell over at one point?
A No, we didn't.
Q Did you have a malfunctioning dishwasher that leaked over the home?
A No.
Q Any type such episodes where large amounts of water would have gotten on the floors that you can recall?
A To the best of my knowledge, we have had no problem with that sort.
Q Now, after you met with Mr. Gorman, did you continue additional work in the home?





A Well, not with regard to the carpeting. What I immediately began doing was to figure out what I could do to make things right, and I'll just wait for your question.
Q What did you do in that regard to try to make things right?
A I called an environmental investigating firm or something like that, with whom I had worked during my tenure with the city and described the problems and asked for some recommendations as to whom I might call. At that point, I didn't really know what the magnitude of the problem was or what the alternatives might be to deal with it and I was waiting of course to hear from Vermont Mutual about what, if anything, they wanted to do. Whether they wanted to hire a contractor or whether I was supposed to take care of things initially myself. Ultimately, this gentleman whose name was Tim Regan made some suggestions to me and gave me a little education about mold remediation generally, and I started calling people to ask them to come and take a look at what was going on. So at least three people came, but there may have been more. There might have been either four or five. Because it seemed like for awhile there, I was going





down to the house pretty much every couple of days.
Q And these people, would they have been mold remediation firms?
A Or general contracting that included the possibility of having somebody else come in. I really still wasn't absolutely clear on this whole subflooring thing. It looked to my lay eyes as though it was a pretty limited area, but I didn't have anyway of knowing that, so I needed somebody to come and tell me.
Q Did you ever have anyone come and do a mold test to determine the amount or the type of mold that you had in the home?
A I believe that at least two or three of the firms that came did various kinds of tests, including boring holes in the walls, and I don't know what all they did, but I know that that kind of thing was done.
Q Did you have someone come in and remove the wooden subfloor?
A Well, no, not all of it. Ultimately, I did have a contractor come in and remove the portions that turned out to be damaged.
Q Did someone come in and remove the remainder





of the tile that was affixed to the slab beneath the carpet?
A Yes.
Q When you removed the remainder of the tile that was once below the carpet, did you make any additional observations of the condition of the slab in those areas?
A The slab seemed to be in good shape. The observation that wasn't made by me but was made by my contractor was that the portion of my bedroom that was an addition was not sealed. The flooring hadn't been sealed. There wasn't a vapor barrier to prevent the percolation of ground water or any other water, I guess, to the foundation.
Q The area of the home that you used as your bedroom was part of the original --
A It was -- may I draw a picture? Would it be --
MR. CORRIGAN: Sure.
THE WITNESS: This is not to scale. This area here on the left-hand side that I'll mark area A used to be the garage and became the family room. This really isn't to scale. This area B is the area in which I call my bedroom. But the

original house ended with this line here. I'll put some Xs. And the area from the Xs to the rear wall of the house was simply exposed concrete. The area on the other side of the Xs, the main body of the house, had the linoleum laid on top of the concrete with, you know, whatever the gluey stuff that they use to stick the linoleum down. So what he noticed was that in the area marked B, there wasn't -- it hadn't been painted, and there was nothing else that looked like a vapor barrier.

Q So the concrete slab in the area marked B was added after the original house was built?

A That's correct.

Q And that slab was carpeted over?

A Correct.

Q But there was no treatment to that slab in the form of paint or other cover between the actual bare concrete and the carpeting?

A That's what I was advised by my contractor.

Q This small square between A and B, is that the patio?

A That's the patio. And we've got a door here that was usually locked, and a door here that I used to access the patio.





Q The door that you used to access the patio from area B, your bedroom, was that inside of your bedroom or in a hallway just outside of the bedroom?

A I believe in exhibit, either D or E, picture 10 depicts what Mr. Gorman calls a -- well, he doesn't call it a hallway. But, I think, he was referring to it above as a hallway. This leads to the patio door and there was a closet behind this hall.

