# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

vs. : C.A. No. [illegible]

DEPOSITION OF , a Witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of HINES & CORRIGAN, INC., One James P. Murphy Highway, West Warwick, Rhode Island on Wednesday, August 22, 2007 at 12:50 p.m.

APPEARANCES:

FOR THE PLAINTIFF
BY: Anthony F. [illegible], Esq.

FOR THE DEFENDANT:
HINES & CORRIGAN, INC.
BY: John Hines, Esq.





I N D E X


WITNESS PAGE
MICHAEL BROWN

EXAMINATION BY MR. HINES.........................3


E X H I B I T S


NO. (DESCRIPTION) DEFENDANT'S PAGE
A (2 PAGES CONSISTING OF VARIOUS DOCUMENTS).....[illegible]






(COMMENCED AT 12:59 P.M.)

having been first duly sworn, testified as follows:

STENOGRAPHER: Please state your name and address for the record.

THE WITNESS:

DIRECT EXAMINATION BY MR. HINES

Q Mr , my name is John Hines, and I represent Mutual with respect to an action that's been brought by against Vermont Mutual. And on behalf of Vermont, I'm going to be asking you a series of questions, and I'd like to establish a couple of ground rules between us so that this could go as orderly as possible. The first being, would you please let me know if, for any reason, you do not understand any question I pose to you?

A Yes, sir.

Q Because I'm going to assume, unless you tell me to the contrary, that you understand the question; okay?

A Yes.





Q Second of all, as you're doing, you have to speak up your answers as part of the record. A nod of the head or the shrugging of the shoulder or something like that is not appropriate; so I'd appreciate it if you do that.

A Yes, sir.

Q I'd also appreciate it, if you would give me the opportunity to finish my question before you begin to respond so that both of us are not talking at once and creating confusion for Linda. And I will reciprocate and give you the opportunity to finish your answer before I pose the next question; okay?

A Yes, sir.

Q And if, by chance, you need a break at any time, let me know, and I'll be glad to accommodate you.

A Okay.

Q All right. Mr. Brown, are you currently employed?

A Yes, sir.

Q And by whom?

A By . Mold & Remediation. And, also, by -- I'm sorry.

Q Go ahead.

A Also by Pest Control

Q And as to Mold & Remediation, in what capacity are you employed? Are you an officer?

A I am the head foreman.

Q And how long have you been working for Mold & Remediation?

A I've been there for about a year and a half, sir.

Q And prior to being employed by Mold & Remediation, by whom were you employed?

A I was with Pest Control before that for about another six months. And before that, I worked actually in a bakery.

Q And how long were you employed in the bakery?

A I don't find that relevant to this really bringing up the bakery, sir.

Q Well, you have to answer my questions, unless instructed by your attorney not to do so.

A Then, I would like to get an attorney present. I don't have an attorney here so...

MR. COTTONE: Well, Mike. Let's go off the record for a second.

(Off-the-record discussion.)





Q All right. So I asked you how long you've been in the bakery?

A For about two months.

Q Besides Mold & Remediation, have you ever been employed by any other firm that was involved in any type of mold or remediation of mold work?

A Before there was actual guidelines for stuff like that, yes, but it was more generalized, working actually for, like, apartment complexes and stuff like that where we had to deal with issues of this nature. I have done research back then into stuff like this because obviously mold is something that you don't want to breathe and it's something people don't want to smell. But back then, they didn't actually have guidelines and stuff like that, so there really wasn't much we could do.

Q And when you worked in an apartment environment, were you working as a maintenance person for the apartment or what in particular?

A Maintenance. Yes, sir.

Q Do you have any particular schooling with respect to mold and the remediation of it?

A I've taken courses through Latex





International which is the actual company that supplies our chemicals. If we don't adhere to their guidelines and we don't have people who are certified, et cetera, et cetera, they can no longer sell us the chemical.

I've, also taken a test that is provided by the EPA that wasn't necessarily required. There are no laws here for having to do, you know, mold remediation. But we try and do stuff like this and constantly have training; this way we can say we know what we're doing.

Q And your specific employment with Mold & Remediation has been in what particular area? What are your job duties while employed with that organization?

A With actual mold or with the Pest Control, also?

