UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ADRIENNE SOUTHGATE<br>*Plaintiff,* | : | |
| | : | |
| vs. | : | C.A. No. 06-500 ML |
| | : | |
| VERMONT MUTUAL<br>INSURANCE COMPANY,<br>*Defendant.* | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I**

Plaintiff,
ADRIENNE SOUTHGATE,
By her attorney,

/s/Anthony F. Cottone
Anthony F. Cottone, #3922
55 Dorrance Street
Suite 400
Providence, RI 02903
Tel: (401) 578-5696
Fax: (401) 861-2922
cottonelaw@cox.net

# TABLE OF CONTENTS

I. FACTS…………………………………………………………………………………4

II. ARGUMENT…………………………………………………………...….…….…9

1. Vermont Mutual has Cynically Misapplied the Policy's So-called "Anti-Concurrent Causation Preface" and Misconstrued the Water Damage Exclusion.………..………….….……9

2. Even if Southgate's Claim was "Fairly Debatable," Vermont Mutual's Grossly Inadequate Investigation of her Claim is Bad Faith, and thus Breach of Contract, *Per Se*………………….…..15

III. CONCLUSION…………………………………………………………………...18

# TABLE OF AUTHORITIES

**Cases**

Elliott Leases Cars, Inc. v. Quigley, 188 R.I. 321, 373 A.2d 810, 812 (1977)…...…………12

Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 298 (R.I. 1999)………………………….11

Fratus v. Republic Western Ins. Co., 963 F.Supp. 113, 116 (R.I. 1997)…………………….12

Front Row Theatre v. Am. Manufacturer's Mut. Ins. Co., 18 F.3d 1343 (6th Cir. 1994)……14

Kula v. State Farm and Casualty Co., 628 N.Y.S. 988 (1995)……………………………....14

Leonard v. Nationwide Mutual Ins. Co., 2007 WL 2446794 (5th Cir. 2007)………….…….14

Mallane v. Holyoke Mutual Ins. Co., 658 A.2d 18, 21 (R.I. 1995)…….…………………….12

Pakmark Corp. v. Liberty Mutual Ins. Co., 943 S.W.2d 256 (Mo. 1997)……………....…14

Peerless Ins. Co. v. Clough, 105 N.H. 76, 83, 193 A.2d 444, 449 (1963)………… …..……11

Preferred Mut. Ins. Co. v. Travelers Cos., 123 F.3d 136 (1st Cir. 1997)…………………..…14

Pressman v. Aetna Cas. and Sur. Co., 574 A.2d 757, 759-60 (R.I. 1990)……………..…….12

Skaling v. Aetna Insurance Company, 799 A.2d 997 (R.I. 2002)……………...………..…14

Sunshine Motors, Inc. v. New Hampshire Ins. Co., 530 N.W.2d 120 (Mich.App. 1995)…...14

T.H.E Ins. Co. v. Charles Boyer Children's Trust, 2006 WL 2923223 (M.D.Pa. 2006…..…14

Woods v. General Accident Ins., 738 N.Y.S.2d 791, 792 (N.Y. App. Div. 2002)… …..….12

**Statutes**

RIGL § 9-1-33………………………………………………………………… ……...…15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ADRIENNE SOUTHGATE<br>*Plaintiff,*<br><br>vs.<br><br>VERMONT MUTUAL<br>INSURANCE COMPANY,<br>*Defendant.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 06-500 ML |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I**

Plaintiff, ADRIENNE SOUTHGATE, submits the following Memorandum in support of her Objection to defendant VERMONT MUTUAL INSURANCE COMPANY'S motion for summary judgment as to Count I of her Complaint, which alleges breach of contract.

