UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ADRIENNE SOUTHGATE :

Vs. : C.A. NO. 06-500ML

VERMONT MUTUAL INSURANCE COMPANY :

**(CON'T) DEPOSITION OF JEFFREY A. GORMAN,** a Witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of HINES & CORRIGAN, INC., One James P. Murphy Highway, West Warwick, Rhode Island on Wednesday, August 22, 2007 at 11:00 a.m.

**APPEARANCES:**

**FOR THE PLAINTIFF:**
BY: Anthony F. Cottone, Esq.

**FOR THE DEFENDANT:**
HINES & CORRIGAN, INC.
BY: John Hines, Esq.

ORIGINAL

Exhibit 2

**I N D E X**

WITNESS PAGE
JEFFREY A. GORMAN

(CON'T)EXAMINATION BY MR. COTTONE................3

*(COMMENCED AT 11:00 A.M.)*

**JEFFREY A. GORMAN**

Having been first duly sworn, testified as followed:

STENOGRAPHER: Please state your name and address for the record.

THE WITNESS: Jeffrey A. Gorman, 666 Roger Williams Avenue, Rumford, Rhode Island, 02906.

**(CON'T) DIRECT EXAMINATION BY MR. COTTONE**

Q Good morning, Mr. Gorman.

A Good morning.

Q This is a continuation, as you know, of a deposition which originally commenced on May 10, 2007. And, then, when I commence the deposition, I went through some brief guidelines, and I'll just repeat some of them to you now.

If you have any questions about anything that I'm asking, please ask the question so that we can make sure you understand the questions; okay?

A I will.

MR. COTTONE: When we left off on May 10th, we were discussing a provision in the policy in this case that was issued by Vermont Mutual, and I'd ask if you could take a look at -- and I'll put it in

front you, some provisions in that policy, which is marked already as Plaintiff's Exhibit 3. No. It's Gorman's Exhibit 2. Plaintiff's Exhibit 2. The first -- and what I want you to look at is the so-called Limited Fungi, Wet or Dry Rot, or Bacteria Coverage Endorsement. I'll get that and put it in front of you.

*(Counsel handed document to the witness.)*

And the other portion I think you should look at when I ask you this question, is part of the main policy, Section I. It's Page 6 of 15. I'll put that in front of you as well.

*(Counsel handed document to the witness.)*

Okay. Now, calling your attention to Page 2 of the fungi endorsement.

THE WITNESS: Got it.

Q Okay. There is a -- it says in the middle of the page, Section I, Perils Insured Against. Do you see that?

A I do.

Q And, then, it says, Coverage A, Dwelling and Coverage B, Other Structures. Now, Paragraph 2.e.3 is deleted and replaced by the following, do you see that? Well, strike that. That's not applicable, but

do you see it?
A I do see it.
Q Following past that to Paragraph 2.e.9 is added, do you see that?
A I do.
Q All right. So I would like to go to Paragraph 2.e.9 or actually 2.e on the main body of the policy which is Page 6 of 15.
A I see that.
Q Okay. On Page 6, it says, Section I, Perils Insured Against, correct?
A Correct.
Q And just for purposes of clarity, I'll read the text of the applicable provision. It's headed Coverage A dwelling and Coverage B other structures, correct?
A Correct.
Q And, then, it provides, we insure against risk of direct loss to property described in Coverages A and B, all right, only if that loss is a physical loss to property. We do not, however, insure for loss. And then we're going to Paragraph 2?
A Yes.

Q Caused by.
A I see it.
Q And, then, we're moving to the additional because it's 2.e.9. Any of the following. Do you see e?
A I do.
Q All right. So going back to the writer, and this is the language that is relevant to my question.
A Okay.
Q Any of the following. And Paragraph 9 on the fungi endorsement provides, constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a periods of weeks, months or years, correct?
A Yes.
Q Unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all insureds and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure. Do you see that?
A I do.
Q Now, the purpose of this question. You went to examine some property damage, or you went to

examine a residence as a result of the description of some property damage at 22 Rosedale Avenue in Barrington, Rhode Island, correct?

