UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ADRIENNE SOUTHGATE

VS. C.A. NO. 06-500ML

VERMONT MUTUAL
INSURANCE COMPANY

**DEFENDANT VERMONT MUTUAL INSURANCE COMPANY'S STATEMENT OF UNDISPUTED FACTS MADE PURSUANT TO LOCAL RULE 56 (a) IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the defendant Vermont Mutual Insurance Company (hereinafter "Vermont") and hereby files its Statement of Undisputed Facts pursuant to Local Rule 56 (a) in support of its motion for partial summary judgment.

1. The plaintiff, Adrienne Southgate was the owner of 22 Rosedale Avenue in Barrington, Rhode Island. The premises was insured by Vermont against risk of direct physical loss under policy no. HO1 2-29-69-42. (Exhibit "A" homeowners policy).

2. The premises is a one-story single family home. The house was constructed on a masonry slab. There is no basement and there is no second story. (Exhibit "B" Southgate depo. p. 9).

3. The left side of the house was originally constructed as a garage. The original garage extended beyond the back wall of the house. The right side of the house was also extended backwards. This was done when the plaintiff added an extension wing to that side of the house within which she built her bedroom. On the date of the alleged loss, the house was a double "L" with a cement patio in the middle that separated the wings on the opposite sides of the house. (Exhibit "B" Southgate depo p. 21).

4. The original portion of the house was built on a slab that was above grade. The original

garage was built on a slab that was even with the grade of the land. When the garage was converted to a family room, a wooden sub-floor was constructed on top of the slab with 2"x4"s and plywood to make it even with the finished floor of the original house. ( Exhibit "B" Southgate depo pp. 22-24).

5. The addition to the right side of the premises which contained the plaintiff's bedroom was constructed on an extension of the original masonry slab, which was above grade. The extended portion of the slab in this area was not treated with a vapor barrier to protect it from water infiltration. (Exhibit "B" Southgate depo. pp. 56-57).

6. A door from the family room exits directly onto the cement patio at grade level while a door from the plaintiff's bedroom exits directly onto the same cement patio above grade. (Exhibit "B" Southgate depo. pp. 57-58).

7. These doors are located across the cement patio from each other. (Exhibit "B" Southgate depo. p.57).

8. The family room, that was once a garage and all of the bedrooms in the house were all covered by wall-to-wall carpeting. (Exhibit "B" Southgate depo. pp. 13-16).

9. On August 31, 2006 the plaintiff was in the process of making improvements to the premises. She intended to place the house on the market for sale. (Exhibit "B" Southgate depo. p.14).

10. As part of that process she contracted with a firm to remove and replace all of the carpets in the house with the exception of one room. (Exhibit "B" Southgate depo. p. 15-16).

11. While that work was being done, the plaintiff received a telephone call from the carpet company representative who advised that "the subfloor has rotted" (Exhibit "B" Southgate depo. p. 17) and that "mold is crawling up your walls" (Exhibit "B" Southgate depo. p. 21).

12. When the plaintiff returned to the property to observe the conditions, she was able to determine that they were much less severe than originally reported. (Exhibit "B" Southgate depo. p. 18).

13. She noted that all of the carpets and the padding had been removed from all the floors in the house. (Exhibit "B" Southgate depo. p. 19).

14. There was a small area of wood rot to the sub-floor of the family room in the area adjacent to the door which exited on to the cement patio. (Exhibit "B" Southgate depo. p. 18).

15. There was a single area of spotting mold around the frame of the door which exits from the hallway off of the plaintiff's bedroom to the opposite side of that same cement patio. (Exhibit "B" Southgate depo. 21).

16. There were no other areas of mold growth or wood rot observed in the premises. (Exhibit "B" Southgate depo. pp. 21-22).

17. Before actually observing these conditions, the plaintiff reported the loss to her insurance agency in the manner described by her carpet removal company on or about September 1, 2006. (Exhibit "B" Southgate depo. pp. 39-40).

18. Vermont received notice of the claim from the plaintiff's agency and assigned licensed claim adjuster Jeffrey Gorman of the firm of Pelletier & Rourke to make an inspection. (Exhibit "C" Gorman depo. Vol. I p. 16).

19. Mr. Gorman met with the plaintiff on September 6, 2006 at the premises. (Exhibit "C" Gorman depo. Vol. I pp.15-17 and Exhibit "B" Southgate depo. p. 41).

20. Gorman was shown the entire premises by the plaintiff. All of the carpets had been removed and disposed of by the carpet installers. There were only two (2) areas of alleged property damage. There was the wood rot in the sub-floor of the family room and the spots of mold in the

door way off of the plaintiff's bedroom.(EXhibit "B" Southgate depo pp. 43-44 and Exhibit "C" Gorman depo. Vol. I pp.18-38).