Q Is there a separate bedroom door that separates your bedroom from the area shown in Exhibit E, photograph 10?

A There's a bedroom door in this area where I put a circle with a C, and it leads, that door leads into this whole suite. There's a sitting area here that's within the main level of the attic after the eight feet or whatever the rooms are. And, then, this additional area B has got a cathedral ceiling and it's a big space.

Q Okay. So the door from your bedroom to the patio is within the --

A Is within the B area.

Q Now, you had the -- strike that. You had someone come and make repairs to the subfloor in area





A?

A I did.

MR. CORRIGAN: Let's mark this diagram as Exhibit H.

(DEFENDANT'S EXHIBIT H MARKED FOR IDENTIFICATION)

THE WITNESS: I'm going to write not to scale, because it really is way out of scale, but it does give you sort of a graphic idea of what we're talking about.

*(Short break taken.)*

MR. CORRIGAN: Can I have the last question read back?

*(Pending question read back.)*

Q Do you know the name of the contractor or the person who came in to make the repairs to the wooden subfloor?

A Yes, I do.

Q What's that person's name?

A Angell Sanchez.

Q And do you know what --

A It's mister.

Q -- what Mr. Sanchez did?

A Fixed it.





Q Did he remove a certain portion of the wooden subfloor?

A I believe so. But I didn't -- I wasn't there to watch him. I actually don't know what he did. I just know he finished it up so the carpet guys could come.

Q He removed a certain portion of the wooden subfloor and replaced it?

A Yes.

Q Did you ever make any observations of the condition of the concrete slab, whether there was a portion of the wooden subfloor removed?

A I did not.

Q Were you made aware of what was visible once that portion of the wooden subfloor was removed?

A I was not.

Q Did Mr. Sanchez ever report to you that there was any additional damage discovered when he removed a portion of the wooden subfloor?

A No.

Q Did Mr. Sanchez report to you that there were any cracks in the concrete slab below that portion of the wooden subfloor?

A He didn't advise me of any additional

problems

Q Did he advise you of the discovery of any type of plumbing present below that wooden subfloor?

A He did not. But there isn't, to the best of my knowledge, any plumbing there.

Q So you had the remainder of the tile removed?

A Yes.

Q You had a portion of the wooden subfloor removed and replaced?

A Yes.

Q Did you have any other demolition done after your visit with Mr. Gorman?

A Yes. But there was remediation contemporaneously with that, and it wasn't done by Mr. Sanchez.

Q What's the total amount of work that Mr. Sanchez did?

A Well, he did the prep work to get the place ready for carpeting and so forth. And, then, after the remediation, he came in and rehung the drywall and, you know, did all those sorts of things, and then he painted everything.

Q Let's -- perhaps, if we could go in





chronological order, it would be easier for me to perceive.

A Sure.

Q After Mr. Gorman made his visit, and the condition of the home at the time of his visit is documented in the photographs in Exhibits A through E; is that correct?

A Correct.

Q After that visit by Mr. Gorman, you had those remaining pieces of vinyl tile that were affixed to the slab removed, correct?

A Correct.

Q Who did that?

A Mr. Sanchez.

Q And you had a portion of the wooden subfloor in what's marked as area A in Exhibit H removed and replaced by Mr. Sanchez as well?

A I did, yes.

Q Is that the total scope of the work done by Mr. Sanchez in regards to demolition or rip out work?

A Yes, I think all of the remaining demolition, as you refer to it, was done by BASH Remediation when they came in to do the mold.

Q Who came first, Sanchez or BASH?





A Well, Mr. Sanchez was one of a number of contractors and remediation people as I indicated that came in, and I don't recall in what order I had them into the house. There were four or five remediation contractors and a couple of regular contractors.

Q Someone removed portions of existing walls?

A Well, ultimately, BASH removed portions of existing walls.

Q In what area of the home?

A In the area that's marked B.

Q Your bedroom?

A Correct.

Q All of the walls or just one or some of the walls?