Q Let's keep with strictly the mold remediation.

A With the mold, my jobs are sometimes dealing with customers on the phone, answering questions and stuff like that. Making a plan of action. When we actually go to a job site and see, you know, visually what's going on there. I'm always there from the





start of a job to the end. When we actually start the remediation, my job is to go there, oversee everybody, make sure stuff gets done, find any new mold as we're actually taking down drywall. If we have to take down drywall, one of the key things that we do is check the back of the drywall for mold back there because mold tends it burrow through stuff. Look at any wood that's been exposed and check if there's any mold there. Insulation. I actually have to actually look through that because some types of mold can grow in there. I oversee the air sampling. We do air sampling to see if there's actually mold present in people's houses. Basically, I do everything.

Q As part of the work that you do for the mold and remediation on behalf of , do you determine the source or sources from which the mold derived?

A My job, according to contract, my job isn't that I have to find it. If I do find the source, I'm more than willing to tell the person, but I don't make it a means to go out of my way to try and find it. Lots of time, I can tell what it is. I can usually at least tell where it's coming from so it narrows it down for the person.

Q Let me briefly just go to    Pest Control. What are your job duties associated with the pest control?

A With pest control, my job duties are sometimes dealing with customers on the phone, explaining to them about the different types of insects and stuff like that. Just to let you know, I am certified. I do have that with me if you want to see that. My job with that is actually using the chemicals to deal with the pest, finding out where the problem is and then coming back and doing paperwork.

Q What is your educational background? I presume you graduated from high school?

A No, sir, I did not.

Q What is the highest grade level that you did obtain?

A It was ninth grade. And, for the record, I would have loved to have finish high school. It wasn't a choice in the matter. I was living on my own. I was actually working for a living. I couldn't support myself and go to school.

Q Have you ever testified as an expert dealing with mold and remediation of it in any court in Rhode





Island?

A No, sir.

Q Have you ever been deposed dealing with an issue of mold and remediation of it before today?

A What do you mean deposed?

Q Well, we're in a deposition today where a lawyer is asking you questions and there's a stenographer present. Have you ever been in that environment dealing with testimony related to mold and the remediation of it?

A That part, I have not.

Q When was the first time you made the acquaintance of Miss

A One second, and I can actually tell you the first time that I actually met her. I did not speak to her on the phone before I went there. To give you the exact date, I'd actually have to get it out of the computer, but it was roughly -- actually, it should be September 22, 2006.

MR. HINES: All right.

THE WITNESS: It should be.

Q And do you recall how it came about that you initially had contact with Miss    in September of 2006?





THE WITNESS:

MR. HINES: I'm sorry.

A You mean how I made contact with her? She called the company. Or do you mean when I actually went there to visit?

Q When you first became aware that she called the company?

A Usually, after    gets off the phone, if I'm in the office, she, you know, tells me about it. That particular day, I'm not positive if she told me when I got back to the office or if I was in the office at the time. Usually, I find out the same day the person calls.    will let me know that I have a mold inspection on this date and the details.

Q Is    an employee who works in the office?

A    is the owner of the company.

Q So, as best as you can recall,    received a call in the office of    Mold & Remediation and notified you that it was from Miss    Is that what I understand?

A She notifies me who the person is. She also notifies me of all the stuff that she talked with her over the phone, which is written down on a piece of





paper.

Q And you have the piece of paper before you as part of the file that you brought?

A Yes, sir, I do.

Q Can you tell me, for the record, what was written down on that piece of paper? Is that the penmanship of Donna, is it?

A Yes, sir, it is.

Q Would you go over it for me?

THE WITNESS: Do you want me to read everything here for you?

MR. HINES: If you would.

A Okay. It has the client's name and address in the upper left-hand corner of it. It has the appointment time which is 8:30 a.m. appointment. It also lists her current address because she was not currently living in the residence that had the mold.

Q Excuse me just for a moment. Was the residence that had the mold    Barrington, Rhode Island?

A Yes, sir, it is.

Q And what does the form indicate as the residence where Miss    was then living or residing?

A I believe that is Street. Providence. I'm pretty sure that's what it's suppose to be. I don't actually know if this was her address, but I'm assuming that that's why there's a second address on there. Excuse me if I mislead you a moment ago.