## I. FACTS

On or about August 31, 2006 Southgate learned for the first time of water *and* mold damage at premises she owned at 22 Rosedale Avenue in Barrington, Rhode Island (the "Premises") after it was called to her attention by a laborer whom she had engaged to replace certain wall-to-wall carpeting. See First Amended Verified Complaint, a copy of which is attached hereto (without Exhibits) as Exhibit 1 ("Complaint"), ¶ 5 at 2. According to Southgate, the laborer informed her that "the sub-floor has rotted" and that "mold is crawling up your walls." See August 22, 2007 deposition transcript of Southgate attached to Vermont Mutual's Memo. as Exhibit B ("Southgate Depo.") at 21. Significantly, Vermont Mutual does not claim that Southgate had any awareness of either the water or the mold damage prior to August of

2006. See August 22, 2007 deposition transcript of Gorman attached hereto as Exhibit 2 ("Gorman Depo., Vol. II") at 15.

The Premises were at all relevant times covered by a homeowner's insurance policy issued by Vermont Mutual, a copy of which is attached to Vermont Mutual's Memo. as Exhibit A ("Policy"). Southgate promptly informed Vermont Mutual of the water *and* mold damage and made a claim for remediation and for the loss of use of the Premises. See Complaint, ¶ 6 at 2. She made the Premises available for inspection and on or about September 6, 2006, Jeffrey A. Gorman, an employee of a local insurance adjusting firm retained by Vermont Mutual, made a visual inspection of the Premises, questioned Southgate and took photographs. See id., ¶ 7 at 2.

In support of the pending motion, Vermont Mutual incorrectly asserts that "there were only two areas of alleged property damage. There was the wood rot in the sub-floor of the family room and the spots of mold in the door way off of the plaintiff's bedroom." See Vermont Mutual's Memo. at 4. In fact, Southgate repeated to Gorman what she had been told, i.e. that "the sub-floor has rotted" and that "mold [was] crawling up [the] walls." See Southgate Depo. at 43. And according to the property loss notice reviewed by Gorman, most of the flooring in the Premises was described as "moldy and rotted." See deposition transcript of Gorman attached to Vermont Mutual's Memo. as Exhibit C ("Gorman Depo., Vol. I") at 27.

The fact that only two areas of property damage were actually uncovered by Gorman is more a reflection of the fact that Gorman: (1) made only one visit and spent, in total, "maybe 45 minutes" at the Premises, see id. at 36;[1] and (2) had absolutely no expertise in mold or its causes or remediation, see Gorman Depo., Vol. II at 15, than it is reflective of the damage actually present. Indeed, despite observing visible evidence of mold, see id. at 17, Gorman made only a

[1] Gorman's arrangement with Vermont Mutual provided that he was to be paid a flat fee of $250, regardless of the number of times he had to visit a site. Id. at 13.

visual inspection *and did no objective testing of any kind*. See Gorman Depo., Vol. I at 35, 37. In fact, as will be discussed, when subsequently investigated in a proper manner by consultants hired by Southgate, the extensive mold damage at the Premises was apparent. See deposition transcript of Michael Brown attached to Vermont Mutual's Memo. as Exhibit E ("Brown Depo.") at 18 – 31.

In any event, on or about September 7, 2006, Gorman sent a so-called "First Report" to Vermont Mutual wherein he concluded, among other things, that: "the water damage ***appears*** to relate to the seepage of surface ***and/or*** subsurface water which has been occurring over a period of time." See Gorman's Report, attached hereto as Exhibit 3 (emphasis added) at 2. However, no mention was made as to the cause of the mold that Gorman had observed and which had been described as "crawling up the walls." Indeed, Gorman frankly admitted at his deposition that he did not follow-up in any way with respect to the mold he observed at the Premises, necessarily confining his conclusion as to causation to one specific floor area near a door in the family room where the sub-flooring had rotted, see Gorman Depo., Vol. I at 28-31; Gorman's Report at 2-3, which Gorman frankly admitted could have been caused by *either* surface or sub-surface water; he was not sure which. See Gorman Depo., Vol. I at 35.