A Correct.

Q Roughly, in September of 2006?

A Correct.

Q And I would like for you to assume, for purposes of the question, that there was in fact mold damage at the premises at 22 Rosedale Avenue; okay?

A Okay.

Q And further assume that the damage was unknown to all the insureds. Was unknown to Miss Southgate. In other words, prior to it having occurred.

A Okay.

Q All right. And further assume that it was hidden within the walls or ceilings or beneath the floors or above the ceilings of the structure that you examined; okay?

A Okay.

Q Would -- if those assumptions were true, would this policy that you have examined, that you've opined on and written about in terms of your work for Vermont Mutual, provide coverage to Miss Southgate,

the insured, as a result of the damage?
A I'm not sure.
Q Okay. And what causes you to be unsure of the answer?
A The language that you referred to adds, we'll say, an exclusion. Number 9. Constant or repeated seepage is not covered unless it was hidden. All right. I'm shortening it. But if I introduced that.
Q Okay.
A But this endorsement provides coverage for mold, rot, limited. I'll read it. Limited fungi, wet or dry rot, or bacteria.
Q Right.
A And in describing the coverages that it adds, if you go down on Page 1 to the bottom of the left side and the bottom of the right side, it talks about the coverage. And B says, the coverage described only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period. And I would go back to, we had talked about previously, surface and/or subsurface water not being covered. So, I think, that would introduce something where they would not provide

coverage, unless it was a Peril Insured Against and because surface and subsurface water is not covered, it's my opinion that it still would not be covered.

Something else you said was, assuming that the mold was hidden. But when I went there, Miss Southgate had indicated that the mold was on the surface of the walls, so I don't think it relates to this hidden issue. So there's some issues that come up just in discussing it off the top of my head.

Q Okay. Well, I want you to be a little better than off the top of your head and take as much time as you need; but you have raised two issues.

A All right, then.

Q The second issue having to do with a hidden nature of the condition.

A Yup.

Q I asked you to assume that it was hidden.

A Okay.

Q So, basically, what you're suggesting is that, if the mold damage that an insured may experience is caused by surface or subsurface water, it is not included, that it is not an insurable damage; is that your opinion?

A That's my opinion.

Q Okay. Now, what about if it was a result of condensation or humidity? Do you see where it says, the presence or condensation of humidity?
A Right.
Q Now, what if the mold damage that was, that is at issue here or hypothetically in your opinion --
A Yup.
Q -- was caused by the presence or condensation of humidity. In that situation, if one were to partialate that, of course, if it was hidden --
A I understand.
Q -- it's the insured; the other elements of it wouldn't be covered?
A I still don't think so, because it would have to be caused by a Peril Insured Against.
Q And, in your opinion, the surface or subsurface water exclusion is sufficient to cover any damage, that's mold damage, as created by condensation -- the presence of condensation or humidity; is that correct?
A Would not be covered.
Q Would not be covered. Right. How about moisture or vapor?

MR. HINES: Tony, could you phrase your whole question rather than how about you know.

MR. COTTONE: Okay.

A I think the whole paragraph would --

Q If the mold damage was caused by moisture, okay, would your -- and it was hidden to the insured and the other elements that we discussed, it was hidden within the walls or ceilings or beneath the floors and it was a result of moisture as opposed to the condensation of humidity, is it your opinion that the surface or subsurface water exclusion would result in a denial of coverage properly under this policy?

A I would say that the coverage would have to apply based on a Peril Insured Against by the policy.

Q Well, that's a general statement, but I'm looking for a, specifically a hypothetical question which is, if there was mold damage caused by moisture that was coming up from the subsurface, from beneath the floors of the structure and it was hidden and unknown to the insured, would it be covered by this endorsement?

A If that moisture was caused by Peril Insured Against is my interpretation of it.