21. The plaintiff denied the occurrence of any type of plumbing leaks, roof leaks or hot water tank failures. (Exhibit "B" Southgate depo. pp. 44-45).

22. Plaintiff further denied any type of incident or occurrence where large amounts of water had spilled or been released in her home. (Exhibit "B" Southgate depo. p. 53).

23. Plaintiff was asked if she ever experienced water pooling outside the dwelling after a heavy rain. She told Gorman it pooled in the front of the house, but cannot remember if she told him it pooled in the back near the cement patio. (Exhibit "B" Southgate depo. pp. 45-46).

24. The cement patio abutted the masonry slab foundation at the door where the wood rot in the family room was discovered. The cement patio extended across the backyard and abutted the masonry slab at the doorway leading to the plaintiff's bedroom where the spots of mold were discovered. (Exhibit "B" Southgate depo. pp. 46-48).

25. Based upon his discussion with the plaintiff and his visual observations of the premises, Gorman concluded that both areas of alleged property damaged were caused by surface and/or subsurface water. (Exhibit "C" Gorman depo. Vol. I p. 30-34).

26. Gorman reported his findings and conclusions to Vermont which then authorized him to issue a denial of coverage letter to the plaintiff in the form approved by Vermont. (Exhibit "C" Gorman depo. Vol. I p.44-47).

27. That denial letter was sent to the plaintiff on or about September 12, 2007. (Vermont Denial Letter attached as Exhibit "D ").

28. After the claim was denied, the plaintiff continued to look for additional items of potential loss. She sought consultation with two or three different mold testing/remediation firms.

(Exhibit "B" Southgate depo. p. 55).

29. They drilled holes in the walls of the plaintiff's bedroom to test for mold. These holes were drilled into the walls on which the spots of mold had been observed. (Exhibit "B" Southgate depo. p. 55).

30. Plaintiff chose a contractor to remove the sheetrock walls of her bedroom and spray a fungicide on mold discovered therein. (Exhibit "B" Southgate depo. pp. 63-66).

31. The plaintiff's critical inquiry during this process was to determine the cause of the mold growth in the bedroom. (Exhibit "B" Southgate depo. p. 68).

32. She asked every remediation and testing firm that visited the property if they could determine the cause of the mold. Each contractor gave her the same answer. (Exhibit "B" Southgate depo. p. 68).

33. The mold found in the bedroom area was caused by water percolating up through the masonry slab that formed the addition to the right side of the house. (Exhibit "B" Southgate depo. p. 56, 74).

34. No one was ever able to discover a plumbing leak or a roof leak in the premises. (Exhibit "B" Southgate depo. p. 68-69).

35. However, when the carpeting was removed in the plaintiff's bedroom, it was discovered that a vapor barrier had never been applied to the cement floor when the addition to the bedroom was constructed. This allowed water to percolate up through the untreated slab and thereafter become trapped within the walls. (Exhibit "B" Southgate depo. pp. 56-57, 68-69).

36. All of the plaintiff's contractors, consulted or retained, agreed that this was the cause of the mold. (Exhibit "B" Southgate depo. p. 68).

37. The unanimous opinion of the various contractors is supported by the plaintiff's own

reporting of the claim to BASH Mold & Remediation, her chosen remediator. (Exhibit "E" Brown depo. pp. 25-26) (see also BASH Questionnaire *Regarding Mold Remediation Jobs*, Exhibit "F ").

38. In her initial reporting, she advised BASH that the damage was caused by her having a "high water table". (BASH Questionnaire *Regarding Mold Remediation Jobs*, Exhibit "F").

39. Plaintiff produced Mike Brown of BASH Mold & Remediation as an 'expert witness', he stated that he was 'not positive', that he had to 'guess' and that he had failed to advise the plaintiff of this opinion previously. Nonetheless, he stated that 'maybe' rain was coming in through the side of the house. (Exhibit "E" Brown depo. pp. 35-36).

40. But he could not rule out the possibility of moisture coming up through the cement slab. (Exhibit "E" Brown depo. pp. 36, 39).

41. Brown made no effort to determine the cause of the wood rot on the subfloor of the family room. (Exhibit "E" Brown depo. p. 19).

Defendant,
By its Attorneys,

/s/ John G. Hines (0576)
/s/ Robert P. Corrigan (4233)
Hines & Corrigan, Inc.
One James P. Murphy Highway
West Warwick, RI 02893
401-821-6266
401-821-6446 (fax)

CERTIFICATION

I, the undersigned, certify that I forwarded by electronic email the within document to the following counsel fo record on the 9th day of November, 2007.

/s/ John G. Hines (0576)

Anthony F. Cottone, Esquire
55 Dorrance Street, Suite 400
Providence, RI 02903
cottonelaw@cox.net