A You'll have to ask Mr. Brown that question. I believe that they removed all of the walls in the area up to the area that's got the Xs. So, in other words, in the entire addition area. The addition. Whatever you want to call it. In the area that had been added to the house, to the original house. All of those walls, I believe, were taken down. There may have been one wall that was left up.

Q When we talk about walls, are we talking





about the gypsum board, the dry walls?

A Correct.

Q Do you know if the walls are stud walls?

A I'm sorry, I don't know what a stud wall is.

Q A stud would be a vertical member that's used to affix the drywall.

A Then, I do know there were stud walls, because when the building official came back, he had a regulation as to how many nails from the board had to be nailed into the stud. So there must have been studs or he wouldn't have said that.

Q Did you observe the bedroom when it was exposed to the studs?

A No. I actually -- I didn't want to see it.

Q Do you know if the studs were metal or wood?

A I believe they were wood, but I don't know for a fact.

Q Do you know if the studs were replaced?

A Some of them may have been, but I don't know for a fact.

Q Your understanding is that all of the walls were replaced in that bedroom?

A It is possible that one wall was not, but I know that the walls of the bathroom, the little thing

that we've called sometimes a hallway leading to the patio, the closet that was on the other side of that hallway and the back wall. Certainly, all of those went, and maybe this outside wall went as well.
Q Do you know why those walls were removed?
A Because the testing determined that there was mold behind the gypsum board. Is that what you called it? And, apparently, on some of the studs as well. But they were able to at least some of them could paint and do whatever they had to. They had to get rid of all of the gypsum boards.
Q Was there any evidence on the living space side of that gypsum that there was mold behind the gypsum?
A In Exhibit E on photograph Number 9, Mr. German documented what he said was mold on the outside of the board. Although, I hadn't particularly noticed that.
Q So did BASH do the testing that revealed the existence of mold inside those walls?
A BASH was one of the firms that tested things before they gave me the estimate of what their remediation would cost. But, yes, they did.
Q Is BASH also the firm that removed the





gypsum wallboard?
A Correct.
Q And did BASH also do the work to repair the gypsum wallboard and replace it?
A They didn't replace it. All they did was take everything down. And, apparently, they could paint or spray some kind of moldicide, fungicide stuff. I'm not really sure what all the remediation. But I know that after whatever it was they were finished doing, they took away all of the contaminated materials. They painted or sprayed something on all of the remaining exposed materials. And, then, they had air exchangers. Everything was sealed off because you couldn't actually go in and see it while it was happening. And they ran those for 72 hours or something like that to try and clean the extra spores and so forth out of the atmosphere. And when they were all finished and they had taken down all of the shielding and whatnot, then Mr. Sanchez was able to come in and start rebuilding that portion of the house.
Q And Mr. Sanchez did the replacement work?
A He did.
Q Did you have any other areas of the property





ripped out or demolished?
A No.
Q So the areas of physical property that were torn out and replaced consisted of the wooden subfloor in what you've marked as area A in Exhibit H. And the walls, at least one of the walls, perhaps more, in what you marked as area B on Exhibit H?
A Yes. I qualify that description of my answer by saying it was only a portion of the subflooring A.
Q Fair enough. And, as far as contractors, you identified Angell Sanchez and BASH Remediation?
A Those were the two who I ultimately selected to do the work, yes.
Q Did you have any other building contractors do any physical work within the house?
A No.
Q Did you have the same carpet replacement company eventually come in and put the new carpets in?
A I did.
Q That was work that you anticipated to do before the discovery of the property damage?
A I already paid for it so. . .