Q That's fine. Go ahead.

A Asked what is the source cause of the moisture problem. This is what we formally ask everybody that calls. This way it gives me a better idea of knowing what they think it is. And, then, I can go from there and decide whether you know I think that is or isn't and move on to the next point to try and find out what's going on, if I want to go that far. She thought the water table at her house was -- because it was the water table at the time because her house is at the bottom of a hill.

Q That's written on the form, is it?

A That's what has written here, yes. What type of building it is has not sure. If there's an attic. There's a ranch building built on a slab. Number of occupants who are at high risk (asthma, lung disease, babies, elderly). None. Number four is extent of moisture damage. What





things in the home have water stains and water damage. They did not talk about that. Note the date. When did the flood or water intrusion happen? It actually has it in back brackets here, note the date. There's no flood. How long did the flood stay in the building before the water was pumped out? No she has. So I'm guessing there was no water pumped out. There was no need to. What type of water? Was it rain or sewage water? She has rain water. Is the source of the moisture problem fixed or not? No. There is a high water table, she thinks. Is mold seen, and if yes, where? Walls, two added rooms, plus one bedroom. Discretely ask if they have flood insurance. No answer there. Ranch on slab. Subfloor. Question if mold is in family room. Used to be insurance. I'm guessing this is -- I can't read the word here. Allstate. Adjuster said he, something, George. The garage turned into house. Vacant. Family room. Believe mold under subfloor. Scribbled a bunch of notes down at the bottom.

Q Can I see the form that you read from?

A Yes, sir.

Q Thank you very much. Now, was the particular -- I'm sorry. Was the mold remediation or





was the form that I have before me, Questions To Ask At Time Of Telephone Conversation, was that form after it was completed presented to you, Mr. ?

A Like I said before, I don't know if it was actually on that date handed to me right away because at the time I might have been out on a job. But I do actually get the forms, and I take them with me before I actually go out on the jobs, because this is something that I need to know before I get there.

Q Now, when does your file reflect that you first went to the residence at Avenue in Barrington, Rhode Island?

A Again, the first time I should have made contact, which I actually had to check the computer, should have been September 26, 2006.

Q And at that particular time, when you say when I made contact, would that be contact with Miss Southgate at the Avenue address?

A Yes, sir.

Q And --

A I take that back.

Q Sure.

A Sorry. It's actually September 20, 2006, because I actually have it here with her signature





here.

Q When you say here with her signature here, that's her signature, a proposal that you --

A Donna authorized the proposal for the date before I even went there. Actually, write down what work I felt was needed to be done. So it would have been the 20th that we actually originally went there and met her.

Q And when you went there on the 20th, did you bring a proposal with you for her?

A What I have is I have a blank form originally, and I go there, and I assess what needs to be done, and I actually write it down. And if the person wants a proposal right then and there at that time, I actually give them this copy, and I can go back if they want an actual, you know, computerized copy that has even more information, indepth details on the computer at the office because, otherwise, it's just too much for me to type out in the field on the laptop and print out it's like eight pages.

Q I understand. How did it work with Miss ? Did you actually give her the proposal when you first met her at the address on September 20th, or did you go back to the

office?
A I'm pretty sure that I actually gave it to her on that day. It was a year ago, so I'm not positive.
Q Is there a signature on the proposal from Miss Southgate?
A I actually should have one here with her actually authorizing it. This actually is giving us authorization to go ahead and inspect. That has it. I believe I am missing a piece of this file, because I don't actually see the signed contract from her in here. We'll have to ask [illegible] about that.
Q Galson Laboratories, New York. Is that where mold samples are sent for determination of what type of mold it is?
A Yes, sir.
MR. HINES: Could I just see the proposal that you, I believe you brought along when you first met Mrs. Southgate?
(Witness handed over document.)
Q This proposal that you've handed to me, Mr. Brown
A Yes, sir.
Q The handwriting on it under the category





entitled mold remediation work plan, is that your handwriting?
A Yes, sir.
Q Could you tell me what you did at the Rosedale Avenue residence on September 20, 2006?
A What I would have done there is, the first thing what I did do there, the first thing we did was go in. If the client was there, we'd actually speak to them. If they have a representative, we'd speak to them. They usually show us around. The first place where we actually looked was in the family room. I'm guessing it was to the family room. It had a sliding glass -- I believe it was a sliding glass door. I'm not positive. But there was some rotting flooring there and inspected that really well. Assessed that there was actually no mold there. It was just something that was rotting away.
Q Now, if I could just stop you for a moment. This family room, do you know whether that at one time had been a garage that was converted to a family room?
A I really couldn't tell you. Is it possible? Yes.
Q I don't want you to guess.