Despite his admitted lack of expertise with respect to mold and the absence of proper testing or investigation, Gorman, a non-lawyer, nonetheless provided Vermont Mutual with his opinion that there was no coverage available under the Policy and sent Vermont Mutual a proposed declination letter which quoted: (1) a so-called mold endorsement to the Policy; and (2) certain other Policy language allegedly pertaining to water damage exclusions. See Gorman's Report at 5-10. The quoted mold endorsement provided, in pertinent part, that the Policy did not cover various types of damage caused from water leakage "***unless***":

> such seepage or leakage of water or the pressure or condensation of humidity, moisture or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

See Policy at 30, Limited Fungi, Wet or Dry Rot or Bacteria Coverage Endorsement (HO 04-32 05 02) at page 2, adding ¶ 2.e.(9) to Section I, Perils Insured Against (the "Mold Endorsement").

The water damage exclusions quoted by Gorman were not even a part of the Policy, having been expressly "deleted and replaced by the following":

> 3. Water damage, meaning:
> a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
> or
> b. Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

See Policy at 22 (VM_CEA 3/99 Page 2 of 3, Section 4) (the "Water Damage Exclusion").

In the declination letter actually adopted by Vermont Mutual and sent to Southgate, Vermont Mutual: (1) removed the language from the Mold Endorsement which had originally been included by Gorman; but nonetheless (2) included and relied upon the erroneously-quoted water damage exclusion language that had been expressly deleted and replaced. See September 12, 2007 Declination Letter attached to Vermont Mutual's Memo. as Exhibit D.

On October 2, 2006, Southgate wrote Vermont Mutual's adjusting firm to call its attention to the Mold Endorsement which, as noted, expressly covered damage caused by: "seepage or leakage of water or the presence of condensation humidity, moisture or vapor" when the "resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure." See Exhibit 4 attached hereto. Southgate also requested that Vermont Mutual provide her with the specific facts which led it to conclude that the mold damage in question was not covered under the Policy. Id.

On October 11, 2006, Southgate - after having provided Vermont Mutual with three estimates to remediate the problem (estimates which included descriptions of the extensive mold damage and which Vermont Mutual did not bother to investigate or even share with Gorman, see Gorman Depo., Vol. I at 53) - went ahead and contracted for the remediation of the mold problem. See Exhibit 5 attached hereto.

On October 16, 2006, Vermont Mutual's attorney claimed that since "the origin of the water in [Southgate's] realty was through the entering of surface water or water below the surface of the ground," the *mold* damage was somehow excluded under the Water Damage Exclusion cited earlier. See Exhibit 6 attached hereto at 2. Vermont Mutual's attorney also cited (*for the first time*) so-called anti-concurrent language in the Policy which, he claimed, "trumps paragraph 2e(9) of the [mold] endorsement. See id. at 3.

On October 23, 2006, Southgate wrote back to inform Vermont Mutual that:

> (1) the exclusion it relied upon had in fact been deleted from the Policy by a so-called "Homeowners Coverage Enhancement Amendment" (see Policy at 22, VM_CEA 3/99 Page 2 of 3, Section 4);
>
> (2) the plain language of the Mold Endorsement provided that "seepage or leakage of water" which causes mold damage is in fact covered provided it is unknown to the insureds and hidden, which was exactly the case here; and
>
> (3) the inference in counsel's October 16 letter that the visible pooling of water in the front and rear yards during heavy rain was in any way related to the mold damage was simply unfounded.

See Exhibit 7 attached hereto.