Q Is moisture that is coming up from beneath the floors of a structure that is unknown to an insured within the perils covered by this policy?

A Yes.

Q It is?

A But I don't think surface or subsurface water is a peril insured by the policy.

Q But moisture is?

A If the moisture was caused by a Peril Insured Against by the policy.

Q That's a circular answer, if you know what I'm saying. In other words, I'm asking you a specific hypothetical, which is, that you have moisture that's coming up from the subsurface of the structure that is beneath the floor that is hidden and unknown to the insured. Is there anything about any of those hypothetical elements or facts that you don't understand?

A Where did the moisture come from in your hypothetical scenario?

Q It came from underneath the ground.

A If it was a natural-type water and it didn't come from a conduit or a plumbing component; whether it be surface or subsurface water, I would say no.

That, that was not a Peril Insured Against the policy in my opinion.

Q So your definition of surface or subsurface water is anything that is naturally occurring in the way of water?

A Yes.

Q So any naturally occurring moisture or humidity or condensation or vapor, okay, would be excluded under the surface and subsurface exclusion. It was naturally occurring condensation?

A I would say, yup.

Q You would say yes?

A Yeah, I would.

Q Now, are you the only person that inspected the premises from Vermont Mutual that you're aware of with this particular claim, 22 Rosedale?

A That I'm aware of.

Q That you're aware of?

A Yes.

Q Did you -- we have all the correspondence that you have with the company, correct? You've already produced that; is that right?

A I believe so, yes.

Q Do you recall any conversations with Vermont

Mutual about the applicability of this exclusion or the applicability of the policy?

A I don't recall any discussions.

Q Okay. So, I know you sent a letter to them?

A Yup.

Q A draft that they were then going to use, correct?

A Right.

Q And, then, they made some changes?

A Correct.

Q All right. Now, in the context with the transmittal of these letters, did you have any conversation with anybody from Vermont Mutual about the applicability of the exclusion or any other aspect of the policy?

A The claim handler was Joe Dike at Vermont Mutual. I might have had a brief discussion with him. I don't recall. But, typically, how we do it is, we'll send an Email with the letter draft. We'll make any changes to it. Send it back to us with authorization to send it out the way he reviewed it and, you know, dated it. So I don't recall any specific discussions, but I do know that we had correspondence back and forth by at least Email.

Q Okay. Do you recall the substance of any of the conversations?

A All I can recall is, I sent it out one way and it came back with a revision. It was not the same letter that I produced initially with instruction to send it out. So, at that point, when we get the okay to send it out, we close our file and the letter would go out as a redrafted.

Q I saw the two versions.

A Okay.

Q But I'm interested in, when you got the changes, the revised letter, did you follow-up with any conversation?

A If I did, it was only in a discussion where he said I'm making the changes accordingly. Send it out. I don't remember if that was verbal or through the Emails we had back and forth.

Q You have no reason to conclude that prior to her being alerted of this damage in August of 2006, that Miss Southgate had any prior awareness, do you?

A No.

Q Okay. You indicated that the reference to the fact that for the water exclusion to apply, as you read it, it has to be non-naturally occurring

water source that creates any mold, right?

A Yup.

Q And, in addition, it has to be hidden, correct?

A Correct.

Q Do you have an opinion as to whether or not this mold damage was hidden within the meaning of the endorsement?

A The rot damage I saw was beneath the carpet. There's nothing to lead me to believe that she saw it because it was beneath the carpet. She did indicate there was mold damage, but the mold damage she referred to was surface. So that on the surface of the walls and the trim and the doors and that type of thing. So, in my opinion, that was not hidden.

Q Okay. Were you aware of the fact that there was, in fact, extensive mold damage behind the walls?

A I was not.

Q You never did any testing in that regard to determine whether or not there was, in fact, any damage behind the walls or hidden anywhere in the structure, correct?

A I did not.

Q You saw evidence of mold, right?