Q When the gypsum walls were removed in the bedroom area of the home, were you advised by BASH Remediation Services that there was any type of a plumbing leak in the area where the mold was discovered?
A No. In fact, the question of what the source of the mold contamination was, was critical in my interviewing remediation contractors, because I was looking at a very substantial sum of money to do the remediation and then the repairs. And, if I didn't know what the source of the mold was, it would have been inadvisable for me to proceed. So I asked that question of each person who came to the house: What could have caused this? And I got the same answer from all of the mold people who came to the house, which was the only source that they could suggest to me was the fact that the foundation in that bedroom area marked B had not been sealed, and that was the only thing that explained what they were seeing. That the mold was inside the wall and not outside the wall and that it was so extensive. Obviously, if they identified a roof leak or a plumbing leak or any other kind of external source, it would have been critical to fix that so that the

mold problem wouldn't repeat itself, but we couldn't find anything at all other than this unsealed foundation.

Q Were you ever advised that you had any type of plumbing leak that may have contributed to any of the property damage associated with this case?

A No.

Q Were you ever advised that you had any type of roof leak that may have contributed in anyway to any of the damage associated with this case?

A I was not.

Q When you were first made aware of damage by the carpet cleaning company, it was related to the rot in the subfloor in area A and the speckled mold on the trim in area B?

A Well, it certainly involved the subflooring area A, as I have indicated a couple of times. What I was told was, your subfloor is rotted. There's mold crawling up your walls, and they did indicate some areas of the carpeting that they had taken up, the padding was wet.

Q Do you recall when you first had BASH Remediation Services come to your home to do testing in relation to the visit you had with Mr. Gorman?





A It would have been sometime subsequent to the 6th. I believe that at each one of the mold contractors who came with the exception of one who I didn't like. I had them submit estimates which I provided to my attorney, and he sent them to Vermont Mutual to give the company an opportunity to decide who should actually do the work. So I let the document speak for itself. I don't have any present recollection.

Q The mold that was discovered inside the walls in the bedroom area, when did you first become aware of that mold?

A I think really probably when Mr. Gorman pointed out that there were some speckles on the outside of the wall that he identify as mold. The only thing I had seen was what was the trim.

Q How about the mold that was remediated inside the wall, behind the gypsum board, when did you first become aware of that?

A I believe, probably, Mr. Brown let me know about it after they had drilled the hole and tested. Whatever the test was that they did.

Q When Mr. Gorman visited the property, those walls were still all intact?





A Oh, yes.

Q But the carpeting had been removed?

A Correct.

Q What was the status of the floor in that bedroom? Was it exposed slab or was it vinyl or anything?

A The area that I've marked B was exposed slab, and then at the crosses -- on the other side of the crosses, the rest of the bedroom area had been part of the original house, there was linoleum.

Q And the exposed slab didn't have any type of covering on it?

A No.

Q Did it have any evidence of mold in it?

A I wouldn't have known what to look for.

Q Did the carpet replacement company advise you of any staining on the carpet in that area marked as area B?

A Well, that would have been my bedroom, and so I would have been pretty aware if there had been any visible staining on the surface of the carpet. There was not any.

Q So you had never experienced any type of water infiltration in your bedroom area prior to





August of 2006?

A Correct.

Q Other than Mr. Sanchez and BASH -- strike that. I think you answered this question already.

A Okay.

Q Were Mr. Sanchez and BASH the only contractors that did physical work to the property?

A Yes.

Q And BASH also did some type of mold testing?

A Yes, they did as part of their evaluation of what needed to be done.

Q And they did some remediation work as well?

A They did.

Q Did you have any other contractors do any other work at the house as a result of this claim?

A No.

Q And, approximately, when was the work completed?

A I think Mr. Sanchez finished up sometime in November, and the carpet was laid shortly thereafter. So around the first week in December I think everything was finished.

MR. COTTONE: Excuse me. Point of clarification. When you say contractors, you're not

including cleanings; is that correct? Just to make the record clear.

MR. CORRIGAN: Sure. Let me ask you this question.

Q You had BASH do its work, and you had Mr. Sanchez doing his work. Did you have any other people come in to do any work to the house including cleaning?

A Well, yes, as you might expect, any time a whole lot of work is done on a house, there's dust and things like that. So I did have somebody come in and clean the house pretty thoroughly, because as I indicated, I was planning to put it on the market.