A Yeah, exactly. I couldn't tell you. I mean that's up to you to make the assumption or not.
Q Now, there was a sliding glass door that lead from the family room. Did it lead onto a patio?
A I didn't go outside there at the time. I'm not positive that it was a sliding glass door. Either way, I know it was right by the door because there was actually rotted wood there.
Q And when you went out to the [illegible] Avenue house, was there carpeting on the floor at that time that you had to lift to get to the underlying wood?
A No, there wasn't.
Q There was no carpeting?
A No carpeting.
Q And this rotting wood was adjacent to the sliding glass door in the living room?
A Right in the corner by the door.
Q Did you make any determination as to the cause or the source of that --
A Nope.
Q -- that lead to that rotting wood development?
A No, sir.
Q But, in any event, you determined that there





was no mold in that particular area; is that what I understand?
A That is correct. The mold -- there was no visible sign of mold. We actually inspected the whole room there and there was no mold there. The rotting wood was only limited to that one corner, so we didn't really feel the need to rip up any other wood. We did rip up a little piece in that corner and it was just rot.
Q Did you actually rip up the wood in the area where the sliding glass door was in the living room?
A It was -- yes, right inside the door. We ripped up a little piece of the wood to just look in the inside to see if we could find any mold or anything like. Or maybe if it was from termite damage, but it was definitely just rot.
Q Did you have an opportunity to look at the slab when you ripped up that limited amount of work?
A I don't know if there was a slab under there or not. We did not rip all of that up. This wasn't even in the room where we found the mold. I wasn't too inclined to tear someone's house up if we don't see any evidence.
Q I understand. So, what did you next do on

that particular day?

A On that particular day, we then next went to the smallest bedroom which was down at the end of the hall and looked around there. There was very limited mold in there. As for, where it came from, I couldn't assess it at the time, so I could not give her a reason for that.

Q Can I just, and I'm sorry to interrupt.

A No problem.

Q Let me stick with that bedroom. Did you see mold in that bedroom?

A Yes, sir.

Q And where did you see it?

A Some on the walls. Most of it was lower to the ground, but there was a few spots about half way up.

Q And did you do -- was there a carpet in that bedroom at that time?

A I cannot recall.

Q Did you do anything with the floor of that bedroom, such as attempt to lift up the wood and look under it to see if there was a slab?

A No, sir.

Q But, in any event, as to that particular





bedroom, you were not able to make a determination of the source from which the mold derived, is that correct?

A Well, I mean, let me rephrase on that. Mold needs moisture to live, to breathe. So, I mean, I know it came from moisture, but I don't know what was the source of the moisture.

Q Okay. Fine. Did you do anything else in that particular room as far as you can recall that day?

A Let me check my paperwork and see if I took a sample in that room. (pause) No, I did not take a sample in that room, so I don't believe I did anything else in that room on that day.

Q Now, when you were there on that particular day, was it just you and Mrs. that were going about the interior of the building?

A I had one other employee that was with me.

Q And who was that, sir?

A Michelle. I cannot think of her last name offhand. I could call my boss if you'd like.

Q No, it's not necessary. And what was the purpose of Michelle being there? Was she assisting you in making your determination?





A Usually, I have somebody there with me. One, I don't like to drive. To be honest with you, I have road rage, so that's why I don't drive. And the other reason why I have somebody with me is, at times I'll have somebody carrying equipment or, like, if I'm going through a discussion with a client, I might have them go in and take an air sample, you know, or lots of time, I'll just have them go over the paperwork if I'm taking a long time inspecting. So it saves me time.

Q I understand. All right. So, then, after going in that particular bedroom you just described, what is the next thing you did that day?