In its Motion for Summary Judgment, Vermont Mutual makes much of the fact that: (1) "the only *discernable* source of the water infiltration was surface water entering at ground level where masonry slab met the exterior ground," see Vermont Mutual's Motion at 2 (emphasis added); and (2) both Gorman and Michael Brown, an employee of the company that Southgate

hired to perform the mold remediation, concluded (according to Vermont Mutual) that the cause of the mold damage was "the infiltration of surface water or water from below the surface of the ground." See Vermont Mutual's Memo. at 6. ***In fact, neither Gorman nor Brown reached any such conclusions, nor did they possess the qualifications or testing necessary to come to any legitimate conclusion as to the cause of the mold damage.*** (Of course, as will be discussed, even if the mold damage was caused by the "infiltration of surface water or water from below the surface of the ground," this would not somehow revoke the coverage provided by the Mold Endorsement).

Gorman frankly admitted that he was "not an expert in mold," Gorman Depo., Vol. II at 17, and therefore it would be necessary for Vermont Mutual to hire such an expert, ***which was not done here.*** Id. at 17-18. The only representative of Vermont Mutual who visited the Premises could not even reach a definite conclusion as to the cause of the water damage, see Gorman Depo., Vol. I at 35, never mind the mold damage. And even though Brown, unlike Gorman, conducted a reasonably thorough investigation - he at least took air samples and had them analyzed, see Brown Depo. at 23-24, 32-33 - Brown nonetheless was not qualified to render an opinion as to the cause of the mold, see id. at 5-7, nor was he ever retained to do so. Id. at 8; see also id. at 35 ("I was not positive as to where the source of the moisture was coming from").

## II. ARGUMENT

### 1. Vermont Mutual has Cynically Misapplied the Policy's So-called "Anti-Concurrent Causation Preface" and Misconstrued the Water Damage Exclusion

Vermont Mutual apparently does not dispute the fact that the elements of the Mold Endorsement *per se* have been met, inasmuch as it must concede that the mold damage at the

Premises was caused by: (a) "seepage or leakage of water or the pressure or condensation of humidity, moisture or vapor," which was (b) unknown to Southgate; and was (c) "hidden within the walls . . . or beneath the floors . . ." of the Premises. See Mold Endorsement (quoted *supra* at 4). Vermont Mutual has no choice but to concede these factual points because as the party which has denied coverage, Vermont Mutual bears the burden of proof as to the basis for its denial of coverage, a burden which it cannot meet, not even having obtained an opinion from a qualified mold expert but instead attempting to adopt the speculation of Brown, Southgate's non-expert.

Instead of challenging any of the relevant factual elements, Vermont Mutual relies upon two separate provisions of the Policy: (a) the Water Damage Exclusion, which provides, among other things, that "loss caused directly or indirectly" by "water damage," which includes "surface water" and/or "water below the surface of the ground," is not covered. See Policy, Homeowners Coverage Enhancement Amendment VM-CEA 3/99 at 2-3, Section I (3)(a) – (b) (quoted *supra* at 4); and (b) the so-called anti-concurrent causation preface to the Policy exclusions, which provides that: "such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." See id. at 2 (quoted in Vermont Mutual's Memo. at 8). Thus, under Vermont Mutual's version of the Policy, if the mold damage was caused by "surface water" and/or "water below the surface of the ground," it is excluded from coverage, even if it was otherwise within the plain language of the Mold Endorsement, i.e., it was "unknown to the insured and "hidden within the walls . . . or beneath the floors . . ." See Vermont Mutual's Memo. at 1.

However, Vermont Mutual ignores the critical fact that the exclusion it relies upon is entitled "Water Damage," which is separate and distinct from the mold damage included in the Policy's Mold Endorsement, which is defined as consisting of "any type or form of fungus,

including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi, "see Mold Endorsement, "Definitions" at § (a), and/or "wet or dry rot, or bacteria." Id. at § 12. Indeed, the very existence of the Mold Endorsement establishes that it was intended to cover damage that is separate and distinct from the Water Damage Exclusion relied upon.