A She pointed it out as mold. There was specs on the walls that she referred to as mold.
Q Would you agree with the assessment?
A Yeah, I would. And a lot of it had been cleaned and painted at the time I got there.
Q But you saw mold?
A There was evidence of mold.
Q There was evidence of some mold?
A Right.
Q And you didn't do any testing to determine whether or not the mold was behind the walls or in some fashion hidden?
A I did not. I would not.
Q That's not your standard practice?
A I'm not an expert in mold. I would not do that. I don't have any authority to do that.
Q How does Vermont Mutual -- well, I assume you would hire somebody to go in and take a look, right, that has the expertise, right?
A Correct.
Q So you have to make a call whether or not the conditions justify a -- or call somebody that has that ability, right?
A Correct.

Q And, in this case, you determined there wasn't sufficient -- why didn't you do it in this case?
A The company determined that they were going to issue a declaration of liability, so my instruction was to retire my file with the letter going out.
Q So the declaration would have nothing to do with whether or not the mold was hidden or not?
A Right.
Q What is your understanding of the Vermont Mutual's basis for their declaration?
A That the damage did not fall within the scope of the policy and endorsements.
Q But the aspect being that it was not naturally occurring --
A That the origin related to surface or subsurface water.
Q Okay. Nothing to do with the fact that the mold wasn't hidden, right?
A No.
Q All right. On October 5th of 2006. We've marked this already as Gorman's Plaintiff's 5. I wrote Mr. Hines, the attorney for Vermont Mutual,

enclosing three environmental estimates; okay?
A Mm-hmm.
Q Did you ever see those environmental estimates? Well, let me ask you the question first. Did you ever see those estimates before your deposition here?
A No. That's the first time I saw them.
Q You've never been back to the premises to take a second look; is that correct?
A Never have been.
Q Were you aware that a claim had been made that there was a need for remediation of a problem there?
A I was not.
Q Okay. All right. Did you meet with Mr. Hines to prepare for your deposition initially?
A The first --
Q The first part of it, which was May, whatever it was, the 10th?
A I did not. I met him at your office.
Q Do you consider that he's your attorney? Is he representing you here today?
A I do not believe he is my attorney. He's the attorney for Vermont Mutual.

Q Do you remember what the nature of your conversation was when you met with Mr. Hines? The substance of any of the conversations.
A When we met at your office. I was there first. He came after I was there already.
Q Had you talked to him prior to that?
A Only to indicate that I was to attend a deposition regarding the Southgate matter.
Q That's the only thing you guys talked about?
A Correct.
Q Okay. Now, as you know, we had a delay after May 10th. Between May 10th and today, have you talked to Mr. Hines?
A I did.
Q What did you talk about?
A He called me to tell me that the deposition transcript was sent over to my office. He asked me to look at it, make any corrections. I took a look at it. I sent it back. I don't believe there was any corrections to it. I received a subsequent call that the finalization of the deposition would take place today, and I came today.
Q You didn't talk about the policy with Mr. Hines?

A I did not talk about the policy.

Q Did you talk about the policy language or anything about the policy language that's applicable with Vermont Mutual between May 10th and today?

A No. We talked about -- I was to answer questions regarding what we didn't finalize the last time. It was pretty brief.

Q I don't understand.

A It ended when you had asked a question, and John had said don't answer.

Q Right. Right.

A But he told me to come back today and answer any questions.

Q Right. But, I mean, what I'm asking you is, did you have conversations, not with John, but with somebody from Vermont Mutual about the policy language?

A I have not talked to anybody at Vermont Mutual since we have met regarding this matter.

MR. COTTONE: All right. I have nothing further.

MR. HINES: No questions. Thank you very much.

**(DEPOSITION ADJOURNED AT 11:26 A.M.)**

C E R T I F I C A T E

I hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2007.

_______________________

LINDA FARIA

CERTIFIED SHORTHAND REPORTER

NOTARY PUBLIC

My commission expires on April 26, 2009.

I.D.#48027