Q Who did that work?

A The firm is called She-bees.

Q Do you know how to spell that?

A S-h-e dash B-e-e-s.

Q They did a clean up after --

A Right.

Q -- the contractors had finished their work?

A Correct.

Q Do you know what the cost of the clean up was?

A I provided the documentation to my attorney.





I don't know off the top of my head.

Q Fair enough. Do you know what, if anything, was done to treat the slab in area B?

A Yes. Mr. Sanchez applied some kind of vapor barrier stuff. As a matter of fact, once the linoleum had been removed, he painted the entire slab with that.

Q Okay. And your understanding was that moisture was coming through that slab and getting trapped between the exterior wall and the interior wall?

A The way it was explained to me, and I have no other way of knowing this, was that when the original energy efficiency work on the house was done by Rise in late '93, everything was very tightly insulated, this area with the cathedral ceiling in it, and there was no place for air to circulate within the walls anymore once they put all this stuff in. So the way it was explained to me was, water might percolate through the slab but then couldn't get out, so it was trapped in the insulation and the area behind the gypsum wallboard. And that actually made a certain amount of sense to me, but I certainly wasn't aware that that was happening.





Q Do you know if BASH photographed the damage they discovered between the exterior and the interior wall?

A I don't know what they may or may not have done.

Q And you did have the home recarpeted?

A I did.

Q And you had the walls rehung and repainted?

A Correct.

Q But you did not sell the house?

A Well, I had it on the market for a number of months and it did not sell. And in the meantime, the residency situation was resolved in such a way that it enabled me to move back, although, that hadn't been my original choice, and I'm back and enjoying it very much.

Q No longer involved with the lease out on Lennon Street?

A I actually only leased on Lennon Street for a year.

Q Did you ever attempt to put the Rosedale Avenue property up for lease while you were living on Lennon Street?

A I had a law student that lived in it for a





few months while I was living on Lennon Street.

Q What inclusive period of time would that have been, do you know?

A Well, it might have been December to June but I don't remember whether it was the first year I was on Lennon Street or the second year I had that address.

Q Would that have been before or after you had the carpets removed?

A Oh, long before.

Q So you were out of that house in the year prior to the carpets being removed?

A Well, I filed my taxes from Lennon Street in the second year, but I still had kids coming back and forth, and the Lennon Street was a small apartment; so it was not a bad idea to have another place to stash my offspring.

Q When you said you had a law student, you had a relative living there?

A No. No. Just a woman that I knew who was living there for a few months.

Q And she lived there alone for a few months?

A Yeah.

Q It would have been '05 into '06?

A I think it was, she moved, like, at the end of December and stayed until she graduated in June.
Q Of '06?
A It might have been '05. I guess it would have been '06, yes.
Q And you were not living there at the time?
A No, I was not living there at the time.
Q Did she ever report to you any incident involving water infiltration into the house?
A No.
Q After BASH Remediation Services removed the gypsum walls in your bedroom, did they report to you what the conditions were that were discovered inside the walls?
A I think, just as I have indicated, that they felt that it needed to be removed because of the fact that there was extensive mold behind the wall.
Q Did you ever report those conditions to Mr. Gorman?
A I didn't have any further discussion with Mr. Gorman after our meeting at the house on the 6th. I believe that there was a further telephone call from my insurance agent, because we hadn't received a denial letter or we hadn t received a letter saying





anything, but it turned out to be a denial letter.
MR. CORRIGAN: Okay. Thank you very much. That's all I have. Mr. Cottone may have questions.
MR. COTTONE: I have no questions. Thank you.

(DEPOSITION ADJOURNED.)





C E R T I F I C A T E

I hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of September, 2007.

LINDA FARIA
CERTIFIED SHORTHAND REPORTER
NOTARY PUBLIC

My commission expires on April 16, [illegible].
I.D. #[illegible]