A We went into, I'm guessing, I don't know if it was a main room or what. A very large room that had mold in it, as well as a bathroom that was off of it that had mold in it. When I first walked in, I noticed that there was lots of small black dots all over the walls and over the ceiling. And, of course, upon closer inspection, my hunch was right. It was actually mold.

Q And how did you determine that? Did you have any machines with you that analyze the --

A We actually take air samples. But from the





looks of it and the stuff that I looked up online, I was fairly certain of myself, which I do not tell the client that it's mold until I actually get the laboratory results, because I do not have a Ph.D in this. That's why we actually take air samples. That, you know, I can sit down and look at it and note to myself whether it is or isn't because of all the research that I've done.

Q Do I understand you to say that you did take samples from that room, however?

A Air samples, yes, sir.

Q And were those air samples tested by any type of lab?

A Galson Laboratories in, I believe, it's Syracuse, New York. It was tested by Galson Laboratories in New York.

Q And do you know the results of their testing? Was it determined to be mold?

A I have the results right here. Yes, sir, it was. Would you like to see the results?

Q No. I'll take your word for it.

A All right.

Q So you told me that you visually observed mold in this particular room on the walls and on the

ceilings, is that correct?
A That is correct, sir.
Q Before I go farther into other potential areas where you found or may have found mold in that room, you mentioned that there was a bathroom off of that room?
A Yes, sir.
Q And did you notice mold any place in the bathroom?
A Yes, sir, I did.
Q And where did you notice it in the bathroom?
A On the walls and on the ceiling, also.
Q And did you take samples of that, what you noticed in the bathroom also?
A I do not believe I did. And my reasoning for this is because, one, when we take the samples -- actually, let me take a step back. I actually took the samples the first day that we did the remediation. It wasn't actually there, so I got ahead of myself.
Q Did you ever determine the water table level at this - property?
A She had said that about in the paperwork that she thought there was a high water table. I did





not see a hill or it pooling up. Actually, I was looking at her house and it seemed fairly flat to me.
Q But did you ever do any research as to what the water table was; whether it was a high water table level, a low water table level in that area?
A No, sir, I didn't. I definitely wouldn't even find a need to seeing that there was no basement. And if the water was seeping in, it would be at ground level which usually doesn't happen, at least from what I've seen.
Q All right. Let's go back to the bedroom in which you noticed the mold on the walls and on the ceiling. Did you do any work to determine if there was mold in any other areas of that room other than the walls and the ceiling?
A Well, with the floor being concrete, it's -- there's not a lot of cellulose, so it would be very hard for there to be mold there. There can be very certain types. Usually when it comes up, it comes up and it looks like a white fuzz. That's when you have a lot of mold growth where you actually get all this. I did not see any visibly there.
Q And when you say there, on the floor?
A On the floor.





Q And the floor was a concrete slab, was it?
A A concrete slab.
Q Was there any carpeting on that floor?
A No, there was not.
Q But there was, if I understand you right, from the slab base, there were walls going up on all four sides?
A Yes, sir.
Q And, obviously, as you mentioned, the ceiling?
A Yes, sir.
Q So did you do anything to the walls to determine if there was any mold behind the walls in that bedroom?
A At the time, there was a small hole. Another company had actually come there and inspected it, I believe. I ripped out a little bit more of the drywall. I did not want to take out much because, one, you know, unless we have air scrubbers and stuff like that there, we're actually just kicking up old spores in the air, so we have to be very cautious as to what we're doing. Plus, also, when I rip up stuff, I usually would like to clean it up. So I took out a very small section. Until we actually get





in there and do the job, it's very hard to tell if there's actually more mold behind the drywall.
Q All right. Go ahead.
A And, then, with drywall, I mean, once we see if there's a lot of mold on it, you know, signs of mold, we actually do have to take it out because mold burrows and it actually gets inside of the drywall. So, I mean, if we spray our chemical on there, we can't be sure that we're actually killing the mold inside it.
Q When you enlarged the hole in this bedroom on this particular day, did you observe mold in the area between the drywall and the outer foundation of the house?
A There was insulation there. That on the back side of the drywall, it did look like there was mold there. So it was coming one way or the other burrowing through. I did not go cut any of the insulation at the time.
Q And did you do any demolition, for lack of a better word, in the bathroom to determine if there was any mold behind the walls in the bathroom?
A Not at the time.
Q Did you do anything else that you can recall

that particular day?