In other words, as the Policy makes clear, it does not cover loss caused by "water damage," which includes loss caused by "surface water" or "water below the surface of the ground." ***However, at the risk of belaboring the point, it is loss caused by mold, not water, that is and always has been the basis of Southgate's claim.***

Vermont Mutual apparently argues that the Mold Endorsement only applies when the water that seeps from beneath the floors is neither "surface water" nor "water below the surface of the ground" within the meaning of the Water Damage Exclusion; and it completely ignores the separate provision in the Mold Endorsement which contemplates mold caused by the "presence or condensation of humidity, moisture or vapor", which has been expressly referenced as a possibility here. See Vermont Mutual's Memo. at 5, citing Southgate Depo. at 68. If taken at face value, this would be the classic definition of illusory coverage (and not incidentally, the classic definition of bad faith). A similar attempt led the Supreme Court of New Hampshire to comment that:

> [t]he plaintiff [insurer] gave the defendant coverage in a single, simple sentence easily understood by the common man in the market place. It attempted to take away a portion of this same coverage in paragraphs and language which even a lawyer, be he from Philadelphia or Bungy, would find it difficult to comprehend.

Peerless Ins. Co. v. Clough, 105 N.H. 76, 83, 193 A.2d 444, 449 (1963).

Vermont Mutual's tortured reading of the Policy cannot withstand analysis under he general rules of construction applicable to insurance policies, which were set forth by the Rhode Island Supreme Court in Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 298 (R.I. 1999):

> [a]s a general proposition, this Court applies the same rules when construing insurance policies as it does when construing contracts. See Martinelli v. Travelers Insurance Companies, 687 A.2d 443, 445 (R.I. 1996). We will not depart from the literal language of the policy absent a finding that the policy is ambiguous. See id. ***To determine whether a policy is ambiguous, we read the policy in its entirety, giving each word its plain, ordinary, and usual meaning, then we will strictly construe the policy in favor of the insured and against the insurer***. See id. However, we will not engage in mental gymnastics, nor will we stretch the language in a policy to read ambiguity into it where none is present."

Id., *citing* Mallane v. Holyoke Mutual Ins. Co., 658 A.2d 18, 20 (R.I. 1995) (emphasis added).

As noted in Pressman v. Aetna Cas. and Sur. Co., 574 A.2d 757, 759-60 (R.I. 1990), the terms of an insurance policy "should be given their plain, ordinary, and usual meaning. If there remains any doubt, the terms should be read in the same sense that the insurer had reason to believe would be the way they would be interpreted by the ordinary reader and purchaser. 'The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean.'" Id., *quoting* Elliott Leases Cars, Inc. v. Quigley, 118 R.I. 321, 326, 373 A.2d 810, 812 (1977).

In addition, in Rhode Island and in a majority of jurisdictions it is clear that although a court "should not strain to identify an ambiguity where one does not exist" (see Fratus v. Republic Western Ins. Co., 963 F.Supp. 113, 116 (R.I. 1997) (citations omitted)), when there is an ambiguity, the rule that it be construed ***against*** the insurer is: "enforced even more strictly when the language at issue purports to limit the company's liability." Woods v. General Accident Ins., 738 N.Y.S.2d 791, 792 (N.Y. App. Div. 2002) (emphasis added); see also Mallane v. Holyoke Mutual Ins. Co., 658 A.2d 18, 21 (R.I. 1995) ("reasonable expectations of coverage

raised by the declarations page cannot be contradicted by the policy's boilerplate unless that declaration page itself clearly so warns the insured"); Elliott Leases Cars, Inc. v. Quigley, 188 R.I. 321, 373 A.2d 810, 812 (1977) (an "ordinary reader, in the face of such detail, would be warranted in concluding that any significant limitation on collision insurance would have been explicitly noted").

Here, Vermont Mutual's attempt to on the one hand provide coverage for mold damage caused by the "leakage of water . . . [from] beneath the floors," see Mold Endorsement, quoted *supra* at 4, while on the other hand denying coverage for damage caused by "water below the surface of the ground, " see Water Damage Exclusion, quoted *supra* at 4, is *at best* ambiguous (if not a bad faith attempt to provide coverage which is illusory).