A We, also, inspected another bathroom that was out in the hallway. And, actually, we inspected the hall, the living room, the whole house, basically. We did end up inspecting just because I explained to her we're here, you know, we're not gonna charge you anything to go ahead and look at the rest of the stuff just to be sure there was no mold there. There was in the bathroom off the hallway, there was some mold in there just strictly on the ceiling.

Q Okay. Now, in your discussions with Miss Southgate on that September 20th day, did you ask her whether there had been any leaking because of the roof; whether she had experienced any water coming into the interior of the building from the roof level?

A I did not ask her that. I did not see any signs of water stains on the ceiling which usually you would see. I had no inclination to ask her because of that.

Q Did she mention to you whether there had been any water leaks in the past because of any plumbing problems?





A She told me that, as far as she knew, she had no leaks, no floods, nothing like that. So, I mean, I kind of narrowed that down for me that it was something else.

Q Did Miss mention anything to you that this -- that she had had any water problems from anything other than a potential natural problem? Natural being the nature of the land, et cetera.

A She did not say that she had any type of water problem at all to me that I recall her saying whether it was natural or unnatural.

Q Now, I gather that you presented the proposal as to the work that had to be done to effectuate the remediation to Miss , and she accepted the proposal, did she?

A She did accept the proposal, but she was also under -- she was also made aware beforehand that once we actually get in there behind the drywall and actually start ripping the stuff down, there can be more work. If we get behind there and we see that there's, you know, drywall, if there's mold on the insulation, mold on the wood and stuff like that, you know, depending on where we're going from there, there might actually be more work to be done for her;





so that could actually increase our cost.

Q Now, do I understand that she actually signed a paper agreeing to the proposed plan?

A There should actually be a contract. I'm guessing that has it at the office, but we normally have a signed contract from the person saying go ahead and do the work, et cetera, et cetera.

Q Now, in the file that you have with you today, can you find a signed contract by Miss Southgate?

A Let me double check here, sir. (pause) I do not have it in this file.

Q But, at least, according to your recollection, there did come a point in time when Miss Southgate did sign a contract agreeing to the scope of the work that would be done?

A I'm fairly certain that it is. As far as do I remember her actually seeing her sign it, no. Again, it was over a year ago. I do meet a lot of people.

Q I understand. I understand that at sometime after September 20th, '06, you or somebody went back to the Avenue property on behalf of BASH to





undertake the remediation work?

A That was myself and two or three other people. I actually had to -- I believe I had to rotate people out that day for my crew.

Q Do you have any recollection sitting here today who those other persons were?

A Nehemiah C , Gabriel , and Michelle. I can't remember her last name.

Q If I understand you correctly, the owner of cleaning is Donna M , is that correct?

A Yes.

Q All right. So you mentioned the people, to the best of your recollection, who assisted in the remediation. When did the remediation work start?

A The 13th of October.

Q What are you looking at now?

A The actual Galson Lab report which is where we actually have the date from the air samples, which the first day there, I always go in and I take air samples.

MR. HINES: Could I just see that Galson Lab report for a moment, please.

(Witness handed over document.)

THE WITNESS: Because if they don't

want an air sample at the time when we're actually doing the inspection, we normally charge if they have one at the inspection. Lots of times, people just want to know what type of mold it is, et cetera. Then, we actually take it when we're doing the work because we use that to actually help us and to make sure we know that we're doing our job all right.

(Counsel returned the document.)

MR. HINES: Thank you very much.

THE WITNESS: You're welcome.

Q All right. Well, getting back to the initial date of the undertaking of the remediation at the Roseodale Avenue property. And can you tell me whether it took more than a day or one day to do the remediation?

A The remediation process takes roughly a week. It was definitely more than one day, sir.

Q And let's go to -- my primary concern is with the rooms in which you had noticed the mold.

A Okay.

Q And we had this bedroom with the bathroom off of it. Did you take down all of the wall in that room?