And Vermont Mutual's attempt to apply the obviously inapplicable Water Damage Exclusion to mold damage leads to absurd results. This was illustrated during Gorman's deposition where he concluded that if the mold was caused by any "natural-type water" and/or any "naturally occurring moisture or condensation or vapor" it would be excluded. See Gorman Depo., Vol. II at 12-13. Of course, it is small comfort to Southgate that the Mold Endorsement apparently would cover mold she happened to grow in a laboratory.

Indeed, even if "water damage" did mean "mold damage," Vermont Mutual has no adequate basis by which to meet its burden of proving the nearly metaphysical point that the mold in question, although caused by water that seeped from "beneath the floor" of the Premises (as referenced in the Mold Endorsement), was also water that emanated from "below the surface of the ground" (as referenced in the Water Damage Exclusion), as opposed to the mold having been caused by "the pressure or condensation of humidity, moisture or vapor." Vermont Mutual simply has no reliable basis upon which to render *any* legitimate conclusion as to the cause of the

mold. After all, its supposed expert did not even observe the mold damage and in any event has no expertise with respect to mold, did absolutely no relevant testing and made no relevant findings.

Finally, not one of the cases cited by Vermont Mutual construing the so-called "anti-concurrent cause preface" suggests that: (1) the Water Damage Exclusion applies to mold damage; and/or (2) an insurer can employ anti-concurrent cause language to preclude coverage before even determining what caused the relevant damage in the first place. The cited cases apply the anti-concurrent cause language to different facts involving different Policy exclusions. None even discuss the Mold Endorsement which is the basis of Southgate's claim here. See Leonard v. Nationwide Mutual Ins. Co., 2007 WL 2446794 (5th Cir. 2007) ("wind" and "water damage" exclusions); T.H.E Ins. Co. v. Charles Boyer Children's Trust, 2006 WL 2923223 (M.D.Pa. 2006) ("earth movement" and "water damage" exclusions); Preferred Mut. Ins. Co. v. Travelers Cos., 123 F.3d 136 (1st Cir. 1997) (exclusion covering "fire or combustion explosion that occurs at the same time as an accident"); Pakmark Corp. v. Liberty Mutual Ins. Co., 943 S.W.2d 256 (Mo. 1997) ("flood" and "surface water" exclusions); Sunshine Motors, Inc. v. New Hampshire Ins. Co., 530 N.W.2d 120 (Mich.App. 1995) ("flood" and "surface water" exclusions); Kula v. State Farm and Casualty Co., 628 N.Y.S. 988 (1995) ("earth movement" exclusion); Front Row Theatre v. Am. Manufacturer's Mut. Ins. Co., 18 F.3d 1343 (6th Cir. 1994) ("flood" and "surface water" exclusions).

**2. Even if Southgate's Claim was "Fairly Debatable," Vermont Mutual's Grossly Inadequate Investigation of her Claim is Bad Faith, and thus Breach of Contract, *Per Se***

Rhode Island's bad faith statute provides in pertinent part that:

> An insured under any insurance contract as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith reused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages, and reasonable attorney fees.

RIGL § 9-1-33 (a).

In construing this statute and rejecting the notion that a plaintiff in a bad faith case need establish entitlement to a directed verdict on the breach-of-contract claim as a matter of law, the Rhode Island Supreme Court noted in Skaling v. Aetna Insurance Company, 799 A.2d 997 (R.I. 2002), that:

> Although we decline to abandon the fairly debatable standard and recognize that an insurer is entitled to debate a claim that is fairly debatable, we are not persuaded that an insurer is relieved of its obligations to deal with its insured consistent with its implied in law obligations of good faith and fair dealing, simply because the claim is fairly debatable. *Accordingly, an intentional failure on the part of the insurer to determine whether there is lawful basis to deny a claim, standing alone, is bad faith.* This can be established by proof that the insurer 'either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review.' Thomas v. Principal Financial Group, 556 So.2d 735, 744 (Ala. 1990) (*citing* Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala. 1981). The insurer's failure to conduct an appropriate and timely investigation may subject the insurer to bad faith liability notwithstanding the merits of the claim. Although a fairly debatable claim 'is a necessary condition to avoid liability for bad faith, it is not always a sufficient condition.' Zilisch v. State Farm Mutual Auto. Ins. Co., 196 Ariz. 234, 995 P.2d 276, 280 (2000). Rather, we are satisfied that 'the appropriate inquiry is whether there is sufficient evidence form which reasonable minds could conclude that in investigation, evaluation and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.' Id.

Id. at 1011 (emphasis added).[2] Of course, it is axiomatic that the failure to meet the above standard constitutes a breach of contract as well as bad faith. (An insurer can be guilty of breaching an insurance contract without being guilty of bad faith, but every instance of bad faith involving an insurance contract is by definition a breach of contract). And significantly, it is clear under Skaling, *supra*, that "an insurer has a responsibility to assume all the facts necessary for a fair and comprehensive investigation *before* it refuses to pay a claim and may not base a defense to bad faith on later acquired information. 'The insurance company cannot later seek to justify its denial of an insured's claim by gathering information which it should have had in the first place." 799 A.2d at 1011, *quoting* Aetna Ins. Co. v. Lavoie, 505 So.2d 1050, 1053 (Ala. 1987).

Here, the insurer, after having been informed of a claim involving rotten sub-flooring and mold "crawling up [the] walls" relied entirely upon the report of an adjuster which was bereft of any description of the extensive mold damage at the Premises and/or meaningful conclusions concerning the source or cause of the mold, an adjuster who lacked relevant expertise with respect to mold and/or its remediation, who was paid a total of $250, made only one 45-minute visit to the site, conducted only a visual inspection and who performed no objective testing of any kind. Then the insurer compounded its error by relying upon a declination letter that had been drafted by this same adjuster, who was not a lawyer, and cited the same erroneously-quoted policy language as had been quoted by the adjuster, which in fact had been deleted from the Policy.

---

[2] The court in Skaling also noted that "because punitive damages are available as a matter of right in bad faith cases, it is unnecessary to plead or prove willful or wanton conduct. When an insurance company intentionally has failed to investigate the claim sufficiently, or to subject the investigation to cognitive evaluation and review, the insurer has acted in bad faith and has opened itself up to a compensatory damage award, punitive damages and attorneys' fees." Id. at 1016.

The above undisputed facts establish that Vermont Mutual was guilty of bad faith within the meaning of Skaling, *supra*, as it: (1) "either intentionally or recklessly failed to properly investigate the claim"; and (2) failed to "subject the results of the investigation to a cognitive evaluation and review." Indeed, there were no results that Vermont Mutual could have subjected to meaningful "evaluation and review" as to the mold damage as the damage was not even discovered by the insurer's expert, who lacked the necessary expertise, and obviously no pertinent tests were conducted.

## III. CONCLUSION

For all the above reasons, Vermont Mutual's motion for summary judgment as to Count I of the Complaint should be denied.

Plaintiff,
ADRIENNE SOUTHGATE,
By her attorney,

/s/Anthony F. Cottone
Anthony F. Cottone, #3922
55 Dorrance Street
Suite 400
Providence, RI 02903
Tel: (401) 578-5696
Fax: (401) 861-2922
cottonelaw@cox.net

**Certification**

I hereby certify that a true and accurate copy of the above Memorandum was filed electronically and sent by electronic mail to John G. Hines, Esq., HINES AND CORRIGAN, INC., One James P. Murphy Highway, West Warwick, RI 02893 at HINES-CORRIGAN@CONVERSENT.NET on this 10th day of October, 2007.

/s/Anthony F. Cottone