A In that room, we took down all of the





drywall. The only thing, I believe, we left up was one section of ceiling which was in the lower -- there were two different ceilings in there. One was just like a flat ceiling when you first walked in. And the second one was more like a cathedral ceiling that actually had two pretty big, like, 10 x 10 wooden beams. It was very nice. We took down the actual cathedral ceiling and left the flat ceiling because there was not really much mold on there. It was from what we took down in the first section, we saw nothing on the back sides, so we didn't feel that we needed to rip that out.

Q I presume you found -- you mentioned that this particular bedroom had a concrete foundation. And in your initial inspection, you did not see any mold on the concrete slab?

A That's correct.

Q Now, once you took the drywall down. Between the drywall and the wooden foundation of the home, did you find any mold on the floor in the slab work?

A We didn't take the foundation of the home down I believe you said.

Q Well, maybe I phrased it wrong. I'm trying





to find in the area between where the drywall was and the foundation of the home, the outer wooden structure of the home, did you find any mold in that area?

A Between the outer wooden structure: yes, sir. And I do actually have pictures of that.

MR. HINES: Could I see that, please?

(Witness handed photographs to counsel.)

THE WITNESS: This one here, you can actually see some over here.

Q So this mold was on the wooden support beams, was it?

A On the studs, yes, sir.

Q And the three pictures you've shown me are with respect to the particular bedroom that we're discussing?

A That is, yes, the room that is in question.

Q Now, did you make any determination of the source from which this particular mold on the pictures that you've shown me derived?

A I was not positive as to where the source of the moisture was coming from. The best guess that I had, which I didn't say to her in a voice mail, was that she actually had some holes in the actual





sheathing that leads to the outside of the siding. Upon walking outside on the side of the house, you can actually see some of the siding was actually pushed up, too. So the best thing that I could come to was that you had rain maybe coming in there, moisture getting in there and getting into the insides of the walls. From the back side of the sheetrock and the drywall, it let me know that the actual moisture was somewhere between the walls, because there was more mold on the back side there and behind the actual insulation we had mold and in some cases in the insulation.

Q Now, what about on the slab floor?

A I still noticed nothing on the slab floor.

Q Nothing in the bedroom on the slab floor whatsoever?

A I noticed nothing. But, of course, if the moisture is there, mold does grow. Depending on how much it grows, I'm not gonna see it, unless, I mean, I have a microscope or something like that.

Q Now, you'll agree that mold grows from some moisture source?

A Yes, sir.

Q Now, in these three photographs that you've

shown to me all dealing with the property, did you notice any mold in this bedroom behind where the sheetrock wall had initially been in any areas other than these three photos?

A Yes, sir.

Q And where was that?

A Pretty much along the majority of the wall where the cathedral ceiling was. There was two main sides. When you come in the doorway, if you're looking at the wall on the far side, that would be one of the walls that had it and that's where the cathedral ceiling was. And, then, there was a wall to the right which had a lot of it also.

Q And that would have been on the walls adjacent to the cathedral ceiling up high?

A Well, the whole room, the whole section that actually had the cathedral ceiling had the majority of the mold. This photo here, sir, is actually -- this is a non-cathedral side. You can see the difference here in the insulation actually. This is the cathedral side, and we did have to actually rip out that insulation, too because it was fairly bad behind there, but not as bad on the other side.

Q Do I understand you to say on this





photograph which is the smaller room, old insulation that there was mold on the insulation?

A On here there wasn't actually mold on the insulation in this photo. Not that I'm showing. That -- what this was taking is that how old the insulation was and that we had to actually rip that down. I mean, I take photos for different reasons when I'm at a job. It's not just to cover ourselves, but it's also that I can point stuff out to people.

Those two photos there have nothing to do with mold. It's just, we broke a window sill, and I wanted to let her know so that we can actually pay for that.

Q Did you make any determination as to the source of the moisture that lead to mold in this small room picture?

A Again, it was with the holes behind the sheathing. That was actually through the sheathing. I should say, excuse me, behind the insulation.

Q And these holes went through to the exterior of the house?

A Right to the siding.

Q Right through the siding?

A Right to the siding. Not through the





siding. To the siding.

Q Right to the siding?

A Yes, sir. And outside there was some gaps in the siding which would be able have been allowed to -- which would have allowed moisture to go in.

Q Did you make any determination if moisture was coming from a subsurface level underneath the slab up through the slab?

A It did not rain at all when we were there, so I could not be certain if there was moisture coming up through there. There was no sign of staining, so I couldn't tell if there was a pooling affect. As for, if there was any moisture coming up, I could not certain as to that. I can say that concrete is semi-porous and moisture can go through it.

Q Now, this particular house did not have a basement. It was just built on top of a slab, is that what I understand?

A Yes, sir.

Q Now, what else do you have in your file there, Mr. Brown? What else did you bring with you?

A I actually have the humidity level of what the humidity was when we were in there. On which





date, I am not certain, because we still don't actually have a date on it, but that's 75 percent relative humidity.

Q Is that high?

A That is considered high for mold, yes. Most types of mold can actually grow in that and grow very well in that.

I have the photos which we went over. I have another note here from Donna that actually has Miss Southgate's number on it. And she was changing insurance carriers at sometime, wanting, if they need to do anything. I'm guessing that that's what she's trying to say here. A note that I was supposed to actually call her on a night. A note with your number on it. Somebody's number on it for here. Then I, also, have the results of the Galson Laboratories. I have the initial paperwork that says that she's allowing us to go ahead and inspect and that we're not actually held liable for finding source of moisture, that going over the cost of the lab results, et cetera. The original phone conversation that Donna had with her. A fax cover sheet that Donna used to send her the results from the lab. Paperwork that Donna printed of the scope

of work that I actually had written down. Little diagrams that were drawn at the time of the job. The humidity test was actually done the day that we were inspecting because of the paperwork that I have right here with my notes. 75 percent humidity. I have a bunch of notes that I had for what I wanted done for days that we were going there. A small drawing of the house. Copy of the phone conversation. Directions to her house. And the receipt from going to Galson Laboratories for when we sent the air-o-cells.

Q Now, as far as you're aware, Mr. Brown, barring the, what I believe to be the signed contract signed by Adrienne Southgate, is that, to your knowledge, your entire file that you brought with you today?

A I was going through it this morning. So chances are that there should be something that I left behind. I know for a fact that I did leave behind the paperwork that says how much Galson Laboratories charges us, because I felt it wasn't relevant to this.

Q I agree. Besides that, in the signed contract, do you think there's anything else?





A There should not be anything else, to my knowledge, unless there were other notes that Donna took out.

Q Do you know when the last -- when it had last rained before the remediation was begun?

A I do not know the actual date that it did rain. I do know that if it does rain, you know, we do look for stuff, you know, signs of that. But it definitely did not rain while we were there or the day that we actually went to inspect.

Q And what about during the days that you -- when you say the days you were there, that means the remediation days, plus the initial inspection, is that what I understand?

A Yes, sir.

MR. HINES: Can I just have a look at your entire file, please?

THE WITNESS: Sure. Do you want photos, too?

MR. HINES: No, that's fine.

(Witness hands file to counsel.)

Q Do you know if anybody else presented a bid for this remediation work besides Mold & Remediation?





A Surf Pro.

Q Do you know whether or not Surf Pro arrived at any conclusion as to the source of the moisture?

A I could not speak for them, sir. I do have a copy back at the office of their bid which we used for our pricing. If you need that, I can actually get that for you guys. But I do believe that it does not say anything in there where they feel where the source of the moisture was coming from.

THE WITNESS: Is there any chance I can take a break, sir, and go have a cigarette?

MR. HINES: Absolutely. Go ahead.

(Short break taken.)

MR. HINES: Mr. Brown, I'm all set. As soon as your file comes back, Mr. Brown, you're on your way.

(Waiting for file to be returned.)

MR. HINES: We'll mark this as one full exhibit.

(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)

MR. COTTONE: No questions.

(DEPOSITION ADJOURNED AT 1:45 P.M.)





C E R T I F I C A T E

I hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule [illegible] of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this [illegible] day of September, [illegible]

LINDA FARIA
CERTIFIED SHORTHAND REPORTER
NOTARY PUBLIC

My commission expires on April [illegible]
I.D. #[illegible]